**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **DAVID SNEED,** ) | **CASE NO.  1:04CV 588** |
| ) | |
| **Petitioner,** ) | |
| ) | **JUDGE PATRICIA A. GAUGHAN** |
| **v.** ) | |
| ) | |
| **DAVID JOHNSON, WARDEN,** ) | <u>**Memorandum of Opinion and Order**</u> |
| ) | |
| **Respondent.** ) | |

This matter is before the Court upon petitioner David Sneed's Petition for Writ of Habeas Corpus (Doc. 1).  For the following reasons, the Petition is DENIED in part and DISMISSED WITHOUT PREJUDICE in part.

**<u>Introduction</u>**

Petitioner, David Sneed, acting pursuant to 28 U.S.C. § 2254, filed a Petition for Writ of Habeas Corpus challenging his conviction and sentence of death rendered by an Ohio court.  The Respondent, David Johnson, Warden, filed a timely Return of Writ and Sneed filed a Traverse.  For the following reasons, the Petition for Writ of Habeas Corpus is denied as to the first through twelfth grounds for relief, and dismissed without prejudice as to the thirteenth ground for relief.

1

## I. Factual History

On February 1, 1985, a Stark County Grand Jury issued a two-count indictment against Sneed.  The first count charged Sneed with the crime of aggravated murder in violation of Ohio Revised Code § 2903.01 for the murder of Herbert M. Rowan.  The indictment contained the capital specification of aggravated robbery under Ohio Revised Code § 2929.04(A)(7).  The second count charged Sneed with the crime of aggravated robbery in violation of Ohio Revised Code § 2911.01 and contained a firearm specification.  Sneed entered a plea of not guilty. Initially, the trial court found Sneed incompetent to stand trial on November 1, 1985.  The trial court found Sneed was restored to competency on February 10, 1986.

The Ohio Supreme Court set out the following factual history, as adduced by the evidence presented at trial, upon considering Sneed's direct appeal of his convictions and sentence:

> On November 17, 1984, the victim, Herbert M. Rowan, a resident of Chicago, Illinois, arrived at a friend's house in Canton, Ohio, to visit for the weekend. The following day, sometime between 7:00 and 8:00 p.m., Rowan left his friend's home to go drinking. Rowan went to a bar and was observed by one witness leaving around 1:30 to 1:45 a.m. on November 19.
>
> According to the testimony of Chevette Denise Brown, a nineteen-year-old prostitute, she was standing outside Andre's Restaurant near the 300 block of DeWalt Avenue, wearing a rabbit coat, when Rowan drove by in his rented Buick automobile around 2:30 to 3:00 a.m. on November 19.  Brown stopped Rowan and asked him if he "want[ed] a date." Rowan declined the offer, circled the block and again drove down the alley at the 300 block of DeWalt Avenue. Brown again propositioned Rowan, who then circled the block a second time and again approached Brown. Appellant, who was apparently in the background near Brown, wearing a trench coat, instructed Brown to ask Rowan if he would give them a ride home. Brown complied and the two entered Rowan's car. Brown opened the front passenger door and sat down in the passenger seat, appellant got in the back, directly behind the driver.
>
> Appellant directed Brown to another destination and, en route, asked Rowan to

2

pull over, turn the car off and to "give him some money." Rowan refused, stating that he only had enough money to get to where he was going. Appellant then pulled out a gun and pointed it at Rowan's temple and told Rowan that "this * * * [is] a robbery." Upon Rowan's refusal a second time, appellant pulled the trigger, shooting the victim. Brown related that Rowan's head immediately struck the steering wheel causing the car horn to sound. In response to the prosecutor's question concerning the likelihood of this particular shooting to cause Rowan's death, the Chief Deputy Coroner and pathologist for the Stark County Coroner's Office stated: "Generally speaking, any bullet which goes in through the skull and perforates the brain or goes into the brain itself is with rare exceptions fatal, so this could have been the fatal bullet." Furthermore, Brown stated that appellant then exited the vehicle, pulled Rowan off the steering wheel and pushed him over. Brown got into the back seat and appellant drove the car to an alley by a house.

While hidden in the alley, appellant purloined Rowan's jewelry and wallet. Next, Brown testified, appellant handed the gun to her over the front seat of the car and Brown, following appellant's orders after being threatened with the gun, shot Rowan in the back of his head. Appellant then drove to another alley where Brown helped appellant place the body into the trunk of the car.

Brown stated that after the shooting they drove the car to appellant's apartment and changed clothes. Appellant removed Rowan's boots, socks and jacket while Brown cleaned the front seat with a brush, towel and bucket of water. Afterward, the two drove in the victim's car to the house of appellant's brother, Theotis Dillard. Dillard and appellant went outside where appellant opened the trunk and disclosed the body. The three then drove back to the appellant's apartment. Brown related that Dillard and the appellant cut electrical cords from lamps, obtained two cement blocks and a plastic garment bag. Dillard in his car and the appellant and Brown in the victim's car drove to the Allen Street bridge. Brown testified that she watched as appellant and Dillard tied the two cement blocks with the electrical cords to Rowan's feet. The two then tossed Rowan's weighted body off the bridge and into the creek below. The body, however, did not become hidden beneath the water in the creek; it landed on the bank and was found the next day.

On November 19, 1984, Rowan's body was discovered on the banks of Nimishillan Creek underneath the Allen Street bridge in Canton, Ohio. The corpse was partially enveloped in a plastic garment bag bearing the name "Joe Slaughter Men's Store." A cement block was tied to the ankles by an electrical cord and a piece of speaker wire later found to have been severed from Rowan's car stereo. A second electrical cord and also speaker wire were tied around the neck. Another cement block tied with an electrical cord or speaker cord lay within two feet of the body. The body was without shoes, socks or jewelry, clothed in a cowboy shirt and jeans. Two bullet holes were in the victim's head: one toward the rear of the skull, the other beside the right eye.

3

*State v. Sneed*, 584 N.E.2d 1160, 1163-64 (Ohio 1992).

## II. <u>Procedural History</u>

Represented by Jack A. Blakeslee, Sneed filed a timely direct appeal of the trial court

judgment to the Fifth District Court of Appeals setting forth twenty-eight assignments of error.

The assignments of error are as follows:

> I. Defense counsel failed to render adequate legal assistance in violation of Defendant's right to counsel under the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution, as well as due process protections under the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution.

> II. The trial court erred in refusing to suppress tangible evidence obtained from Defendant's home as a result of the flagrant, egregious infringement of his rights guaranteed under the Fourth, Fifth and Sixth Amendments to the United States Constitution, Article I, Sections 10 and 14, and applicable Ohio statutory laws.

> III. The trial court erred in refusing the defense motion for a change of venue, resulting in a denial of the Defendant's rights to a fair trial before a fair and impartial jury, as guaranteed by the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and Article I, Sections 9, 10 and 16 of the Ohio Constitution.

> IV. The State engaged in prosecutorial misconduct contrary to the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the State Constitution by expressing a personal opinion concerning Defendant's guilt during voir dire.

> V.  The trial court deprived the Defendant of a fair and impartial trial in violation of his federal and state constitutional rights by indirectly conveying to the jury that the Defendant was going to be convicted.

> VI.  The trial court erred in finding no inconsistencies in State witness Goosby's prior statement and in refusing to allow defense counsel to use such statements for purposes of cross-examination and effectively deprived Defendant of his rights to effective assistance of counsel, confrontation of witnesses and due process of law as guaranteed by the Sixth and Fourteenth Amendments to the Federal Constitution and Article I, Section 10 of the State Constitution.

> VII.  The trial court erred to the prejudice of the Defendant by refusing to allow

4

counsel to cross-examine key state witness Chevette Brown concerning thefts during acts of prostitution in violation of Evid. R. 402 and Evid. R. 608(B), thus depriving defendant of his right to effective assistance of counsel, his right to confront witnesses and his right to a fair trial as guaranteed by the Federal and State Constitutions.

VIII.  The trial court committed prejudicial error by failing to declare a mistrial or, in the alternative, give a cautionary instruction after the unfair comment by the State on Defendant's failure to testify in violation of his rights as guaranteed by the Fifth and Fourteenth Amendments of the Federal Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.

IX.  The failure of the trial court to give a special instruction to the jury on accomplices' credibility at the request of the defendant deprived him of a fair trial as guaranteed by the Constitutions of the United States and the State of Ohio.

X.  Absent a request from the State or the Defendant, the trial court is not permitted to deliver written charges and instructions to the jury in their retirement, and such practice is contrary to R.C. 2945.10(G), Crim. R. 30, and the due process clause of the Federal and State Constitutions.

XI.  The failure of the trial court to sequester the jury after the cause was submitted to them at the conclusion of the guilt phase of the Defendant's trial was prejudicial error per se and denied Defendant his right to a fair trial as guaranteed by the Federal and State Constitutions.

XII.  The failure of the trial court to sequester the jury after the cause was submitted to them at the conclusion of the guilt phase of the Defendant's trial was prejudicial error per se and rendered the recommendation of death by the jury at the conclusion of the sentencing phase nugatory.

XIII.  The Defendant may not be sentenced to death since the Defendant was frustrated in his attempt to present all mitigating factors to the jury due to destruction of important records pertaining to the Defendant by State agencies.

XIV.  The trial court committed error prejudicial to the Defendant by refusing to instruct the jury at the conclusion of the mitigation phase of the trial that they may consider the State's pretrial offer that Defendant should receive a sentence of thirty years to life should he chose [sic] to plead guilty to the crime of aggravated murder and specifications as a mitigating factor.

XV.  Statements by the court, the prosecutor and defense counsel to prospective jurors during voir dire that their verdict as to a life or death sentence is merely a recommendation misstated the law and diminished the jury's responsibility in

5

violation of the Fifth, Eighth and Fourteenth Amendments to the United States
Constitution and Article I, Sections 2, 9 and 16 and Article II, Section 26 of the
Ohio Constitution.

XVI. The non-neutrality of death qualified juries violates a capital defendant's
Sixth and Fourteenth Amendment rights to a jury that is fair and impartial and
reflects a fair cross-section of the community during the trial of guilt or
innocence.

XVII. The death penalty is and will be arbitrarily, freakishly and discriminatorily
inflicted, constituting cruel and unusual punishment and a denial of equal
protection under the Eighth and Fourteenth Amendments and Article I, Sections 9
and 16 of the State Constitution.

XVIII.  The death penalty as authorized by revised code sections 2903.01,
2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04, and 2929.05 deprives
capitally charged defendants of their lives without due process of law in violation
of the Fourteenth Amendment and Article I, Sections 9 and 16 of the State
Constitution.

XIX.  Ohio Revised Code Section 2929.03 and Section 2929.04 are overbroad
and violate the Equal Protection Clauses of the Fourteenth Amendment and
Article I, Section 2 of the Ohio Constitution by according disparate treatment.

XX.  Use of the same felony twice to elevate an offense to aggravated murder and
again to elevate it to capital aggravated murder fails to narrow the class of
offenders eligible for the death penalty.

XXI. The vagueness of Sections 2929.03(D)(1), (2) and (3) and (F) and 2929.05
relating to weighing of aggravating and mitigating circumstances leads to
arbitrary impositions of the death penalty because the statute, although requiring a
weighing process to occur, articulates no weighing method to be employed by the
sentencer.

XXII.  Sections 2929.021, 2929.03, and 2929.05 fail to assure adequate appellate
analysis of excessiveness and disproportionality of death sentences.

XXIII.  Bifurcated trials violate the Sixth, Eighth and Fourteenth Amendments to
the United States Constitution and Article I, Sections 10 and 16 of the State
Constitution.

XXIV.  Sections 2929.02, 2929.022, 2929.03, 2929.04 and 2929.05 deprive the
capitally charged defendant of due process and constitute cruel and unusual
punishment under the United States and Ohio Constitutions because these

provisions permit imposition of the death penalty on a less than adequate showing of guilt and appropriateness of the death penalty.

XXV.  Ohio's death penalty statutes are unconstitutional per se and are violative of one's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10 and 16 Article I of the State Constitution.

XXVI.  The trial court erred instructing the jury in the penalty phase that even if it finds mitigating circumstances, it still may recommend death, thus violating the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 9 and 16 of the Ohio Constitution.

XXVII.  The accused in a capital case is encouraged to waive fundamental state and federal rights, thus rendering the state capital sentencing scheme unconstitutional under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the State Constitution.

XXVIII.  The failure of the trial court to engage in individual sequestered voir dire of the jury prior to the sentencing phase of Defendant's trial and its failure to even specifically inquire into the juror's ability to consider evidence in mitigation violated the Sixth, Eighth and Fourteenth Amendments to the Federal Constitution and Article I, Sections 9, 10 and 16 of the Ohio Constitution.

(Doc. 45, at 87-92.)

The appellate court affirmed the trial court's judgment, overruling petitioner's

assignments of error.  *State v. Sneed*, No. CA-6976, 1989 WL 63272 (Ohio Ct. App. May 22,

1989).  Sneed, represented by Ronald Mark Caldwell, appealed to the Ohio Supreme Court,

raising thirty-two propositions of law as follows:

1. A capital defendant is constitutionally entitled to suppression of evidence obtained from a warrantless search of his private residence absent a showing of exigent circumstances or valid consent.

2. Failure of a trial court in a capital case to allow the defendant to use the grand jury testimony of a state witness for impeachment on a crucial issue deprives defendant of a fair trial.

3. When the death penalty is sought for an aggravated murder and an indicted co-conspirator is spared the death penalty by a negotiated plea agreeing to testify

7

against the capital defendant, refusal to give a special instruction on accomplice credibility is error and deprives a capital defendant of a fair trial.

4. Imposition of the death penalty is precluded where a capital defendant is charged with a violation of R.C. 2903.01(B) (Felony-murder) and is not found by the fact finder to be the principal offender.

5. A defendant accused of a capital crime is entitled to a mandatory sequestration of the jury during the guilt phase of his trial.

6. The trial court is required to give a full and correct statement of the charges against a capital defendant.  It is plain error to charge the jury upon a gun specification not charged in the indictment.

7. A trial court that delivers written instructions to the jury in a capital case to be used during deliberations which do not adequately state the law and the charges deprives a capital defendant of a fair trial.

8. A capital defendant is denied the effective assistance of counsel when his trial counsel fails to raise a viable insanity defense and fails to object to inclusion of a firearm specification not charged in the indictment.

9. A capital conviction must be reversed when a prosecutor engages in misconduct which deprives the defendant of a fair trial in violation of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the State Constitution.

10. The trial court committed error prejudicial to the defendant by refusing to instruct the jury in the mitigation phase of the trial that the State's pre-trial offer to defendant of a negotiated life sentence and subsequent acceptance by defendant is a mitigating factor.

11. A capital defendant suffers substantial prejudice in the penalty phase of his trial when he is unable to offer mitigating factors relating to his youth because of destruction of those records by a State agency.

12. Death is excessive and disproportionate to the penalty imposed against accomplice Chevette Brown.

13. A death sentence must be set aside if the sentencing court weighs non-statutory aggravating circumstances against mitigating factors.

14. The court of appeals erred in finding that the trial court properly weighed the aggravating circumstance of aggravated robbery and the mitigating factors.

8

15. The court of appeals erred in finding that the aggravating circumstance outweighed the mitigating circumstances beyond a reasonable doubt.

16. The death sentence imposed in appellant Sneed's case is inappropriate and violates the Fifth, Eighth and Fourteenth Amendments to the United States Constitution and Section 9 and 16, Article I of the Ohio Constitution.

17. The court of appeals erred in finding that death was appropriate and proportionate to the penalty imposed in similar cases.

18. Statements by the court, the prosecutor and defense counsel to prospective jurors during voir dire that their verdict as to a life or death sentence is merely a recommendation misstated the law and diminished the jury's responsibility in violation of the Fifth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 2, 9, 16 and Article II, Section 26 of the Ohio Constitution.

19. The non-neutrality of death qualified juries violates a capital defendant's Sixth and Fourteenth Amendment rights to a jury that is fair and impartial and reflects a fair cross-section of the community during the trial of guilt or innocence.

20. The death penalty is and will be arbitrarily, freakishly and discriminatorily inflicted, constituting cruel and unusual punishment and a denial of equal protection under the Eighth and Fourteenth Amendments and Article I, Sections 9 and 16 of the State Constitution.

21. The death penalty as authorized by revised code sections 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04 and 2929.05 deprives capitally charged defendants of their lives without due process of law in violation of the Fourteenth Amendment and Article I, Sections 9 and 16 of the State Constitution.

22. Ohio Revised Code Section 2929.03 and 2929.04 are overbroad and violate the Equal Protection Clauses of the Fourteenth Amendment and Article I, section 2 of the Ohio Constitution by according disparate treatment.

23. Use of the same felony twice to elevate an offense to aggravated murder and again to elevate it to capital aggravated murder fails to narrow the class of offenders eligible for the death penalty.

24. The vagueness of sections 2929.03(D)(1)(2) and (3) and (F) and 2929.05 relating to weighing of aggravating and mitigating circumstances lead to arbitrary impositions of the death penalty because the statute, although requiring a weighing process to occur, articulates no weighing method to be employed by the

9

sentencer.

25. Sections 2929.021, 2929.03 and 2929.05 fail to assure adequate appellate analysis of excessiveness and disproportionality of death sentences.

26. A bifurcated trial violates the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the State Constitution.

27. Sections 2929.02, 2929.022, 2929.03, 2929.04 and 2929.05 deprive the capitally charged defendant of due process and constitute cruel and unusual punishment under the United States and Ohio Constitutions because these provisions permit imposition of the death penalty on a less than adequate showing of guilt and appropriateness of the death penalty.

28. Ohio's death penalty statutes are unconstitutional per se and are violative of one's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10 and 16, Article I of the State Constitution.

29. The trial court erred instructing the jury in the penalty phase that even if it finds mitigating circumstances, it still may recommend death, thus violating the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 9 and 16 of the Ohio Constitution.

30. The accused in a capital case is encouraged to waive fundamental state and federal rights, thus rendering the state capital sentencing scheme unconstitutional under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the State Constitution.

31. The failure of the trial court to engage in individual sequestered voir dire of the jury prior to the sentencing phase of the defendant's trial and its failure to even specifically inquire into the juror's ability to consider evidence in mitigation violated the Sixth, Eighth and Fourteenth Amendments to the Federal Constitution and Article I, Sections 9, 10 and 16 of the Ohio Constitution.

32. To inform a jury during a capital trial that it may not be influenced by any consideration of sympathy violates the Eighth and Fourteenth Amendments to the United States Constitution and Sections 9 and 16, Article I of the Ohio Constitution.

(Doc. 46, at 204-213.)   The Ohio Supreme Court affirmed Sneed's conviction and sentence of

death. *State v. Sneed*, 584 N.E.2d 1160 (Ohio 1992).  Sneed thereafter filed a petition for a writ

of certiorari with the United States Supreme Court.  He raised the following two issues:

>    1. Did the Ohio Supreme Court violate the Eighth Amendment and *Zant v. Stephens* 462 U.S. 862 (1983), by holding that the jury verdict on the aggravating circumstances in Petitioner's case sufficiently narrowed the class of offenders eligible for the death penalty under Ohio law and thus justified a sentence of death for the petitioner?
>
>    2. Whether a state reviewing court, in a weighing state, must consider the life sentence received by a co-defendant in determining the appropriateness and proportionality of a defendant's sentence of death?

(Doc. 48, at 12.)  The United States Supreme Court denied the petition.  *Sneed v. Ohio*, 507 U.S. 983 (1993).

Sneed filed a petition for post-conviction relief on December 13, 1993.  He amended this petition on February 25, 1994, raising 112 total claims for relief as follows:

>    1. Defense counsel failed to enter an insanity defense when it was appropriate.
>
>    2. Evidence obtained through a warrantless search should have been suppressed.
>
>    3. The trial court's denial of a change of venue resulted in a violation of the petitioner's constitutional rights.
>
>    4. Petitioner was prejudiced because the trial court did not allow petitioner to use the grand jury testimony of a state witness for impeachment on a crucial issue.
>
>    5. When the death penalty is sought for an aggravated murder and an indicted co-conspirator is spared the death penalty by a negotiated plea agreement to testify against the capitally charged defendant, a refusal to give a special instruction on accomplice liability is an error.
>
>    6. Petitioner is constitutionally entitled to a mandatory sequestration of the jury during the guilt phase of the trial.
>
>    7. The trial court failed to give the full and correct statement of the charges.
>
>    8. The written instructions to the jury did not adequately state the law and the charges filed against the petitioner.
>
>    9. The prosecution's actions inappropriately and unconstitutionally influenced the

11

jury.

10. The court's refusal to instruct the jury in the mitigation phase of the trial that the state's pre-trial offer to the petitioner of a negotiated life sentence and subsequent acceptance by the petitioner was a mitigating factor.

11. The sentence of death is excessive and disproportionate to the penalty imposed on the co-defendant.

12. Petitioner was being medicated by the state during the time in which his competency to stand trial was assessed.

13. Due to the medication, petitioner was unable to aid his attorneys in their preparation and investigation.

14. A competency hearing was not conducted to determine petitioner's competency to proceed with the mitigation phase of his capital trial when petitioner attempted to prevent his attorneys from introducing mitigating evidence.

15. Trial counsel was deficient in failing to allege and move for a competency hearing prior to the mitigation phase of trial.

16. Ohio's capital punishment statute encourages pleas rather than innocent citizens wrongfully accused of crimes from attempting to clear their names.

17. Petitioner's conviction was based upon hypnotically refreshed testimony, in which reliability was never tested.

18. The statute under which Petitioner was sentenced to death allows the commission of some other felony to act as both an element of the death-eligible offense of aggravated murder and as an aggravating circumstance.  This fails to narrow the class of death-eligible offenses.

19. Ohio's capital punishment statutes are unconstitutional on their face and as applied to Petitioner because they result in an improper deprivation of the right to life, which is a fundamental liberty interest.

20. Ohio's capital punishment statutes create a mandatory presumption in favor of death.

21. Ohio's capital punishment statutes require imposition of the death penalty if the aggravating circumstances outweigh the mitigating factors by even the slightest amount.

22. Ohio's capital punishment statutes improperly shift the burden of production upon defendants to establish the existence of mitigating factors.

23. Ohio's capital punishment statutes are unconstitutional on their face in regards to petitioner because the decision whether to capitally indict a defendant is left in the discretion of the prosecutor.

24. Ohio's death penalty is in violation of international laws.

25. The state appellate courts' consideration of death sentences were narrowed to consideration of only those cases where death was imposed rather than sought and rejected.

26. Ohio's capital punishment statutes charge appellate courts with performing a de novo review of death sentences, but improperly restrict mitigating factors to those presented at trial.

27. There was insufficient admissible evidence to conclude that Petitioner committed the crime of aggravated murder or either of the specifications attached to both counts of the indictment.

28. The guilty verdicts were against the manifest weight of evidence.

29. The trial court overruled Petitioner's motions when there was insufficient evidence to support his convictions.

30. The prosecutor made improper statements to prospective jurors during voir dire.

31. The trial court improperly excluded jurors who expressed hesitation or opposition to the death penalty.

32. The trial court failed to excuse individuals who indicated that they could not give Petitioner a fair hearing.

33. The trial court failed to keep a complete record of the proceedings.

34. The trial court refused to instruct the jury on a lesser offense when the evidence warranted such instruction.

35. Ohio's reviewing courts failed to review the proportionality of Petitioner's death sentence.

36. The Ohio death penalty scheme violates the United States and Ohio

13

Constitutions.

37. The execution of Petitioner while seeking review would be cruel and unusual punishment.

38. The community had access to media, newspaper, radio, and television coverage, thus prejudicing the jury.

39. The grand jury was improperly constituted.

40. Ohio's mandatory scheme prohibits the sentencer from deciding whether or not death was an appropriate punishment.

41. The grand jury proceedings were not recorded.

42. The defense counsel did not request nor did the trial court appoint a social worker to assist counsel in identifying, interviewing and preparing witnesses for the mitigation phase of trial.

43. The State failed to establish beyond a reasonable doubt that any constitutional error that occurred during trial did not contribute to the convictions and sentences of the Petitioner.

44. The State failed to disclose that the gun it claims was used to kill Herbert Rowan had been purchased by another person.

45. The State failed to provide relevant discovery information which was generated by the Division of the Police during the course of their investigation of actions allegedly committed by the Petitioner.

46. The State of Ohio failed to provide counsel with all information in possession and control of the Division of the Police.

47. Petitioner was denied a fair and impartial review of his death sentence.

48. The State failed to prove that the aggravating circumstances outweighed the mitigating factors.

49. The trial court charged the jury with mitigating factors that were not presented by the defense, thus the jury considered the absence of statutory mitigating factors as an aggravating circumstance.

50. R.C. 2929.03(D)(1) is unconstitutional.

14

51. Counsel did not receive timely or full discovery prior to trial.

52. Trial counsel failed to conduct an adequate mitigation investigation.

53. Theotis Dillard and Richard Dillard were not charged with or indicted for being an aider and abettor in the killing, or with any other criminal acts regarding the killing.

54. Relevant and available mitigating evidence was not introduced at trial.

55. Defense counsel did not request an independent expert pathologist who could have contested prosecution witnesses.

56. The trial court did not give the jury a unanimity charge as to the death penalty specification.

57. Potential jurors were informed during voir dire that the jury must convict Petitioner of the death penalty specifications in order to reach the capital sentencing phase.

58. The State of Ohio failed to state the reasons for exercising its peremptory challenges.

59. The instructions to the jury shifted the burden of proof on this issue of punishment and prevented the jury from making its finding of the appropriateness of the death penalty.

60. The jury was instructed that it could consider any factors that are relevant to whether the defendant should be sentenced to death.

61. The State used its peremptory challenges to eliminate prospective jurors who had doubts about the death penalty.

62. The trial court failed to instruct the jury in the sentencing phase that Petitioner enjoyed a presumption of life and the right to live.

63. The trial court failed to adequately define the term outweigh in its sentencing instructions.

64. The State of Ohio introduced cumulative photographs of the crime scene.

65. The trial court instructed the jury in the mitigation phase that a life verdict must be unanimous.

66. The jury was instructed that they must not be influenced in deliberations by any consideration of sympathy or prejudice.

67. The trial court failed to inform the jury about the correct burden of proof.

68. The State of Ohio violated Petitioner's rights by denying access and by failing to disclose to trial counsel information material to the guilt phase of the proceedings.

69. The State of Ohio violated Petitioner's rights by denying access and by failing to disclose to trial counsel information material to the mitigation phase.

70. The trial court's opinion included constitutional error.

71. The trial court did not order a second special venire when the first venire was exhausted.

72. The jury instruction provided by the trial court concerning aider and abettor liability extended liability for aggravated murder in an impermissible and unconstitutional manner.

73. Petitioner was denied his right to the assistance of experts in preparing and presenting his defense.

74. The court failed to appoint a non-attorney expert to assist counsel in jury selection.

75. Petitioner should have undergone an examination and investigation.

76. Trial counsel was unwilling or unable to interview the majority of the witnesses prior to trial.

77. The trial court instructed the jury that a life verdict must be unanimous.

78. The special venire was an unrepresentative sample of the population of Stark County.

79. The police engaged in misconduct in the investigation and presentation.

80. The State of Ohio exercised its peremptory challenges in a discriminatory manner.

81. The trial court in the mitigation charge referred to the fact that the jury was to consider multiple specifications.

82. Petitioner was not present for the jury view.

83. The definition of beyond reasonable doubt was used in the guilt phase instructions.

84. Law enforcement and prosecutors pressured numerous witnesses to obtain their testimony.

85. The trial court made it appear as if there was more than one death penalty specification.

86. The trial court admitted inadmissible hearsay.

87. The trial court in its penalty phase charge informed the jury that a death verdict was only a recommendation.

88. Petitioner was not present for crucial phases of the trial.

89. The trial court considered invalid specifications in sentencing Petitioner to death.

90. Petitioner was denied the right to assistance of experts in preparing and presenting his defense.

91. The State of Ohio used unreliable and/or false testimony.

92. The trial court instructed the jury that it could infer from the fact that Petitioner used a deadly weapon that he specifically intended to cause the death of the victim.

93. The State of Ohio adduced testimony that witnesses were afraid of Petitioner.

94. The trial court failed to follow procedures in responding to questions from the jury.

95. Residual doubt existed about Petitioner's guilt, therefore making the death sentence inappropriate.

96. The testimony of an accomplice was given the same weight as other witnesses.

97. The State improperly obtained blood and saliva samples.

98. The definition of circumstantial evidence was improperly given to the jury.

17

99. The penalty phase instructions created a mandatory presumption in favor of the death sentence.

100. Defense counsel did not request an independent expert on firearms.

101. Defense counsel did not request a criminal investigator who could assist the defense.

102. Defense counsel did not request an independent expert on blood identification.

103. Defense counsel did not request an independent expert on shoe print identification.

104. Defense counsel did not request an independent criminalist.

105. Defense counsel did not request an expert on cross-cultural issues to assist counsel.

106. Racism deprived Petitioner of his right to a fair trial and sentencing proceeding.

107. Effective assistance of counsel was not given during the voir dire phase.

108. Petitioner did not receive effective assistance of counsel within the meaning of the Sixth Amendment during his culpability trial.

109. Petitioner did not receive effective assistance of counsel during the penalty phase of his trial.

110. The weapon specification (O.R.C. § 2929.71) and death penalty specification (O.R.C. § 2929.04(A)(7)) were simultaneously tried.

111. Petitioner's trial counsel were deficient in failing to pursue a plea agreement that would have spared Petitioner's life.

112. Defense counsel did not request an expert on fingerprints.

(Doc. 30, at 9-16.)  The post-conviction court granted the State's motion for summary judgment

on September 28, 1999.  *State v. Sneed*, No. 1993 CV 02093, slip op., (Ohio Ct. Common Pleas

Sept. 28, 1999); (Doc. 49, at 441).

18

Sneed appealed the trial court's decision to the Fifth District Court of Appeals.  On January 21, 2000, he filed a brief containing the following five assignments of error:

> 1. The trial court erred in denying appellant any opportunity to conduct discovery of facts and evidence necessary to justify his opposition to summary dismissal, or to develop and support his claims for relief once State misconduct became apparent, thus violating his right under the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 2, 9, 10, 16 and 20 of the Ohio Constitution.

> 2. The trial court erred in granting appellee's summary judgment motion.

> 3. The trial court erred when it denied Sneed an evidentiary hearing on his petition for post conviction relief, thus violating his rights under the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 1, 2, 9, 10, 16 and 20 of the Ohio Constitution.

> 4. The trial court erred in its application of the doctrine of res judicata to appellant's claims for relief, thus violating his rights under the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 1, 2, 5, 9, 10, 16 and 20 of the Ohio Constitution.

> 5. The trial court erred in denying the merits of appellant's post-conviction petition.

(Doc. 50, at 63.)  The Court of Appeals affirmed the post-conviction court's decision.  *State v*. *Sneed*, No. 1999 CA 339, 2000 WL 1476140 (Ohio Ct. App. Sept. 29, 2000); Doc. 50, at 435.

Sneed appealed the Fifth District's decision, raising the following five claims to the Ohio Supreme Court in support of jurisdiction:

> 1. The trial court's failure to provide a capital post-conviction petitioner any opportunity to conduct discovery of facts and evidence necessary to justify his opposition to summary dismissal, or to develop and support his claims for relief once State misconduct became apparent, violates his rights under the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution, and Article I, Sections 1, 2, 9, 10, 16, and 20 of the Ohio Constitution.

> 2. When a trial court grants the State's motion for summary judgment despite the existence of genuine issues as to material facts, such a ruling violates the petitioner's rights under the Fifth, Sixth, Eighth, Ninth, and Fourteenth

19

Amendments to the United States Constitution, and Article I, Sections 1, 2, 9, 10, 16, and 20 of the Ohio Constitution.

3. The trial court's denial of an evidentiary hearing to a post-conviction petitioner when his petition is sufficient on its face to raise constitutional claims which depend upon factual allegations which cannot be determined from the record, deprives the petitioner of rights under the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution, and Article I, Sections 1, 2, 9, 10, 16, and 20 of the Ohio Constitution.

4. A trial court's improper use of the doctrine of res judicata to bar a post-conviction petitioner's claims for relief violates the petitioner's rights under the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution, and Article I, Sections 1, 2, 9, 10, 16, and 20 of the Ohio Constitution.

5. The trial court may not deny a post-conviction petitioner's petition to vacate or set aside a sentence filed pursuant to Ohio Revised Code § 2953.21 when each of the one hundred twelve claims for relief set forth constitutional violations upon which relief should be granted.

(Doc. 51, at 7.)  The Ohio Supreme Court declined to exercise jurisdiction on February 7, 2001.

*State v. Sneed*, 741 N.E.2d 893 (Ohio 2001)(Table).

After exhausting his post-conviction appeals, Sneed filed an application to reopen his direct appeal pursuant to Ohio Rule of Appellate Procedure 26(B).[1]  In that brief, he asserted that

_____

[1]    An application to reopen, also known as a *Murnahan* application, permits a convicted criminal defendant to assert that he received ineffective assistance of counsel during his or her first appeal as of right.  The Ohio Supreme Court invited the state legislature to promulgate rules to establish this proceeding in *State v. Murnahan*, 584 N.E.2d 1204 (Ohio 1992).  Thereafter, the Ohio legislature created Rule of Appellate Procedure 26(B), which reads in pertinent part:
> (1) A defendant in a criminal case may apply for reopening of the appeal from the judgment of conviction and sentence, based on a claim of ineffective assistance of appellate counsel.  An application for reopening shall be filed in the court of appeals where the appeal was decided within ninety days from journalization of the appellate judgment unless the applicant shows good cause for filing at a later time.

20

his appellate counsel were ineffective for failing to raise the following twenty-four (24)

assignments of error:

> 1. The trial court's refusal to permit Sneed to use the grand jury testimony of a prosecution witness for impeachment purposes deprived him of his rights to a fair trial.

> 2. Sneed's aggravated murder conviction is invalid because the jury never made the finding that he was the principle offender or that the murder was committed with prior calculation and design.

> 3. Prosecutorial misconduct deprived Sneed of his right to a fair trial.

> 4. Sneed's death sentence is excessive and disproportionate to the penalty imposed on co-defendant.

> 5. The State involuntarily medicated Sneed to secure his competency to stand trial.

> 6. Sneed's convictions were based upon refreshed testimony.

> 7. The Ohio death penalty violates international law.

> 8. Limited appellate review deprived Sneed of his rights.

> 9. Sneed was deprived of his rights since there was insufficient admissible evidence to conclude that he committed a crime.

> 10. Trial court errors deprived Sneed of his rights.

> 11. Improper and incomplete guilt phase instructions deprived Sneed of his rights.

> 12. Pretrial publicity deprived Sneed of his right to a fair trial.

> 13. Grand jury errors deprived Sneed of his rights.

> 14. The denial of independent experts deprived Sneed of his rights.

> 15. The State improperly withheld evidence favorable to Sneed on the issues of guilt and punishment.

---

Ohio R. App. P. 26(B).

16. Improper and incomplete penalty phase instructions deprived Sneed of his rights.

17. R.C. § 2929.03(D)(1) is unconstitutional in that it does not require an examination and investigation of every defendant facing the death penalty.

18. Sneed did not receive the effective assistance of counsel during the penalty phase of his capital trial.

19. The State exercised its peremptory challenges in a discriminatory manner.

20. The State improperly introduced photographs of the crime scene.

21. Sneed did not receive the effective assistance of counsel during the culpability phase of his capital trial.

22. Sneed's venire was an unrepresentative sample of the population.

23. Sneed was not present for crucial phases of his trial.

24. Racism deprived Sneed of his right to a fair trial and sentencing determination.

(Doc. 47, at 2.)  The Fifth District Court of Appeals denied the application on January 14, 2002.

*Id.* at 292.  Sneed appealed the Fifth District's decision, but the Ohio Supreme Court affirmed it

on September 25, 2002.  *State v. Sneed*, 774 N.E.2d 1216 (Ohio 2002).

## III. Habeas Proceeding

Sneed initially filed a Petition for habeas corpus relief pursuant to 28 U.S.C. § 2254 on

February 6, 2002.  *Sneed v. Johnson*, No. 02 CV 230.  (Doc. 1.)  After Sneed moved the Court

for the appointment of counsel, the Court granted the motion and appointed Alan C. Rossman

and Kevin M. Cafferkey to represent him.  (Doc. 9.)  After the parties fully briefed the issues,

Sneed filed a Motion to Stay the Case and Hold it in Abeyance.  (Doc. 67.)  Because the United

States Supreme Court had just issued its opinion in *Atkins v. Virginia*, 536 U.S. 304 (2002), in

which the Court held that it was unconstitutional to execute a mentally retarded individual,

22

Sneed sought to return to state court to exhaust a claim that he was mentally retarded and therefore ineligible for execution.  On September 19, 2002, the Court denied Sneed's motion to stay the case and instead dismissed it without prejudice.  (Doc. 77.)

Sneed moved to reopen the case on February 5, 2004.  The Court denied the motion, holding that because the Court previously had dismissed the case, Sneed was required to re-file his Petition.  *Id.* at 93.  On March 25, 2004, Sneed re-filed his habeas Petition.[2]  Sneed moved the Court to incorporate the pleadings from the prior case into the new one.  *Sneed v. Johnson*, No. 04 CV 588, at Doc. 4.  The Court granted the motion.

Sneed thereafter filed several motions. The Court denied Sneed's motion for experts, for an evidentiary hearing, and to expand the record pursuant to Habeas Rule 7.  The Court granted Sneed's motion to expand the record pursuant to Habeas Rule 5. (Doc.  28.)

## IV.  Petitioner's Grounds for Relief

Sneed asserts thirteen (13) claims for relief.  The claims are as follows:

1. The fairness of Petitioner's trial and the reliability of his convictions and death sentence were undermined by the absence of exculpatory and impeachment evidence that the prosecution failed to disclose.  In the alternative, defense counsel were ineffective for failing to discover the exculpatory and impeachment evidence.

2. Petitioner's conviction and death sentence were constitutionally corrupted by the state's reliance on hypnotically refreshed testimony from an alleged eyewitness.

3. Prosecutorial misconduct violated Petitioner's constitutional rights and undermined the reliability of his conviction and death sentence.

---

[2]    Although this Court was assigned the case, the matter was given a new case number; 04 CV 588.

23

4. Petitioner's mental disease or defect rendered him incompetent to stand trial, unable to participate in his defense, and, as aggravated by counsel's ineffectiveness, caused him to reject a plea bargain by which he could have avoided a death sentence in exchange for a life sentence.

5. Multiple errors in the jury instructions at both phases of Petitioner's trial violated his constitutional rights to a fair trial, effective assistance of counsel, and to be free from an arbitrary and capricious death sentence.  These errors were compounded by discrete constitutional violations related to improper verdict forms, and the trial court's violation of its own sequestration order.

6. Petitioner's trial counsel prejudiced Petitioner by failing to provide objectively reasonable effective assistance of counsel at either phase of his capital trial, and the trial court failed in its duty to ensure that Petitioner received a fair trial and that his counsel functioned as the type of advocates necessary to ensure a reliable conviction and/or death sentence in violation of Petitioner's constitutional rights.

7. Petitioner's constitutional rights were violated by an improperly empaneled jury, which included some individuals who were automatic death penalty jurors and others who, but for the trial court's unconstitutional denial of valid "cause" objections and defense counsel's failure to ask for removal by cause, would have been excused had Petitioner not exhausted his peremptory challenges.

8. Trial court errors violated Petitioner's constitutional rights and ruined any chance for a reliable outcome at either phase of Petitioner's trial.  As a result, Respondent forfeited a valid finality interest in Petitioner's conviction and death sentence.

9. Petitioner's appellate counsel violated his right to effective assistance of appellate counsel by failing to raise obvious errors, which if raised, would have rendered his conviction and death sentence unreliable.  These constitutional violations rendered Petitioner's conviction and death sentence unreliable.

10. Petitioner's death sentence is constitutionally infirm because Ohio's capital punishment system on its face as codified, as construed by Ohio's courts, and as applied to Petitioner operates in an arbitrary, capricious and discriminatory manner in violation of the United States Constitution.

11. The cumulative effect of the errors and omissions presented in this habeas petition constitute constitutional violations which merit relief.

12. Sufficiency and weight of the evidence at mitigation; due process violations.

13. Petitioner Sneed's execution will violate the Eighth and Fourteenth

Amendments because he will be unable to rationally understand the connection between his acts and the punishment to be inflicted.

## V. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which amended 28 U.S.C. § 2254, was signed into law on April 24, 1996.  In *Lindh v. Murphy*, 521 U.S. 320, 336 (1997), the United States Supreme Court held that the provisions of the AEDPA apply to habeas corpus petitions filed after that effective date.  *See also Woodford v. Garceau*, 538 U.S. 202, 210 (2003); *Barker v. Yukins*, 199 F.3d 867, 871 (6th Cir. 1999)("It is now well settled that AEDPA applies to all habeas petitions filed on or after its April 24, 1996 effective date.").  Because Sneed's Petition was filed on March 25, 2004, the AEDPA governs this Court's consideration of his Petition.[3]

The AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases, and 'to further the principles of comity, finality, and federalism.'" *Woodford*, 538 U.S. at 206 (citing *Williams v. Taylor*, 529 U.S. 362, 436 (2000)). In advancing such goals, Section 2254(d) places new constraints on "the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." *Williams*, 529 U.S. at 412.  Section 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --

---

[3]  Even Sneed's initial Petition, filed prior to the Court's dismissal of his initial action was filed on February 6, 2002, nearly six years after the AEDPA's effective date.

25

(1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

With respect to Section 2254(d)(1), "clearly established federal law" refers to the holdings, as opposed to dicta, of the United States Supreme Court's decisions as of the time of the relevant state-court decision.  *Williams*, 529 U.S. at 412; *Barnes v. Elo*, 231 F.3d 1025, 1028 (6th Cir. 2000).[4]  The "contrary to" and "unreasonable application" clauses of the Section 2254(d)(1) are independent tests and must be analyzed separately.  *Williams,* 529 U.S. at 412-13; *Hill*, 337 F.3d at 711.   A state court decision is "contrary to" federal law only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  *Williams*, 529 U.S. at 412-13.

Even if the state court identifies the "correct governing legal principle," a federal habeas court may still grant the Petition if the state court makes an "unreasonable application" of "that principle to the facts of the particular state prisoner's case."  *Williams*, 529 U.S. at 413.  A state-court decision also involves an unreasonable application if it unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or

_____

[4]        Although only Supreme Court case law is relevant under the AEDPA in examining what federal law is "clearly established," Circuit Courts of Appeals' decisions "may be informative to the extent [they] have already reviewed and interpreted the relevant Supreme Court case law to determine whether a legal principle or right had been clearly established by the Supreme Court."  *Hill v. Hofbauer*, 337 F.3d 706, 716 (6th Cir. 2003).

unreasonably refuses to extend that principle to a new context where it should apply.  *Id.* at 407; *Hill*, 337 F.3d at 711.   For a state court's application of clearly established federal law to be unreasonable, the state court's decision must be more than incorrect or erroneous; rather, it must be objectively unreasonable.  *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003); *Williams*, 529 U.S. at 411; *Simpson v. Jones*, 238 F.3d 399, 405 (6th Cir. 2000).  The reasonableness of the application of a particular legal principle depends in part on the specificity of the relevant rule. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).  While the application of specific rules may be plainly correct or incorrect, courts may have more leeway in reasonably applying more general rules in the context of a particular case.  *Id.*

As to the "unreasonable determination of the facts" clause in Section 2254(d)(2), the Supreme Court applied that section of 2254(d)(2) in *Wiggins v. Smith*, 539 U.S. 510 (2003).  In that case, the Court noted a "clear factual error" such as making factual findings regarding the contents of social service records contrary to "clear and convincing evidence" presented by the defendant constitutes an "unreasonable determination of the facts in light of the evidence presented."  *Id.* at 528-29.  In other words, a state court's determination of facts is unreasonable if its findings conflict with clear and convincing evidence to the contrary.  This analysis mirrors the "presumption of correctness" afforded factual determinations made by a state court which can only be overcome by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Mason v. Mitchell*, 325 F.3d 732, 737-38 (6th Cir. 2003); *Clark v. O'Dea*, 257 F.3d 498, 506 (6th Cir. 2001)("regardless of whether we would reach a different conclusion were we reviewing the case de novo, the findings of the state court must be upheld unless there is clear and convincing evidence to the contrary").  This presumption only applies to basic, primary facts,

27

and not to mixed questions of law and fact.

By its express terms, however, Section 2254(d)'s constrained standard of review only applies to claims adjudicated on the merits in the state court proceeding. *Clinkscale v. Carter*, 375 F.3d 430, 436 (6th Cir. 2004). When a state court does not assess the merits of a petitioner's habeas claim, the deference due under the AEDPA does not apply. *Id.*; *Newton v. Million*, 349 F.3d 873, 878 (6th Cir. 2003); *Maples v. Stegall*, 340 F.3d 433, 436-37 (6th Cir. 2003).[5] In such a case, the habeas court is not limited to deciding whether that court's decision was contrary to or involved an unreasonable application of clearly established federal law, but rather conducts a *de novo* review of the claim. *Maples*, 340 F.3d at 436-37; *Benge v. Johnson*, 312 F. Supp. 2d 978, 987 (S.D. Ohio 2004).[6] If the state court conducts a harmless error analysis but does not indicate whether its finding is based on state or federal constitutional law, however, a habeas court, while conducting an independent review of the facts and applicable law, must nonetheless determine "whether the state court result is contrary to or unreasonably applies clearly established federal law." *Maldonado v. Wilson*, 416 F.3d 470, 476 (6th Cir. 2005)(citing *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000)).

---

[5]  Prior to *Maples*, the Sixth Circuit had applied the AEDPA standard of review to claims which had not been explicitly mentioned or analyzed by the state courts. *See, e.g., Clifford v. Chandler*, 333 F.3d 724, 730 (6th Cir. 2003); *Doan v. Brigano*, 237 F.3d 722, 727 (6th Cir. 2001). However, in *Maples*, the Sixth Circuit found that *Doan* and *Clifford* had been abrogated by the United States Supreme Court's decision in *Wiggins v. Smith*, 539 U.S. 510, 534-38 (2003). *Maples*, 340 F.3d at 437.

[6]  To the extent that the state court did not address a claim due to petitioner's failure to raise it on direct review, the claim may have been procedurally defaulted. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999); *Maples v. Stegall*, 340 F.3d 433, 437-38 (6th Cir. 2003).

**VI. <u>Exhaustion and Procedural Default</u>**

**A. Exhaustion**

A state prisoner must exhaust his state remedies before bringing his claim in a federal habeas corpus proceeding.  28 U.S.C. § 2254(b), (c); *Rose v. Lundy*, 455 U.S. 509 (1982). Exhaustion is fulfilled once a state supreme court provides a convicted defendant an opportunity to review his or her claims on the merits.  *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999).  A habeas petitioner satisfies the exhaustion requirement when the highest court in the state in which the petitioner has been convicted has had a full and fair opportunity to rule on the claims. *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994); *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990).  If under state law there remains a remedy that a petitioner has not yet pursued, exhaustion has not occurred and the federal habeas court cannot entertain the merits of the claim. *Rust*, 17 F.3d at 160.

Claims that were never raised at any juncture of the state-court proceedings are both unexhausted and procedurally defaulted because no Ohio court has had an opportunity to decide them.  If a habeas petitioner sought to return to state court and attempt to present new claims to the Ohio Supreme Court, that court would find them procedurally barred.  "The Ohio Supreme Court has stated that it will not consider constitutional claims not raised and preserved in the Ohio Court of Appeals."  *Fornash v. Marshall*, 686 F.2d 1179, 1185 n.7 (6th Cir. 1982)(citing *State v. Phillips*, 270 Ohio St.2d 294, 300 (1971)).  Thus, Sneed's failure to raise a claim to the Ohio Court of Appeals would preclude Ohio Supreme Court review.  This preclusion, in turn, would prevent Sneed from satisfying the exhaustion requirement as the Ohio Supreme Court has

29

not had a "fair and full opportunity" to review these claims as *Rust* requires.[7]

A petitioner "cannot obtain federal habeas relief under 28 U.S.C. § 2254 unless he has completely exhausted his available state court remedies to the state's highest court." *Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001)(quoting *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001))(internal quotation marks omitted).  Rather than dismiss certain claims the Court deems unexhausted, however, a habeas court need not wait for exhaustion if it determines that a return to state court would be futile.  *Lott v. Coyle*, 261 F.3d 594, 608 (6th Cir. 2001).  In circumstances where the petitioner has failed to present a claim in state court, a habeas court may deem that claim procedurally defaulted because the Ohio state courts would no longer entertain the claim.  *Buell*, 274 F.3d at 349.   To obtain a merit review of the claim, the petitioner must demonstrate cause and prejudice to excuse his failure to raise the claim in state court, or that a miscarriage of justice would occur were the habeas court to refuse to address the claim on its merits.  *Seymour v. Walker*, 224 F.3d 542, 550 (6th Cir. 2000)(citing *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)).

**B. Procedural Default**

**1. General Law**

In general, a federal court may not consider "contentions of general law which are not resolved on the merits in the state proceeding due to petitioner's failure to raise them as required by state procedure."  *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).  If a state prisoner has defaulted his federal claims in state court pursuant to an independent and

---

[7]        The Court also notes that the *Perry* rule, discussed *infra*, would bar
         on grounds of res judicata an Ohio court from considering any
         issue that could have been, but was not, raised on direct appeal.

adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  To be independent, a state procedural rule and the state courts' application of it "must rely in no part on federal law." *Fautenberry v. Mitchell*, No. C-1-00-332, 2001 WL 1763438, at * 24 (S.D. Ohio Dec. 26, 2001)(citing *Coleman*, 501 U.S. at 732-733).  To be adequate, a state procedural rule must be "firmly established and regularly followed" by the state courts at the time it was applied.  *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991); *Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir. 2001).  If a petitioner fails to fairly present any federal habeas claims to the state courts but has no remaining state remedies, then the petitioner has procedurally defaulted those claims.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999); *Rust v. Zent*, 17 F.3d at 160.

In *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986), the Sixth Circuit outlined the now familiar test to be followed when the State argues that a habeas claim is defaulted because of a prisoner's failure to observe a state procedural rule:

> First, the federal court must determine whether there is a state procedural rule that is applicable to the petitioner's claim and whether the petitioner failed to comply with that rule.  Second, the federal court must determine whether the state courts actually enforced the state procedural sanction -- that is, whether the state courts actually based their decisions on the procedural rule.  Third, the federal court must decide whether the state procedural rule is an adequate and independent state ground on which the state can rely to foreclose federal review of a federal constitutional claim. Fourth, if the federal court answers the first three questions in the affirmative, it would not review the petitioner's procedurally defaulted claim unless the petitioner can show cause for not following the procedural rule and that failure to review the claim would result in prejudice or a miscarriage of justice.

*Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir. 2001)(citing *Maupin*, 785 F.2d at 138)(further

31

citations omitted).

In determining whether the *Maupin* factors are met, the federal court looks to the last explained state court judgment.  *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991);  *Combs v. Coyle*, 205 F.3d 269, 275 (6th Cir. 2000).  If the last reasoned opinion on a claim explicitly imposed a procedural default, there is a presumption, which can be rebutted with strong evidence to the contrary, that "a later decision rejecting the claim did not silently disregard the bar and consider the merits."  *Ylst*, 501 U.S. at 803.  "If the last state court to be presented with a particular federal claim reaches the merits, it removes any bar to federal-court review."  *Id.* at 801.

If the three *Maupin* factors are met, the claim is procedurally defaulted.  However, the federal court may excuse the default and consider the claim on the merits if the petitioner demonstrates (1) there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error or; (2) a fundamental miscarriage of justice would result from a bar on federal review.  *Maupin*, 785 F.2d at 138; *Hutchison v. Bell*, 303 F.3d 720, 735 (6th Cir. 2002); *Combs*, 205 F.3d at 274-275.

A petitioner can establish cause in two ways.  First, a petitioner may "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."  *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Mohn v. Bock*, 208 F. Supp. 2d 796, 801 (E.D. Mich. 2002).  Objective impediments include an unavailable claim or interference by officials that made compliance impracticable.  *Murray*, 477 U.S. at 488; *Mohn*, 208 F. Supp. 2d at 801.  Second, constitutionally ineffective assistance of counsel constitutes cause.  *Murray*, 477 U.S. at 488-489; *Rust v. Zent*, 17 F.3d 155, 161 (6th Cir. 1994); *Mohn*, 208 F. Supp. 2d at 801, 804.

If a petitioner asserts ineffective assistance of counsel as cause for a default, that ineffective assistance claim must itself be presented to the state courts as an independent claim before it may be used to establish cause. *Murray v. Carrier*, 477 U.S. 478, 488-489 (1986). If the ineffective assistance claim is not presented to the state courts in the manner that state law requires, that claim is itself procedurally defaulted and can only be used as cause for the underlying defaulted claim if the petitioner demonstrates cause and prejudice with respect to the ineffective assistance claim. *Edwards v. Carpenter*, 529 U.S. 446, 452-53 (2000).

To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995)(quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000).

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the United States Supreme Court has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392 (2004)(citing *Murray v. Carrier*, 477 U.S. 478, 495-96 (1985)). When the Supreme Court extended this exception to claims of capital sentencing error, it limited the exception in the capital sentencing context to cases in which the petitioner could show "'by clear and convincing evidence that, but for constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law.'" *Id.* (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)).

33

## 2. Sneed's Challenges to the Application of Procedural Default

The Respondent asserts that some of the claims raised in the Petition are barred from review by this Court because they are procedurally defaulted.[8]  Sneed attacks the Respondent's assertions of procedural default on several grounds.  First, he claims that the Ohio Supreme Court's rule articulated in *State v. Perry*, 226 N.E.2d 104 (Ohio1967), is insufficient for the Court to find a claim to be procedurally defaulted.  Sneed also asserts that Ohio's Rule of Appellate Procedure 26(B) is defective and not entitled to deference by this Court.  Sneed asserts that sub-claims raised with substantially the same facts and legal theories should not be barred from federal habeas review because of procedural default.  He claims that the State of Ohio has no legal interest in this Court's finding that a claim is procedurally defaulted.  Finally, Sneed contends that the Court should entertain cumulative error assertions in which he raises issues of prosecutorial misconduct or ineffective assistance of counsel.  The Court will address each individual claim of procedural default when it reviews Sneed's distinct claims for relief.  At this juncture, however, the Court will consider Sneed's general counter-arguments to the Respondent's allegations of procedural default.

### a.  The *Perry* Rule

Sneed argues that Ohio's post-conviction relief system does not meet federal constitutional requirements because of the Ohio Supreme Court's interpretation of the post-conviction statutes in *State v. Perry*, 226 N.E.2d 104 (Ohio 1967).

Under the *Perry* doctrine, a final judgment of conviction bars a convicted defendant from

---

[8]      Respondent alleges that Sneed has procedurally defaulted all or part of claims 1, 4, 5, 6, 7, 8, 9, 11, and 13.

34

raising and litigating in any proceeding, except an appeal from that judgment, any defense or any claimed lack of due process that was raised *or could have been raised* by the defendant at the trial on the merits, or on appeal from that underlying judgment.  *Id.* at 108; *see also State v. Roberts*, 437 N.E.2d 598, 601 (Ohio 1982)(holding policy behind *Perry* bars post-conviction petitioners from raising issues that could have been raised on direct appeal in a collateral proceeding to avoid reversal of conviction based on collateral, rather than constitutional, issues). Thus, unless a claim is based on evidence *dehors* (outside of) the record, it must be raised during direct appeal, or be deemed waived.

Sneed argues that his ineffective assistance of counsel claims are subject to one of the exceptions that the Ohio courts have carved out of the *Perry* rule.  Sneed cites to *State v. Cooperrider*, 448 N.E.2d 226 (Ohio 1983), to support his assertion that post-conviction may be a proper forum in which to raise, in the first instance, an ineffective assistance of counsel claim. While the Court agrees generally with Sneed that ineffective assistance of counsel claims may be properly raised in the first instance during post-conviction relief proceedings, Sneed first must demonstrate that these claims are dependent on evidence *dehors* the record for factual development.  Barring this demonstration, the *Perry* rule would render such a claim procedurally defaulted.

Sneed next contends that, in several of his grounds for relief, the Ohio courts failed to enforce an existing procedural bar.  Thus, Sneed argues, this Court may address those claims on the merits.  Normally, federal courts may not decide constitutional questions on habeas review of a state criminal proceeding where a petitioner's violation of a state procedural rule prevented the state courts from addressing that same claim.  *Wainwright v. Sykes*, 433 U.S. 72 (1977).   As the

Sixth Circuit has noted, however, that rule does not apply where the state itself has failed to

enforce its own procedural bars to review of the constitutional question presented and has, in

fact, addressed the merits of the claim. *Raper v. Mintzes*, 706 F.2d 161, 163 (6th Cir. 1983)("In

such a case, the rationale of *Sykes* is inapplicable since the state itself has chosen not to apply its

procedural rules so as to bar the claim . . . .").

Where a state enforces a procedural bar, but then alternatively rules on the merits,

however, a habeas court is still barred from a merit review. In *Harris v. Reed*, 489 U.S. 255, 264

(1989), the United States Supreme Court held that:

> [A] state court need not fear reaching the merits of a federal claim in an
> alternative holding. By its very definition, the adequate and independent state
> ground doctrine requires the federal court to honor a state holding that is a
> sufficient basis for the state court's judgment, even when the state court also
> relies on federal law. Thus, by applying this doctrine to habeas cases, *Sykes*
> curtails reconsideration of the federal issue on federal habeas as long as the state
> court explicitly invokes a state procedural bar rule as a separate basis for its
> decision. In this way, a state court may reach a federal question without
> sacrificing its interests in finality, federalism, and comity.

*Id.* at n.10 (citations omitted). *See also Scott v. Mitchell*, 209 F.3d 854, 866 (6th Cir. 2000), *cert.*

*denied*, 531 U.S. 1021 (2000)(holding that a state court's alternative holding does not necessarily

permit a habeas court to reach the merits of a claim). Thus, while Sneed is correct in asserting

that any state court decision to forgive a procedural bar and address a claim on the merits permits

this Court to act likewise, he cannot successfully bypass a procedural bar when a state court

addresses the merits of a claim in the context of an alternative holding.

Sneed also claims that the Ohio post-conviction review system is inadequate because a

post-conviction petitioner is not permitted to obtain discovery without first demonstrating that he

is entitled to it by producing evidence *de hors* the record. Sneed asserts this requirement creates

a classic "Catch-22" situation in which he must support his claim with evidence he likely only could obtain in court-ordered discovery. Thus, he claims that Ohio's post-conviction system violates his Fourteenth Amendment rights to due process and equal protection.

The Court declines to consider this argument because Sneed fails to articulate any infringement for which a federal habeas corpus court can grant relief. The Sixth Circuit has held that, "habeas corpus is not the proper means by which prisoners should challenge errors or deficiencies in state post-conviction proceedings." *Greer v. Mitchell*, 264 F.3d 663, 681 (6th Cir. 2001)(citing *Kirby v. Dutton*, 794 F.2d 245 (6th Cir. 1986)). As the *Greer* court observed, the United States Supreme Court has determined that states have no constitutional obligation to provide post-conviction remedies. *Id.* (citing *Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987)).

Ultimately, Sneed's argument is unpersuasive. The Sixth Circuit has specifically held that Ohio's application of the res judicata doctrine under *Perry* is an adequate and independent state ground. *Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001)("This court has held that [the *Perry* rule] is regularly and consistently applied by Ohio courts as required by the four-part *Maupin* test.")(citing *Byrd v. Collins*, 209 F.3d 486, 521-22 (6th Cir. 2000)). *See also Mapes v. Coyle*, 171 F.3d 408, 420 (6th Cir. 1999), *cert. denied*, 528 U.S. 946 (1999)(noting that the *Perry* rule has been consistently applied). Consequently, this Court holds that any claim the Ohio courts refused to address based on *Perry* is procedurally defaulted and barred from habeas review absent a showing of cause and prejudice.

### b. Ohio Rule of Appellate Procedure 26(B)

In his Traverse, Sneed asserts three arguments concerning his procedural default pursuant to *State v. Murnahan*, 584 N.E.2d 1204 (Ohio 1992) and Ohio Rule of Appellate Procedure

37

26(B).[9]  First, Sneed asserts that the Ohio Courts of Appeals misapply this Rule when they review ineffective assistance of counsel claims pursuant to the test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Second, Sneed claims that because the *Murnahan* procedure violates an indigent applicant's due process and equal protection rights, this Court should not afford it deference when determining whether a claim is procedurally defaulted.  Finally, Sneed contends that the "good cause" exception to the timing requirement of Rule 26(B) is not adequate because it is not consistently applied.  Thus, he maintains, the Court should disregard any procedural bar the Ohio courts would impose based on the time he filed an application to reopen direct appeal pursuant to Ohio Rule of Appellate Procedure 26(B)(hereinafter "*Murnahan* application" or "application to reopen").

Sneed asserts that the process for applying to reopen his direct appeal pursuant to Ohio Rule of Appellate Procedure 26(B) violates the Constitution as interpreted by *Anders v. California*, 386 U.S. 738 (1967) and as refined by *Smith v. Robbins*, 528 U.S. 259 (2000).  In those cases, the United States Supreme Court held that the states must maintain an appellate review system whereby indigent appellants can receive an adequate review of their claims even when appointed counsel finds the appeal to be wholly frivolous.  *Smith*, 528 U.S. at 271.  Sneed interprets *Smith* to require the Ohio Court of Appeals to review his application to reopen claims not only on the merits, but to determine whether the claims are frivolous.  He asserts that because the Ohio Court of Appeals reviewed his case on the merits, when he only needed to

---

[9]        As stated above, the Ohio legislature created this proceeding to permit a convicted criminal defendant to raise ineffective assistance of appellate counsel in the Ohio courts of appeal and to the Ohio Supreme Court.

demonstrate that his claims were not frivolous, the *Murnahan* process should be declared unconstitutional.

While Sneed's assertion presents an interesting question for the Ohio courts, he fails to substantiate his allegation that this type of review is of constitutional import entitling him to habeas relief.  Since Sneed filed his Traverse, the Sixth Circuit has determined that "Rule 26(B) creates a collateral post-conviction procedure, and is not part of the direct right of appeal." *Lopez v. Wilson*, 426 F.3d 339, 341 (6th Cir. 2005).  Because the application to reopen is a collateral review, the Ohio courts have wide latitude in determining how to review their own cases.  *See, e.g., Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987)(finding no Sixth Amendment right to counsel in state collateral proceedings).  Unlike the *Robbins* case, which involved a criminal defendant's direct appeal as of right and the constitutional rights attendant thereto, Sneed asserts here that the Ohio courts are not providing him with a proper review in a post-conviction proceeding.  Because he has no constitutional right to such a review, the Court will not hold that the *Murnahan* process is unconstitutional.

Sneed also asserts that this Court should find that the *Murnahan* proceeding is not an adequate remedy at law entitling it to deference by this Court.  Accordingly, Sneed argues, this Court should find that any procedural default caused by his failure to file a *Murnahan* application should be disregarded.  Sneed's assertions of *Murnahan*'s inadequacy stems from his allegation that this procedure denies an indigent applicant's rights pursuant to the equal protection and due process clauses of the Constitution.  Specifically, because Ohio has found that there is no constitutional right to counsel in preparing an application to reopen, indigent applicants are more ill equipped to make such an application than their similarly situated, yet

39

more affluent counterparts.  As discussed above, however, the Sixth Circuit has held that an application to reopen is not a direct appeal in which a criminal defendant has a Sixth Amendment right to counsel.  *Lopez*, 426 F.3d at 341.  Thus, Sneed's assertion that his constitutional rights were denied because he was not afforded counsel is without merit.

Conversely, Sneed's assertion that the "good cause" exception to the time for filing requirement in the Rule is not an "adequate" ground for foregoing a merit review of a claim pursuant to *Maupin* is well-taken.  Recently, the Sixth Circuit held that the Ohio Supreme Court has inconsistently applied the ninety-day filing requirement in capital cases.  In *Franklin v. Anderson*, 434 F.3d 412 (6th Cir. 2006), the court reviewed cases in which the Ohio Supreme Court adjudicated on untimely *Murnahan* applications.  The Sixth Circuit found that the court had varied in its decision to enforce the rule over the approximately fifteen years since its enactment.  Although it appeared that the Ohio Supreme Court at one point enforced the rule, it began to ignore the rule on several occasions in the year 2000.  While the Ohio Supreme Court once again began enforcing the timeliness rule in a series of cases decided in 2004, the Sixth Circuit held that, because of the Ohio Supreme Court's vacillation in enforcing the ninety-day rule, it could not find that the rule was "adequate."  Thus, it concluded, "Rule 26(B) is not an adequate and independent state rule that can preclude consideration of [a petitioner's] ineffective assistance of appellate counsel claim."  *Id.* at 421.

### c. Defaulted Sub-Claims

Sneed observes that in the Return of Writ the Respondent asserts that several of his sub-claims are procedurally defaulted.  He argues that even though he may not have raised a specific sub-claim in state court, he is entitled to a merit review of that sub-claim if "there is an arguable

factual connection between the habeas claim and the claim raised in state court."  Traverse, at 34 (citation omitted).  The Sixth Circuit has held, however, that to exhaust a claim, a petitioner must present it "to the state under the same theory in which it is later presented in federal court. *See Hicks v. Straub*, 377 F.3d 538, 552-53 (6th Cir. 2004)(holding that "the exhaustion doctrine requires the petitioner to present 'the same claim under the same theory' to the state courts before raising it on federal habeas review.")(quoting *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987)); *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998).  The Court will not speculate at this juncture of the Opinion which of Sneed's sub-claims may be closely enough related to a claim he previously raised in state court to escape the reaches of the *Hicks* holding.  Instead, the Court will review each sub-claim and its defaulted status when it review's Sneed's individual grounds for relief.

### d. Cumulative Error

Sneed maintains that prosecutorial misconduct and ineffective assistance of counsel claims, even if not individually meriting habeas relief, could entitle him to habeas relief if they are accumulated.  The Court will address this argument when reviewing Sneed's eleventh ground for relief (cumulative error) after a review of his ineffective assistance and prosecutorial misconduct claims.[10]

---

[10]     Sneed also asserts that the State has no legitimate interest in enforcing a procedural default where it unconstitutionally withheld exculpatory or impeaching evidence.  Once again, the Court will address this claim, if necessary, after a review of Sneed's specific *Brady* and *Kyles* claims contained in the first ground for relief.

41

**VII. <u>Analysis of Petitioner's Claims</u>**[11]

> **A. The fairness of Petitioner's trial and the reliability of his convictions and death sentence were undermined by the absence of exculpatory and impeachment evidence that the prosecution failed to disclose.  In the alternative, defense counsel were ineffective for failing to discover the exculpatory and impeachment evidence.**

In this ground, Sneed asserts that the State withheld exculpatory or impeaching information that was material to his convictions and sentence.  He claims that the State impermissibly used hypnotically refreshed testimony during the trial.  He also states that law enforcement officials obtained the names of other murder suspects but did not forward them to the defense team.  He maintains that police did not disclose to the defense names of inmates who refused to testify against him.  Sneed alleges that the State did not disclose that there was snow on Rowan's car, which affected the police's ability to obtain a fingerprint from that car.  He claims that there was a bloody shirt found in a local dumping area around the time Rowan was killed but that he was not informed of this fact.  He claims that information about the victim's sexual orientation and practices would have enabled him to impeach several witnesses had the State not withheld it from him.  Finally, Sneed asserts that police used coercive tactics to obtain favorable testimony from Brown, Theotis Dillard, and Ricky Dillard.[12]  The Court reviews each of these sub-claims individually.

---

[11]    Each of Sneed's claims is set forth in bold at the beginning of the discussion of that claim.

[12]    It appears from the trial transcripts that Sneed's half brother, Ricky, testified that his surname was Dillard during the culpability phase of trial but that it was Taylor during the mitigation phase of trial.  Because Ricky's father's last name was Taylor, and his mother's last name is Dillard, the Court presumes that there is only one Ricky who is Sneed's half brother.  For clarity's sake, he will be referred to as Ricky Dillard in this Opinion.

To establish a claim under *Brady v. Maryland*, 373 U.S. 83 (1963), "the petitioner has the burden of establishing that the prosecutor suppressed evidence; that such evidence was favorable to the defense; and that the suppressed evidence was material."  *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000)(citing *Moore v. Illinois*, 408 U.S. 786, 794–95 (1972)). "The inquiry is objective, independent of the intent of the prosecutors."  *Id.* (citing *Brady*, 373 U.S. at 87). *Brady* material applies not only to exculpatory evidence, but to evidence that could have been used for impeachment purposes.  *United States v. Blackwell*, 459 U.S. 739, 758 (2006)(citing *United States v. Bradley*, 473 U.S. 667, 676 (1985)).

To meet the suppression requirement, the petitioner must show that the evidence was in the prosecution's exclusive control.  There is no *Brady* violation "where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available . . . from another source, because in such cases there is really nothing for the government to disclose."  *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998), *cert. denied*, 528 U.S. 842 (1999)(internal quotation marks and citations omitted).  The United States Supreme Court has held that defendants are not required to "scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed."  *Banks v. Dretke*, 540 U.S. 668, 695 (2004).  The duty to disclose exculpatory evidence applies to the prosecution whether or not the defense makes a *Brady* request. *Apanovitch v. Houk*, 466 F.3d 460, 474 (6th Cir. 2006).

### 1. Hypnotically Refreshed Testimony

Prior to trial, police hypnotized Daniel Jasionowski, a witness who saw Sneed, Brown, and Rowan in a car around the time of Rowan's murder, to refresh his memory regarding what

he saw on that night.  Although some of what he recalled corroborated the State's theory of the murder, other statements, Sneed asserts, contradicted it.  Sneed raises this claim as his second ground for relief.  Because the Court will not duplicate its efforts in reviewing the claims and sub-claims raised in the Petition, the Court will address this issue when it reviews Sneed's second ground for relief.

### 2. Names of Other Suspects

Sneed asserts that the State failed to provide the defense with information regarding two other alleged suspects for the Rowan murder, William Bennett and a female impersonator named "Miss Kelley."  He observes that Bennett confessed to committing a similar murder and also admitted that he smoked Newport cigarettes, the same type of cigarette found in Rowan's vehicle.

While Sneed asserts that information about Bennett as a possible suspect to Rowan's murder could have aided him during trial, he fails to note in his briefs that the State actually provided defense counsel with information regarding Bennett as a possible suspect to Rowan's murder.  In fact, defense counsel unsuccessfully attempted to introduce evidence regarding Bennett during trial.  Because the State provided defense counsel with information about Bennett, the Court finds that there is no *Brady* violation here.  Additionally, because Sneed does not provide any information about who "Miss Kelley" was and why information about this individual was exculpatory, the Court finds this claim to be too vague to entitle him to relief.

### 3. Names of Inmates Who Refused to Testify Against Petitioner

In this sub-claim, Sneed argues that the State improperly withheld information regarding his fellow inmates who police contacted to testify against him but who refused to do so.  Sneed

claims that, if he had the names of the inmates who were unwilling to testify against him, he could have asserted during trial that the State's case was so weak that it had to "push" for evidence from informants. Additionally, he maintains that he could have asserted that because he made no inculpating statements to other inmates, it could have bolstered his assertion that he had committed no criminal acts.

The Court finds both these arguments to be speculative and unsupportive of a *Brady* violation. First, the fact that the State spoke to other inmates in contact with Sneed is not exculpatory or impeaching. Moreover, this fact does not support Sneed's claim that the State's case was a weak one. Thus, there is no *Brady* violation in the State's failure to turn over the names of inmates with which it spoke but did not have testify at trial. The fact that the State found no inmates to testify against Sneed is equally unsupportive of a *Brady* claim. Sneed's assertion that he could have used this fact to demonstrate that he did nothing wrong is a dubious one because, while he may have committed criminal acts, he may not have chosen to discuss them with his fellow inmates. The Court finds that no *Brady* violation occurred because of the State's failure to provide defense counsel with information regarding its contact with other prison inmates.

### 4. Snow on Rowan's Vehicle

Sneed next asserts that the State failed to disclose that there was snow on Rowan's vehicle. He claims that, had he known this fact, he could have called into question the trial testimony that Brown's fingerprint was found on the exterior of Rowan's vehicle.

There are several defects with this sub-claim. The Court concludes that it is insufficient to support a *Brady* claim because it is not information exclusively in control of the State. As

45

stated above, to meet the suppression prong of *Brady*, the petitioner must demonstrate that the information the State held was in its exclusive control.  *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998).  Because the snow accumulation on the evening of Rowan's murder is a fact easily obtainable from another source, the prosecution's failure to disclose this fact is not a *Brady* violation.  Moreover, there is no evidence to support Sneed's theory that the existence of snow on the vehicle would have prevented police from obtaining a fingerprint on it, particularly because the print was found on a rear door window, a place where it is unlikely that any snow accumulated.  Finally, even if the defense used this information for the purposes Sneed describes, it is unlikely that it would have had any impact on his convictions because he admitted that he and Brown were in and around Rowan's vehicle at the time of Rowan's murder.  Thus, this sub-claim lacks merit.

### 5. Gun's Chain of Ownership

Although the State traced the ownership of the gun used to kill Rowan, the State failed to turn over the fruits of its investigation.  Sneed claims that had the State done so, he could have disputed the State's theory as to whether he or Brown had the gun at the outset and who fired the fatal shot.  The Respondent asserts that this claim is procedurally defaulted.  While Sneed raised a claim in state court that the gun used to kill Rowan was previously purchased by Captain Paul Shoemaker of the Bellevue Police Department, he made no assertion regarding its chain of ownership to prove that Brown had possessed the gun.

As stated above, to receive federal habeas review, a habeas petitioner must present his or her claim for relief under the same theory both the state and federal courts.  *Hicks v. Straub*, 377 F.3d 538, 552-53 (6th Cir. 2004).  Although Sneed asserts here, as he did above, that the State

46

has no interest in procedurally defaulting a *Brady* claim, he does not substantiate this assertion with any authority.  Thus, the Court finds that this sub-claim is procedurally defaulted and it will not review the claim on the merits.[13]

### 6. Bloody Shirt Found in Area

Sneed claims that the State's failure to disclose that a blood-stained shirt found in a local dumping area around the time Rowan was killed is a *Brady* violation.  The Court cannot provide him relief on this bald assertion, however, because he does not specify how this fact is relevant to his conviction or how it would have affected the outcome of his trial.  Thus, the Court finds that this sub-claim is not well-taken.

### 7. Information about the Victim

In this sub-claim, Sneed argues that the State impermissibly withheld information regarding Rowan's character.  He asserts, *inter alia*, that the State never informed the defense team that Rowan was "a bisexual with a reputation as a hustler or male prostitute."  (Doc. 1, at 6.)  Had counsel known this information about Rowan, Sneed claims, he could have used this information to dispute the State's theory about the events that lead up to his death.

The Respondent correctly observes that Sneed does not explain how it is exculpatory. Sneed admitted to most of the events that the State asserted occurred around the time of the murder.  Sneed merely disputed whether he or Chevette Brown, who testified regarding the events leading up to Rowan's murder, was the actual killer.  Thus, Rowan's background is immaterial based on the testimony that the State utilized in support of its murder theory.  Sneed

---

[13]    Even if this claim were preserved for habeas review, it would not entitle Sneed to habeas relief.  Although the issue of who actually shot Rowan was a disputed issue during trial, proving the chain of ownership would not have assisted Sneed on this issue as there was no evidence that Brown ever owned a gun.

admitted to most of these facts and the evidence Sneed asserts was withheld was not in dispute. Thus, the evidence of Rowan's background is neither impeaching nor exculpatory and unsupportive of a *Brady* claim.

### 8. State's Coercive Testimony

In Sneed's final sub-claim, he contends that the State used coercive means to obtain the testimony of Brown, Theotis Dillard, and Ricky Dillard .  Sneed does not specify what tactics were used or whether the State induced any or all of the above witnesses with deals in exchange for their testimony.  Although Sneed cites *Giglio v. United States*, 405 U.S. 150 (1972), which stands for the proposition that the State must disclose to the defense whether it induced a witnesses in exchange for trial testimony, he does not specify which deals the State made prior to his trial of which he was unaware.  Without this vital information, the Court cannot find that Sneed's assertions entitle him to relief.

### B. Petitioner's conviction and death sentence were constitutionally corrupted by the state's reliance on hypnotically refreshed testimony from an alleged eyewitness.

Sneed's second ground for relief is that the State used the hypnotically refreshed testimony of Daniel Jasionowski during trial.  His assertions regarding the impropriety of this testimony are twofold: First Sneed claims that the State committed a *Brady* violation when it failed to inform the defense team that Jasionowski's testimony was hypnotically refreshed. Additionally, Sneed claims that the use of this testimony during trial rendered it fundamentally unfair.

After calling police to notify them that he saw some individuals in a Buick in front of his house, Jasionowski apparently was hypnotized by Richard Bryan, Chief of the Massillon Police Department.  After the hypnotism session, Jasionowski was able to recall further that he had

48

observed three people, rather than the two people he initially stated he had seen in the vehicle in front of his home.  Additionally, he was able to recall that the individual in the front passenger seat was white.  During trial, Jasionowski testified for the State regarding what he saw.  He stated that he was awakened by the noise of a car engine revving very loudly.  He observed one of the three individuals exit the passenger side of the Buick, walk around the back of the vehicle, and re-enter it in the front, driver seat.  (Doc. 34, at 221.)  Jasionowski could not identify any of the individuals other than to say that the race of the front seat passenger was white and the man who exited and re-entered the vehicle had bushy hair.  *Id.* at 222.

Sneed raised this claim on appeal from his denial of post-conviction relief.  The Fifth District Court of Appeals concluded that, "given the vague description of the parties, there [was] no prejudice" in the State's presentation of this testimony during trial.[14]   (Doc. 50, at 448.)

Although conclusory, the Fifth District's decision to deny this claim is not unreasonable.  A review of the transcript reveals that Jasionowski's testimony was brief and of limited benefit to the State.  Even if Sneed had been able to completely discredit it, it would not have altered the outcome of the trial because Sneed admitted to the main point of Jasionowski's testimony, *i.e.*, that he was with Brown and Rowan in Rowan's vehicle.  Even if the Court were to find the evidence to be exculpatory and withheld from the defense, Sneed could not succeed in proving that this information was material to the outcome of the trial.  Thus, no *Brady* violation occurred.

For similar reasons, the Court finds that Sneed's trial was not rendered fundamentally

---

[14]    The Fifth District noted that the Ohio Supreme Court had barred post-conviction petitioners from obtaining information pursuant to *Steckman v. Jackson*, 639 N.E.2d 83 (Ohio 1994), which is how Sneed learned of Jasionowski's hypnotism.  The Respondent has not asserted a procedural defense to this claim, however, presumably because the Fifth District did not appear to bar the claim from a merit review on those grounds.

unfair because of the use of hypnotically refreshed testimony.  The United States Supreme Court

has never held that the use of such testimony is unconstitutional *per se*.  *See, e.g., Clark v.*

*Arizona*, – U.S. –, 126 S.Ct. 2709, 2744 (2006)(affirming holding in *Rock v. Arkansas*, 483 U.S.

44 (1987), which banned the *per se* abolition of hypnotically refreshed testimony).  Because

Sneed cannot demonstrate that the use of the testimony inured to his prejudice and resulted in an

unfair trial, the Court finds this claim is not well-taken.

### C. Prosecutorial misconduct violated Petitioner's constitutional rights and undermined the reliability of his conviction and death sentence.

Sneed maintains that prosecutorial comments rendered his trial fundamentally unfair.  He

asserts that he should be granted relief because the prosecutor: (1) declared his personal belief

that Sneed was guilty; (2) argued that Sneed must prove his innocence and had an obligation to

present evidence; and, (3) created a non-statutory aggravating circumstance by alleging that

Sneed not only murdered the victim but ruined Brown's life as well.

To assert a successful prosecutorial misconduct claim in a habeas proceeding it "'is not

enough that the prosecutors' remarks were undesirable or even universally condemned.  The

relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as

to make the resulting conviction a denial of due process.'"  *Spisak v. Mitchell*, 465 F.3d 684, 713

(6th Cir. 2006)(quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974))(further citations

omitted).  This question must be answered in light of the totality of the circumstances in the case.

*Lundy v. Campbell*, 888 F.2d 467, 473 (6th Cir. 1989), *cert. denied*, 495 U.S. 950 (1990).  The

prosecutor's comments must be so egregious as to render the trial fundamentally unfair.  *Fussell*

*v. Morris*, 884 F.2d 579 (6th Cir. 1989)(Table).

The Sixth Circuit held in *Boyle v. Million*, 201 F.3d 711 (6th Cir. 2000), that a district

court should first determine whether the challenged statements were, in fact, improper, and if so, to determine whether the comments were "flagrant," thus requiring reversal.  *Id.* at 717. Flagrancy is determined by an examination of four factors: 1) whether the statements tended to mislead the jury or prejudice the defendant; 2) whether the statements were isolated or among a series of improper statements; 3) whether the statements were deliberately or accidentally before the jury; and 4) the total strength of evidence against the accused. *Id.* (citation omitted).  Sneed asserts that the prosecutor stated that he believed Sneed was guilty.  He does not, however, cite to where in the trial transcript the prosecution made such a statement in either the Petition or the Traverse.[15]  Thus, the Court summarily dismisses this sub-claim.

Sneed also claims that the prosecutor told the jury that Sneed must prove that he was not the individual who killed Rowan.  During closing arguments of the culpability phase of trial, the prosecutor asserted that Sneed's version of the events leading up to Rowan's murder – that Brown was the actual killer and he entered the vehicle only after Brown had killed Rowan – was not a plausible one.  He argued as follows:

| | |
|---|---|
| Prosecutor: | You have to ask yourself what evidence have you heard to prove what they want you to think?  What evidence have you heard from the stand?  What evidence is submitted to you to prove their story? |
| Defense: | Objection. |
| The Court: | I will hear you. |
| Defense: | We don't have to prove anything.  He said we have to prove something. |

---

[15]    In addressing this claim in the Return of Writ, the Warden noted that Sneed failed to set forth the point at which the prosecutor made this statement.  Despite the Warden calling this issue to Sneed's attention, Sneed failed to address this issue in the Traverse.

We don't have to prove anything.

The Court:     Do you wish to respond?

Prosecutor:    I have nothing to say.

(Doc. 37, at 41.)

While this argument certainly implied that the defense bore some burden of proving their account of the Rowan murder, the trial court cured any incorrect inferences the jury may have made by the prosecutor's comments when it instructed the jury at the conclusion of the guilt phase that "[a] defendant must be acquitted unless the State produced evidence which convinced you beyond a reasonable doubt of every essential element of any crime charged in the indictment." *Id.* at 58.  Thus, any harm that may have been caused by the prosecutor's misstatement was cured by the trial court's contrary instruction to the jury.

Finally, Sneed alleges prosecutorial misconduct because of the prosecutor's remarks during the closing argument of the mitigation phase of trial in which he asserted that, in addition to taking Rowan's life, Sneed had ruined Brown's life.  The remarks occurred as follows:

Prosecutor:    We know that when the Defendant threatened [Brown] to shoot the man or that he would shoot her, she did so.  Not only did the Defendant commit the aggravated murder of Herbert Rowan and the aggravating circumstance in this case, he also ruined the life of Chevette Brown.

Defense:    Objection, Your Honor.

The Court:    I will hear you on it.

(Conference at the bench out of the hearing of the jury.)

52

| | |
|---|---|
| Defense: | Highly prejudicial.  The Prosecutor starts arguing about ruining the life of Chevette Brown, the co-defendant. |
| The Court: | I don't know what that has to do with how – |
| Prosecutor: | We discussed the deal that Chevette got, and I am comparing - - I am arguing that he was the one more culpable, that he was the one that made her, threatened her to do that. |
| The Court: | As far as what he did to her life, that is not relevant in this case; so I don't see that it is prejudicial, but I don't think it is relevant. |
| Prosecutor: | Instruct them to disregard it then. |
| (End of bench conference.) | |
| The Court: | I am going to instruct the Jury to disregard what was stated in regard to the effect on the life of Brown. |

(*Id.* at 608-9.)

While the prosecutor's remarks in this instance may have been inappropriate, the trial court immediately remedied any ill effects of this remark by instructing the jury to disregard it. Moreover, this remark was one, isolated statement.  It did not render Sneed's trial fundamentally unfair.  *Boyle*, 201 F.3d at 717.

**D. Petitioner's mental disease or defect rendered him incompetent to stand trial, unable to participate in his defense, and, as aggravated by counsel's ineffectiveness, caused him to reject a plea bargain by which he could have avoided a death sentence in exchange for a life sentence.**

In this ground, Sneed alleges that he was denied the right to a fair trial under the due process clause and that he was denied his Sixth Amendment right to effective assistance of counsel.  He asserts that, despite the trial court's finding to the contrary, he was not competent to

53

stand trial.  Moreover, he claims that because he was forced to ingest powerful psychotropic drugs to restore his competency, he was denied due process because the side effects of the medication affected his demeanor, which in turn affected how the jury viewed him. Additionally, Sneed alleges that defense counsel were ineffective for ensuring that he receive this medication, by force if necessary, to restore him to competency.  Finally, Sneed asserts that counsel should have realized that he was actually not competent, even with the use of the medication, and could not make an adequate decision regarding a plea offer from the State.

Although the Respondent argues that these claims are procedurally defaulted, Sneed counters that he raised them in his Petition for post-conviction relief.  Sneed did raise essentially the same claims in his habeas Petition as grounds for relief twelve and thirteen in his post-conviction petition.  (Doc. 49, at 22-24.)  The Fifth District Court of Appeals summarily denied those claims, finding that they were "of record or are unsupported by any affidavit or exhibit and are therefore *res judicata*."  *Id.* at 479.

The Fifth District's decision that this claim was barred by res judicata precludes this Court from considering the claim on the merits.  The evidence that supported the trial court's finding that Sneed was competent, the transcripts of two competency hearings as well as the trial court's orders, were all contained in the record.  Thus, any claim pertaining to the trial court's competency findings should have been raised on direct appeal pursuant to the *Perry* holding. The Court finds that these claims are procedurally defaulted.

Sneed raises two arguments in support of his claims that he can overcome any default. First, he notes that he raised these claims in his application to reopen his direct appeal.  The Court  finds that these claims are procedurally defaulted because they were never raised, as they

54

are here, as distinct grounds for relief but raised as ineffective assistance of appellate counsel claims in the application to reopen. Because claims of ineffective assistance of appellate counsel are reviewed pursuant to *Strickland v. Washington*, 466 U.S. 688 (1984), rather than the authority applicable to raising competency issues, the Court finds that they are procedurally defaulted because they were never presented to the Ohio courts under the same theory as they were raised in the Petition. *See Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998)(holding that, to exhaust a claim, a petitioner must present it "to the state courts under the same theory in which it is later presented in federal court."). Thus, Sneed's assertion that he can overcome procedural default because he raised these claims in his *Murnahan* application must be rejected.

Sneed also asserts that these claims should be subject to the miscarriage of justice exception to the procedural default rule. Pursuant to the miscarriage of justice exception to the procedural default bar, a habeas petitioner's actual innocence of a crime entitles that petitioner to a merit review of his or her procedurally defaulted claims. *Schlup v. Delo*, 513 U. S. 298, 314-15 (1995). In *Schlup*, the Supreme Court determined that the petitioner should have been afforded a merit review of his claims after evidence suggested that he had been a victim of mistaken identity in the murder of a prison inmate.

The *Schlup* Court enunciated what standard of review applies in cases where the petitioner seeks to utilize claims of actual innocence as a gateway to assert he was wrongly convicted of the crime and should therefore escape the procedural default bar. The Court determined that a habeas petitioner must demonstrate that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Id.* at 327 (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986). To constitute the necessary "probability," the petitioner

55

must show "that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Id.; see also House v. Bell*, – U.S. –, 126 S.Ct. 2064 (2006)(utilizing *Schlup* standard and holding habeas petitioner set forth sufficient newly discovered scientific evidence to entitle him to a merit review of his habeas claims).

Sneed does not assert his actual innocence but claims that the miscarriage of justice exception applies in instances where, as here, a petitioner asserts that he was incompetent to stand trial.  To support his argument, Sneed cites to an Eighth Circuit Court of Appeals decision that was vacated *en banc*, apparently on other grounds.[16]  While the Court does not determine that the miscarriage of justice exception would never, in the abstract, apply to circumstances in which a habeas petitioner demonstrates that he or she was not competent to stand trial, it finds that the extension of this principal is not warranted here because Sneed makes no such demonstration.  Thus, for reasons described more fully below, the Court finds that Sneed cannot overcome the default of his claims by asserting that the miscarriage of justice exception applies to him.

As stated above, Sneed asserts three sub-claims in this ground for relief.  First, he asserts that he was not competent to stand trial.  He also asserts that the trial court did not afford him due process when it failed to consider the side effects that psychotropic medication would have on him and, in turn, his demeanor before the jury.  Finally, Sneed asserts that trial counsel were ineffective for failing to consider and raise several issues regarding his competency.

Addressing each claim in reverse order, the Court notes that Sneed raises ineffective assistance of counsel claims regarding his competency in his sixth ground for relief.  To avoid

---

[16]     Sneed cites to *Weekley v. Jones*, 56 F.3d 889, 894-5; n.4 (8th Cir. 1995), which
         was later vacated by the *en banc* decision in 76 F.3d 1459 (8th Cir. 1995).

56

duplicating its efforts, the Court addresses those issues when it reviews Sneed's sixth ground.

Sneed asserts that, despite the trial court's finding that he was competent to stand trial, he was not, in fact, competent.  Even if the trial court was reasonable in determining that he was competent, he argues, he was only competent because he was taking powerful psychotropic medication without his consent.  But for his incompetency, Sneed maintains, he would have accepted a plea offer from the State that would have spared his life.

On February 19, 1985, Sneed's counsel moved the court to find Sneed incompetent. Counsel informed the trial court that Sneed had been treated for mental problems on three prior occasions and that personnel at the Stark County Sheriff's Department had taken Sneed to the Massillon State Hospital since his arrest because he was behaving irrationally.  (Doc. 42, at 99-100.)  The court granted the motion and Sneed was then evaluated by three mental health professionals.  The trial court conducted a hearing regarding Sneed's competency on April 12, 1985.  (Doc. 31, at 22.)  It concluded that Sneed was incompetent to stand trial.  (Doc. 42, at 492.)

Initially, one of Sneed's doctors, Dr. Mijo Zakman, diagnosed Sneed with severe manic bipolar disorder and a schizo-affective disorder involving hallucinations and delusions.  After receiving medication to treat these conditions, however, Dr. Zakman reported that Sneed's condition changed dramatically.  Accordingly, Dr. Zakman concluded in a report dated September 12, 1985, that based on his continued use of psychotropic medication, Sneed had been restored to competency.  (Doc. 43, at 3.)  The trial court held a second competency hearing on February 10, 1986.  Based on Dr. Zakman's testimony, the court held that Sneed was competent to stand trial.  *Id.* at 10.

57

Sneed urges the Court to find that because the trial court only found him to be competent because of his use of medication without his consent, he was not truly able to make rational decisions.  Thus, he asserts that the Court should disregard the trial court's conclusion that he was competent to stand trial.

The United States Supreme Court has long recognized that the criminal trial of an incompetent defendant violates due process.  *Drope v. Missouri*, 420 U.S. 162, 172-73 (1975); *see also Pate v. Robinson*, 383 U.S. 375, 385-86 (1966)(holding due process violation applicable to state trials through Fourteenth Amendment).  To determine if a criminal defendant is competent to stand trial, a trial court must determine "whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding – and whether he has a rational as well as factual understanding of the proceedings against him."  *Dusky v. United States*, 362 U.S. 402, 402 (1960).

In addition to questioning the trial court's competency findings, Sneed asserts that this court should hold that those competency findings are a mixed question of law and fact, entitled to deference by this Court unless it "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

It is clear, however, that the Court must utilize the standard set forth in 28 U.S.C. § 2254(e)(1) when reviewing this claim.  That statute states that a federal habeas court must presume a state court's factual findings are correct.  A habeas petitioner may rebut this presumption only upon demonstrating it is incorrect "by clear and convincing evidence."  *Id.*

"The presumption of correctness accorded to state court findings only applies to basic,

58

primary facts, and not to mixed questions of law and fact." *Combs v. Coyle*, 205 F.3d 269, 277 (6th Cir. 2000), *cert. denied*, 531 U.S. 1035 (2000)(internal quotation marks and further citations omitted).  In *Mackey v. Dutton*, 217 F.3d 399, 413 (6th Cir. 2000), the Sixth Circuit held contrary to its prior findings, "§ 2254(d)'s presumption of correctness applies to a trial court's competency determination."  *Id.*  Although the *Mackey* court noted it previously had held in *Cremeans v. Chapleau*, 62 F.3d 167 (6th Cir. 1995), that competency determinations are mixed questions of law and fact, the subsequent United States Supreme Court holding in *Thompson v. Keohane*, 516 U.S. 99, 111 (1995), superceded the *Cremeans* holding.  *Id.*  District courts have followed this holding, concluding, "[a] determination by a state trial court that a habeas petitioner was competent to stand trial is a finding of fact that is entitled to the presumption of correctness for purposes of federal habeas review."  *Hastings v. Yukins*, 194 F. Supp. 2d 659, 670 (E.D. Mich. 2002)(citing *Maggio v. Fulford*, 462 U.S. 111, 117 (1983); *Mackey*, 217 F.3d at 412).

Here, the trial court found that Sneed was competent to stand trial based on Dr. Zakman's report and subsequent hearing testimony regarding Sneed's ability to assist his counsel and understand the nature of the charges and proceedings against him.  Sneed has done nothing to overcome the presumption of correctness that this Court must afford to the trial court's competency finding.  Thus, this aspect of Sneed's fourth ground for relief is not well-taken.

One final aspect of Sneed's claim does require further review.  Sneed asserts in the Petition that the trial court failed to consider the side effects the medication would have had on him and his right to a fair trial.  Specifically, Sneed claims that the trial court failed to consider the sedating effect of the psychotropic medications and how this change in his demeanor would

effect the jury's view of him and his attitude towards the murder and trial.  He maintains that he was denied due process because he was forced to take this medication without his consent.

In reviewing the transcripts of the trial court competency hearings, it is clear that the trial court did not consider the side effects that Sneed might experience from taking the medication and its concomitant impact on his right to a fair trial because of how the jury might perceive his demeanor.  It is noteworthy that counsel did not raise this issue to the trial court at any point during the competency hearings.  Thus, the next question the Court must address is whether the trial court was required, *sua sponte*, to address the side effect issue in the absence of counsel's raising it.

Pursuant to current law, a trial court must balance a criminal defendant's and the State's interests in determining whether that defendant must forcibly take medication to be restored to competency to stand trial.  In *Washington v. Harper*, 494 U.S. 210 (1990), the United States Supreme Court held that while a prisoner has a liberty interest to be free from unwanted medication, a state could treat a mentally ill prison inmate with antipsychotic drugs if the inmate was a danger to his or herself or to others.  *Id.* at 227.  The Court reiterated its findings in *Riggins v. Nevada*, 504 U.S. 127 (1992), and further held that a state could medicate a prisoner if the prosecution demonstrated that the inmate's treatment was medically appropriate, that there were no less intrusive means to treat the inmate, and that the medication was necessary for the inmate's "own safety or the safety of others."  *Id.* at 135.

More recently, in *Sell v. United States*, 539 U.S. 166 (2002), the Supreme Court held that the due process clause permits a state to forcibly medicate a prisoner to restore his or her competency to stand trial only if the treatment is medically appropriate and is unlikely to have

side effects that may undermine the fairness of the trial. It ruled that a trial court may medicate a prisoner solely for purposes of trial competence when the following three factors are met: (1) there is an important government interest at stake; (2) involuntary medication will significantly further the state's interests; and (3) the administration of drugs is medically appropriate. *Id.* at 180-81.

While these cases address the issue Sneed raises in the Petition, they appear to be inapplicable to the trial court's decision in Sneed's case because they all were decided after the trial court rendered its competency decision in 1986. Although Sneed advocates that the relevant state law decision which this Court must consider is the Fifth District Court of Appeals' decision to deny Sneed's appeal for post-conviction relief, it is clear that the trial court's decision regarding Sneed's medication and his subsequent restoration to competency is the only decision of relevance to this issue. Thus, based on the law as it stood in 1986, the trial court did not appear to have a duty to determine whether the side effects of the medication would preclude him from receiving a fair trial.

More importantly, unlike the above cases, there is no indication from the record that Sneed actually refused to take the prescribed medications. While Sneed suggests in his brief that he was incapable of making the decision of whether or not to voluntarily self-medicate, both the *Harper* and *Sell* inmates refused to take their prescribed medication. *Harper*, 494 U.S. at 214; *Sell*, 539 U.S. at 171.[17] Moreover, Sneed's counsel agreed to the continued use of his

---

[17]    Although the Court does not affirmatively state in the *Riggins* opinion that the defendant refused to take his medication, it does observe that the defense moved the court for an order suspending the administration of the defendant's medication during his trial, asserting that the effects of the drugs would alter his demeanor and mental state during the trial. *Riggins*, 504 U.S. at 130.

medication at the conclusion of the second competency hearing so that he could remain competent prior to his trial.  (Doc. 31, at 72-3.)  Without some overt indication that Sneed himself wished to be taken off of his medication, the trial court cannot be responsible for failing to determine whether the side effects of these drugs would deny him the right to a fair trial.  Accordingly, the Court finds that Sneed cannot prevail on this sub-claim of his fourth ground for relief.[18]

> **E. Multiple errors in the jury instructions at both phases of Petitioner's trial violated his constitutional rights to a fair trial, effective assistance of counsel, and to be free from an arbitrary and capricious death sentence.  These errors were compounded by discrete constitutional violations related to improper verdict forms, and the trial court's violation of its own sequestration order.**

In ground for relief five, Sneed alleges the trial court improperly instructed the jury either because of an alleged error in a given instruction, or by the failure to instruct.  The Court examines these claims individually mindful that an incorrect jury instruction does not warrant federal habeas corpus relief if it was merely undesirable, erroneous or universally condemned.  *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).  Upon habeas review, trial court instructional errors warrant relief only if they deprived a petitioner of constitutional due process.  *Gall v. Parker*, 321 F.3d 265, 321 (6th Cir. 2000).  "Thus, '[t]he only question for us is whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'"  *Poindexter v. Mitchell*, 454 F.3d 564, 586 (6th Cir. 2006)(quoting *Estelle*, 502 U.S. at

---

[18]     Even if the Court were to utilize the standards set forth in *Harper*, *Riggins*, and *Sell*, there is some indication that Sneed was harmful to others and himself prior to taking his medication.  Dr. Harold Blakelock, who testified during Sneed's first competency hearing, stated that Sneed was hostile to others and that Sneed had made several prior attempts at suicide.  (Doc. 31, at 39-40.)  Thus, because he was potentially harmful to himself or others while off the medication, the trial court could have found, pursuant to the *Harper* and *Riggins* holdings, that the State held a compelling interest in forcibly medicating him.

72)(further citations omitted).  The impropriety of the instruction must be considered in the context of the instructions as a whole and the trial record.  *Boyd v. California*, 494 U.S. 370, 380 (1990).

Because jury instruction errors typically are matters of state law, the standard for demonstrating that a jury instruction caused constitutional error in a habeas proceeding "is even greater than the showing required to establish plain error on direct appeal."  *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).  A habeas petitioner's "burden is especially heavy [when] no [affirmatively] erroneous instruction was given . . . .  An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law."  *Id.* at 155.  The Court now turns to Sneed's individual claims for relief.

**1. Guilt Phase Instructions**

**a. Aggravated Robbery Specification Instruction**

Sneed complains that the trial court misled the jury when it charged that the jury could convict him of aggravated murder with capital death specifications if it found that Sneed committed aggravated robbery while committing *or* attempting to commit or fleeing immediately after committing *or* attempting to commit aggravated robbery.  He claims that the jury could then convict him of capital murder without unanimously finding which felony offense he committed.  The Respondent asserts that this claim is procedurally defaulted because Sneed never raised it in any Ohio court.  Sneed cannot overcome the Respondent's assertion of procedural default.  Thus, the Court will not review the merits of the claim.[19]

---

[19]    Even if this claim were ripe for habeas review, it would be without merit.  In *Turner v. United States*, 396 U.S. 398, 420 (1970), the United States Supreme Court held that, "[t]he general rule is that when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive . . . the verdict stands if the

### b. Principal Offender Findings on Verdict Forms

Sneed next argues that the jury failed to find that he was the principal offender in the aggravated murder of Rowan and should not have been subject to the death penalty.[20]  When reviewing this claim on direct appeal, the Ohio Supreme Court found that it had no merit.  It reasoned as follows:

> Appellant in his fourth proposition of law does not challenge the trial court's jury instruction with regard to accomplice liability, but instead challenges the verdict forms and the jury's findings pursuant to those forms. Specifically, appellant argues that the jury did not find appellant to be the principal offender in the aggravated murder of Rowan as required by R.C. 2929.04(A)(7) and, therefore, the death sentence should be vacated.

> * * *

> In order that the death penalty for the crime of aggravated murder, a violation of

---

evidence is sufficient with respect to any one of the acts charged."  Here, Sneed actually admitted that he robbed Rowan.  Thus, the instruction regarding the felony of robbery was not erroneous.

[20]    Although the Respondent did not allege that this claim was procedurally defaulted, a review of the Ohio Supreme Court's opinion on this issue clearly indicates that the court reviewed that claim for plain error because Sneed failed to raise it on direct appeal.  *State v. Sneed*, 584 N.E.2d 1160, 1167 (Ohio 1992).  Thus, the Court could find that this claim is procedurally defaulted.
        The Court is not required, however, to engage in a *sua sponte* analysis of procedural default where the Respondent has declined to raise the issue.  "[P]rocedural default is normally a defense that the State is obligated to raise and preserve if it is not to lose the right to assert the defense thereafter."  *Trest v. Cain*, 522 U.S. 87, 89 (1997) (internal quotation marks and citations omitted).  Thus, a habeas court may forego a procedural default analysis and address the merits of a claim when the respondent fails to raise this defense.  *See, e.g., Jamison v. Collins*, 100 F. Supp. 2d 521, 597 (S.D. Ohio 1998)(addressing merits of claim when respondent failed to raise procedural default defense in return of writ or supplement to return of writ).  The Court does, however, have discretion to apply this procedural bar *sua sponte* in some circumstances. *Lorraine v. Coyle*, 291 F.3d 416, 426 (6th Cir. 2002); *Elzy v. United States*, 205 F.3d 882, 886 (6th Cir. 2000).

64

R.C. 2903.01(B), may be imposed, the state must prove beyond a reasonable doubt that the accused purposely caused the death of another and additionally that the accused was the principal offender in the commission of the aggravated murder, as mandated by R.C. 2929.04(A)(7). *See State v. Jenkins* (1984), 473 N.E.2d 264, 280, fn. 17.  Appellant directs this court's attention to the disjunctive nature of the verdict form and argues that it had the potential of creating an unanimous jury verdict with fewer than all the jurors actually finding him to be the principal offender."  The contention is that appellant could have been convicted by less than a unanimous jury since some of the jurors could have found that he was the principal offender, others that he was the aider, others that he was the abettor, and still other jurors could have found him only to have been a conspirator in the crime. Assuming one of the jurors had failed to agree that appellant was the principal offender, appellant could still be convicted for aggravated murder under R.C. 2903.01(B) and 2923.03; however, appellant could not be subject to the death sentence pursuant to R.C. 2929.04(A)(7)

We are not persuaded by appellant's argument. We observe that the jury found, on a separate verdict form, that the appellant "DID personally perform every act constituting the offense in this case of Aggravated Murder." Prior to the jurors' signing this verdict form, the trial judge defined the term "principal offender" in the jury instructions as "one who personally performs every act constituting the offense, in this case aggravated murder." Therefore, upon signing this separate verdict form each juror found that the state had met its burden of proving beyond a reasonable doubt that appellant was the principal offender in the aggravated murder. This renders any claimed ambiguity in the complained-of verdict form resolved. Accordingly, we hold that R.C. 2929.04(A)(7) was fully complied with because each individual juror's signing a verdict form that found appellant personally performed every act constituting the offense of aggravated murder was tantamount to a specific finding that appellant was the principal offender.

Additionally, we must emphasize that the evidence in this case does not reasonably suggest that an individual juror could have found appellant not to have been the principal offender. The evidence adduced by the prosecution does not reasonably compel a juror's conclusion that appellant's participation in this crime was merely that of an aider, an abettor, or a conspirator. Neither does the evidence support any theory other than that presented to the jury by the prosecution. Through the testimony of various witnesses, the prosecution sought to prove that appellant, and not Brown, fired the shot that killed the victim. The possibility that this testimony was self-serving was adequately explored by appellant's attorney by a thorough cross-examination of the state's witnesses. Appellant neither introduced any tangible evidence that he was the accomplice rather than the principal offender, nor did he testify to that effect.

Therefore, we believe that the outcome of the trial would not have been otherwise

had the jury made an explicit finding that appellant was the principal offender. Accordingly, we hold that in the instant case it is of no meaningful consequence that the jury verdict form was stated in the disjunctive when (1) upon the signing of a separate verdict form, each juror found that the appellant personally performed every act constituting the offense of aggravated murder, and (2) the evidence in this case does not reasonably suggest that appellant was other than the principal offender.

*State v. Sneed*, 584 N.E.2d 1160, 1167-69 (Ohio 1992).

The Ohio Supreme Court's thorough analysis of this claim is not contrary to or an unreasonable application of any United States Supreme Court precedent. As stated above, Sneed must demonstrate that he was denied due process because the jury did not find that he was the principal offender in Rowan's murder. Because it is clear from the verdict forms that the jury actually found that Sneed committed Rowan's murder, no due process violation occurred. This claim lacks merit.

### c. Accomplice Credibility Instruction

Sneed maintains that the trial court erred when it failed to instruct the jury about the questionable credibility of accomplice testimony. Prior to Sneed's trial, the State offered a plea to Brown in exchange for her testimony. In accordance with this plea, Brown testified regarding the details of Rowan's murder. Sneed argues that the trial court should have instructed the jury regarding the suspect credibility of her testimony.

Prior to the culpability phase deliberations, the trial court instructed the jury regarding the motivations of witness testimony. It charged:

Credibility. You are the sole judges of the facts, the credibility of the witnesses, and the weight of the evidence. To weigh the evidence, you must consider the credibility of the witnesses. To do this, you will apply the tests of

66

truthfulness which you apply in your daily lives.

These tests include the appearance of each witness upon the stand, the witness's manner of testifying, the reasonableness of the testimony, the opportunity the witness had to see, to hear, and to know the things concerning which the witness testified, the witness's accuracy of memory, the witness's motivation, that is, what did a particular witness have to gain or lose by testifying as he or she did, the witness's frankness or lack of it, intelligence, interest and bias, if any, together with all the facts and circumstances surrounding the testimony.

(Doc. 37, at 54-5.)

On direct appeal, the Ohio Supreme Court held that this instruction was sufficient to inform the jury regarding the credibility of a testifying co-defendant. *Sneed*, 584 N.E.2d at 1167. Moreover, the Sixth Circuit Court of Appeals has held that a general credibility instruction is sufficient to satisfy any due process concerns upon habeas review. *Scott v. Mitchell*, 209 F.3d 854, 883 (6th Cir. 2000). Thus, this sub-claim is not well-taken.

### d. Lesser Included Offense Instruction

Sneed claims that the trial court should have instructed the jury regarding lesser included offenses. The Respondent asserts that this claim is procedurally defaulted because while Sneed raised it in his petition for post-conviction relief, the Fifth District Court of Appeals held on appeal from denial of post-conviction relief that Sneed could have raised this claim on direct appeal as an ineffective assistance of counsel claim because counsel failed to object to the claim during trial. Thus, it held, the claim is procedurally defaulted. Sneed cannot establish cause and

prejudice or a miscarriage of justice to excuse the default.  Accordingly, the Court will not review the claim on the merits.

Were the Court to do so, it would find that this claim does not warrant habeas relief.  In *Beck v. Alabama*, 447 U.S. 625 (1980), the United States Supreme Court held that it is unconstitutional to impose a death penalty when a "jury [is] not permitted to consider a verdict of guilty of a lesser included non-capital offense, and when the evidence would have supported such a verdict."  *Id.* at 627.  In that case, the Count found that the jury's fact-finding function was impermissibly impinged by its inability to consider the lesser-included offense of felony murder when the defendant's intent was disputed during trial.

Two years later, in *Hopper v. Evans*, 456 U.S. 605 (1982), the Court revised the *Beck* decision, placing limits on its applicability.  The *Hopper* defendant testified during mitigation that he felt no remorse for the murder he committed, and would return to a life of crime if he were ever freed.  *Id.* at 607.  The *Hopper* Court determined that the decision whether to provide the jury with a lesser-included offense charge was a fact specific one.  Noting the defendant's testimony, the Court held that a lesser-included offense charge was not warranted in that case.

In the instant case, the trial court instructed the jury not only regarding the elements of aggravated murder, but the lesser included offense of murder.  (Doc. 37, at 70.)  Moreover, Sneed does not explain why the lesser included offenses the trial court provided fun afoul of *Beck*  and *Hopper*.

### e. Aider and Abettor Instruction

Sneed claims that the instruction the trial court provided the jury on aider and abettor criminal liability was unconstitutional.  The Respondent claims that this sub-claim is also

68

defaulted as Sneed failed to raise it at any juncture of his state court appeals.  Sneed cannot

successfully argue a means of excusing the default.  Therefore, the Court will not review the

claim.[21]

### f. Reasonable Doubt Instruction

Sneed argues that the trial court erroneously charged the jury on reasonable doubt.

Respondent alleges this claim is procedurally defaulted because the Fifth District Court of

Appeals held that Sneed could have raised it on direct appeal as an ineffective assistance of

counsel claim because counsel failed to object to the instruction during trial.  This Court agrees

and finds that this sub-claim is procedurally barred.

This claim would be meritless, however, even if it were ripe for review.  The Sixth

Circuit has found that Ohio's statutory definition of reasonable doubt, the definition supplied by

the trial court, is constitutional.[22]  *Byrd v. Collins*, 209 F.3d 486, 527 (2000)(citing *Thomas v.*

*Arn*, 704 F.2d 865, 867-69 (6th Cir. 1983)).  To offend due process, the instruction must be of

the type that could mislead the jury into finding no reasonable doubt when in fact there was

---

[21]     This claim lacks merit in any event.  First, the trial court did charge the jury on
the definition of aider and abettor liability.  (Doc. 37, at 65.)  Moreover, Sneed
does not explain why this instruction was infirm.

[22]     That statute reads:
"Reasonable doubt" is present when the jurors, after they have
carefully considered and compared all the evidence, cannot say
they are firmly convinced of the truth of the charge.  It is a doubt
based on reason and common sense.  Reasonable doubt is not mere
possible doubt, because everything relating to human affairs or
depending on moral evidence is open to some possible or
imaginary doubt.  "Proof beyond a reasonable doubt" is proof of
such character that an ordinary person would be willing to rely and
act upon it in the most important of his own affairs.
Ohio Rev. Code § 2901.05(D).

some.  *Holland v. United States*, 348 U.S. 121, 140 (1954); *Thomas*, 704 F.2d at 868.  In the present case the trial court merely read the statutory jury instruction that has been found constitutional.  The instruction, thus, cannot be considered misleading.  This claim is without merit.

### g. Use of a Deadly Weapon Instruction

Sneed next asserts that the trial court improperly charged the jury regarding the inferences it could make regarding the use of a deadly weapon.  Sneed failed to raise this claim at any point during his state court appeals.  Thus, this claim is procedurally defaulted.

The trial court did charge the jury with a deadly weapon instruction as follows: "If a wound is inflicted upon a person with a deadly weapon in a manner calculated to destroy life, the purpose to kill may be inferred from the use of the weapon.  Such inference is not conclusive but may be accepted or rejected by you in your deliberations." *Id.* at 62.  Sneed does not explain how this instruction relieved the State of its burden of proof or was insufficient to inform the jury about the non-conclusive nature of the use of deadly force when committing an offense with a deadly weapon.  This claim lacks merit.

### h. Circumstantial Evidence Instruction

Sneed next complains that the trial court improperly charged the jury on the definition of "circumstantial evidence."  The Respondent asserts that this claim is procedurally defaulted because, like the claims reviewed above, the Fifth District held that Sneed should have raised this claim on direct appeal.  The Court agrees and finds that this claim is defaulted.[23]

---

[23]  This claim also lacks merit.  Other than making a conclusory statement that the trial court erred in defining circumstantial evidence, Sneed does not specify what portions of the instructions were unconstitutional.

### i. Unanimity Instruction

Sneed contends that the trial court "failed to give the jury an augmented unanimity charge as to the death penalty specification."  (Doc. 1, at 21.)  In his Traverse Sneed explains that he is referring to a penalty phase instruction in this sub-claim.  The Court will address this claim when it reviews the penalty phase instruction claims, *infra*.

### j. Firearm Specification Instruction

Here Sneed asserts that the trial court erroneously stated that there was a deadly weapon specification to count one of the indictment.  Sneed raised this claim on direct appeal and the Ohio Supreme Court addressed it on the merits.  The court held that the trial court's error did not require reversal of Sneed's conviction:

> In his sixth proposition of law, appellant argues that the trial court committed plain error by submitting to the jury an instruction and verdict form concerning a firearm specification to the aggravated murder count which was not charged in the indictment.  Our review of the record reveals that appellant *was charged* by indictment with one count of aggravated murder with a death penalty specification *and a firearm specification*, and one count of aggravated robbery with a firearm specification.  The jury instructions and verdict forms correctly reflected an additional firearm specification to the aggravated murder count. Accordingly, this proposition of law is without merit.

*State v. Sneed*, 584 N.E.2d 1160, 1171 (Ohio 1992).  The Ohio Supreme Court aptly pointed out the flaw in Sneed's factual assumptions.  This claim has no merit.

### k. More than One Death Specification

It appears that this claim is duplicative of Sneed's first sub-claim regarding jury instructions at the culpability phase of trial.  Because the Court already reviewed that claim, *supra*, the Court will not re-address it here.

### 2. Penalty Phase Instructions

71

### a. Principal Offender Instruction

Sneed argues that the trial court erred when it stated that one aggravating factor was that he was the principal offender because, Sneed maintains, the jury never found that Sneed was the principal offender.  The Respondent alleges that this claim is procedurally defaulted because Sneed never raised this claim at any point in his state court appeals.  Sneed cannot overcome these allegations of procedural default.  Thus, the Court will not address it on the merits.[24]

### b. Trial Court Listed All Statutory Mitigating Factors

Sneed next complains because the trial court read the entire list of mitigating factors from Ohio Revised Code § 2929.04(B).  He claims that by reading the mitigating factors for which Sneed did not present evidence, the jury was exposed to irrelevant and prejudicial information as it may have assumed that Sneed was required to present evidence under each mitigating factor.  The Respondent asserts that this claim is procedurally defaulted because Sneed never raised it to any state court.  There is no means of excusing this default.  Thus, the Court will not review the claim on the merits.[25]

---

[24] This claim lacks merit in any event.  When addressing a distinct claim, the Ohio Supreme Court observed that the jury did, in fact, find that Sneed was the principal offender.  *Sneed*, 584 N.E.2d at 1168-69.

[25] Even if the claim were ripe for federal habeas review, the claim would not be well-taken.  The Sixth Circuit Court of Appeals has held that appellate counsel were not ineffective for failing to raise the issue of the trial court's listing of mitigating factors for the jury.  *See Poindexter v. Mitchell*, 454 F.3d 564, 585 (6th Cir. 2006)(holding no merit to ineffective assistance of appellate counsel claim and noting that, at the time of petitioner's 1988 appeal, before the Ohio Supreme Court decided *State v. DePew*, 528 N.E.2d 542, 557-58 (Ohio 1988), "the Ohio Supreme Court had never reversed a death sentence on the ground that the trial court gave the jury an instruction that neutrally listed all statutory mitigating factors, even though the list included factors the defense had not presented; characterizing such errors as either harmless or not plain error.")(citations omitted). Because Sneed's trial occurred in 1986, prior to the *DePew* holding, the

72

### c. Unanimity Instruction

It is somewhat unclear what Sneed raises in this sub-claim.  In the Petition, Sneed states that the trial court failed to give an augmented unanimity instruction regarding the death penalty specification.  In the Traverse, he appears to explain this sub-claim by asserting that the trial court stated that a life instruction must be unanimous.  Moreover, Sneed maintains, the court did not inform the jury what it should do in the event that they did not agree on a life verdict.  Thus, Sneed concludes, the jurors may have believed that they could only have prevented a death sentence in the event that they unanimously agreed upon a life sentence.

The Respondent contends that this claim is procedurally defaulted because Sneed never raised it at any juncture of his state court appeals.  Sneed does not counter this assertion.  Thus, the Court finds that the claim is procedurally defaulted and not entitled to a review on the merits.

This claim also lacks merit.  It is clear from the language in the Traverse that what Sneed raises was a unanimous-life instruction.[26]  The Sixth Circuit recently held that a unanimous-life instruction was consistent with Ohio law and did not run afoul of constitutional mandates.  In *Williams v. Anderson*, 460 F.3d 789, 807 (6th Cir. 2006), the court held that "[u]nder Ohio law, a jury verdict recommending a sentence of life in a death penalty case must be unanimous."  *Id.* at 808-9.  Moreover, it held that if the petitioner was asserting, as Sneed does here, that the jury instruction was misleading because it failed to inform the jury regarding the consequences of a deadlock, the United States Supreme Court rejected this type of challenge under the Federal

_____

trial court did not err in listing the statutory mitigating factors.

[26]    This claim is distinct from an "acquittal-first" instruction in which the trial court charges the jury that it must first unanimously agree that a death sentence is inappropriate before determining which life sentence would be appropriate.

73

Death Penalty Act in *Jones v. United States*, 527 U.S. 373 (1999).  The *Williams* opinion squarely addressed and rejected this sub-claim.

### d. Definition of Reasonable Doubt

Sneed argues here that the trial court improperly charged the jury by providing it with Ohio's statutory definition of reasonable doubt.  This claim was raised and addressed in section (1)(f), *supra*, and will not be re-addressed here.

### e.  "Any Other Factors" Instruction

In this sub-claim Sneed contends that the trial court erred when it charged the jury that it could consider "any other factor" when formulating its death sentence.  Although the trial court was speaking of mitigating factors when it made this statement, Sneed maintains that the statement invited jurors to consider non-statutory aggravating factors when rendering its sentencing decision.  As with his previous sub-claims, the Respondent asserts that this sub-claim is procedurally defaulted.  While Sneed raised it in his petition for post-conviction relief, the Fifth District Court of Appeals held that it was barred from a merit review on grounds of res judicata because it could have been raised on direct appeal.  Sneed cannot overcome this default by demonstrating cause and prejudice or a miscarriage of justice.  Thus, the Court will not review it on the merits.[27]

---

[27]     This claim would be without merit in any event. Sneed extrapolates one phrase from the trial court's instructions regarding the jury's ability to consider any mitigating evidence and presumes that the jury would impermissibly apply this phrase to the aggravating circumstances.  This assertion defies logic. Moreover, other than sheer speculation, Sneed does not support this theory with any indication that jurors were thus confused.  The trial court instructed jurors regarding the sole aggravating circumstance.  It further informed them that "[n]o other aggravating circumstance may be considered by you, and you are not allowed to take account of any other factors or circumstances as an aggravating circumstance."  (Doc. 42, at 627-8.)

74

### f. Trial Court did not Define the Term "Outweigh"

Sneed claims that the trial court did not properly define the term "outweigh."  Sneed raised this claim in his post-conviction relief petition but the Fifth District Court of Appeals held on appeal of that petition that the claim was barred by res judicata because Sneed could have raised it on direct appeal.  Thus, this claim is procedurally defaulted.[28]

### g. Presumption of Death Instructions

Sneed's final trial court instruction claim is that various mitigation phase instructions created a bias toward a verdict of death.  He claims that, pursuant to linguists' opinions, several of these instructions were vague and misleading.  Sneed asserts that the trial court's acquittal-first instruction, its any other factor instruction, its unanimous life instruction and its failure to define the term "mitigate" all misled the jury into sentencing him to death.  Although Sneed raised this claim in his post-conviction petition, the Fifth District Court of Appeals refused to review it on the merits because it was barred on grounds of res judicata as Sneed could have raised it on direct appeal.  Sneed's failure to explain why these sentences were vague and misleading and led the jury to return a death sentence also render this claim meritless.

**F. Petitioner's trial counsel prejudiced Petitioner by failing to provide objectively reasonable effective assistance of counsel at either phase of his capital trial, and the trial court failed in its duty to ensure that Petitioner received a fair trial and that his counsel functioned as the type of advocates necessary to ensure a reliable conviction and/or death sentence in violation of Petitioner's constitutional rights.**

Sneed's sixth claim for relief is that defense counsel provided constitutionally ineffective assistance during both phases of the trial in violation of his Sixth and Fourteenth Amendment

---

[28]    Moreover, the trial court charged the jury that the term "outweigh" means "to weigh more than, to be more important than."  (Doc. 42, at 630.)  Sneed does not specify why this definition is insufficient or erroneous.

rights.  He contends that counsel were ineffective in thirteen (13) instances in the pre-trial and culpability portions of his trial and in four instances during the mitigation hearing.  The defaulted status and merits of each sub-claim is reviewed below.

To assert a successful ineffective assistance of counsel claim, a petitioner must satisfy the familiar two-prong test for ineffective assistance of counsel set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  First, the petitioner must demonstrate counsel's errors were so egregious "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id.*  Second, the petitioner must show he or she was prejudiced by counsel's errors.  "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Id.*

A petitioner must point to specific errors in counsel's performance.  *United States v. Cronic*, 466 U.S. 648, 666 (1984).  Thereafter, a reviewing court must subject the allegations to rigorous scrutiny, determining "whether, in light of all circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance."  *Strickland*, 466 U.S. at 690.  A reviewing court must strongly presume counsel's conduct was reasonable and might be part of a trial strategy.  *Id.* at 689.  "'Judicial scrutiny of a counsel's performance must be highly deferential'" and . . . 'every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'"  *Cone v. Bell*, 535 U.S. 685, 698 (2002)(quoting *Strickland*, 466 U.S. at 689).

To ascertain whether counsel's performance prejudiced a criminal proceeding, a reviewing court does not speculate whether a different strategy might have been more successful,

76

but a court must "focus[] on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).

### 1. Ineffective Assistance of Counsel During Culpability Phase of Trial

As stated above, Sneed alleges thirteen instances of ineffective assistance at this stage of trial.  Specifically, he contends that trial counsel were ineffective for: (1) failing to object to the trial court's finding that Sneed was competent to stand trial; (2) failing to request a second competency hearing; (3) asserting a theory of defense which included denying that he killed Rowan; (4) failing to assess a not guilty by reason of insanity defense; (5) failing to procure the assistance of experts; (6) failing to investigate the culpability aspects of the case; (7) incorrectly advising Sneed to reject a plea offer from the State based on the failure to investigate and prepare for trial; (8) failing to conduct an adequate voir dire; (9) failing to object to jury instruction and verdict forms; (10) failing to request a jury instruction on lesser included offenses; (11) failing to object to the trial court's failure to provide an augmented verdict instruction; (12) failing to object to the trial court's use of Ohio's statutory definition of reasonable doubt; (13) failing to raise the unconstitutionality of Ohio's death penalty statutes.

### a. Sub-claims 1 and 2: Sneed's competency to stand trial

Sneed asserts that trial counsel were ineffective for failing to challenge the trial court's finding that he was competent to stand trial.  He also asserts that counsel should have asked for a second competency hearing "after it became apparent that [he] could no longer assist in his own defense."  (Doc. 1, at 21.)

The Respondent asserts that these claims are procedurally defaulted because Sneed first

77

raised them in his post-conviction petition.  The Fifth District Court of Appeals held that they were barred by res judicata because Sneed should have raised them on direct appeal.  Thus, these claims are procedurally defaulted.

They also lack merit.  As stated above, Sneed's counsel moved the court to find Sneed incompetent on February 19, 1985.  Counsel informed the trial court that Sneed had been treated for mental problems on three prior occasions and that personnel at the Stark County Sheriff's Department had taken Sneed to the Massillon State Hospital since his arrest because he was behaving irrationally.  (Doc. 42, at 99-100.)  The court granted the motion and Sneed was then evaluated by three mental health professionals.  The trial court conducted a hearing regarding Sneed's competency on April 12, 1985.  (Doc. 31, at 22.)  It concluded that Sneed was incompetent to stand trial.  (Doc. 42, at 492.)

Initially, one of Sneed's doctors, Dr. Mijo Zakman, diagnosed Sneed with sever manic bipolar disorder and a schizo-affective disorder involving hallucinations and delusions.  After receiving medication to treat these conditions, however, Dr. Zakman reported that Sneed's condition changed dramatically.  Accordingly, Dr. Zakman concluded in a report dated September 12, 1985, that based on his continued use of psychotropic medication, Sneed had been restored to competency.  (Doc. 43, at 3.)  The trial court held a second competency hearing on February 10, 1986.  Based on Dr. Zakman's testimony, the court held that Sneed was competent to stand trial.  *Id.* at 10.

Sneed does not explain in his briefs why, after hearing the testimony of Dr. Zakman, his counsel were ineffective for not challenging the trial court's findings.  As with his fourth ground for relief, Sneed does not offer any support for his contention that he was forced against his will

78

to take the psychotropic medications that restored him to competency.  Importantly, Dr. Zakman testified during the mitigation hearing in July 1986, that Sneed actually expressed remorse for what he had done to Rowan, rather than refer to himself and the events surrounding the murder in the third person.  (Doc. 41, at 450.)   Thus, Sneed's mental health appears to have improved after the trial court found him to be competent to stand trial.

Also similar to his fourth ground, there was no law in place at the time of the trial which counsel can be accused of disregarding.  As stated above, the law in 1986, the date of Sneed's trial, did not prohibit the medication of a criminal defendant for purposes of restoring competency.  Thus, Sneed is hard pressed to assert that counsel should have anticipated that, several years later, the United States Supreme Court would hold that restoring competency alone cannot be the predicate to medicate a mentally ill criminal defendant.  *Sell v. United States*, 539 U.S. 166 (2002).  Because counsel did not act unreasonably based on the law in effect at the time of the trial, Sneed's assertion that counsel were ineffective for failing to question the trial court's decision to medicate him so that he would be restored to competency should not be well-taken.

Equally unpersuasive is Sneed's assertion that counsel should have requested a second competency hearing.  Sneed does not outline in his briefs when counsel should have requested this hearing and why they should have done so.  With only this summary assertion that counsel were ineffective, the Court finds that this sub-claim is not well-taken.

### b. Sub-claim 3: Defense Theory

Sneed takes issue with the defense theory in which counsel asserted that Brown was the actual shooter.  Sneed claims that this theory was inconsistent with the evidence and discredited him before the jury when he ultimately admitted to killing Rowan during mitigation.

79

Additionally, Sneed claims that rather than proceeding to trial, counsel should have accepted a plea offer by the prosecution made on the eve of trial which would have spared his life.  The Respondent asserts that this claim is unexhausted and procedurally defaulted because Sneed never raised it to any Ohio court.  This Court agrees.[29]

Even if it were ripe for habeas review, the Court finds that this claim fails on the merits.  In an exhibit to his post-conviction relief petition, Sneed stated that he followed the advice of his attorneys "and chose to have a trial rather than accept a plea offer."  (Doc. 48, at 425.)  He further stated that "[i]f my attorneys had advised me to accept the plea offer before trial, I would have blindly followed their advice . . . ."  *Id.*  Thus, Sneed now asserts, counsel were ineffective for so advising him.

Although the trial record does not directly contradict Sneed's statement, it does offer an alternative description of these events.   After Sneed rejected the State's offer, the trial court sought to place Sneed's rejection of it on the record.  Counsel stated that Sneed rejected this offer, "We took [the] offer to Mr. Sneed, and it was Mr. Sneed's decision not to accept the offer, to proceed to trial on the indictment."  (Doc. 31, at 203.)  The trial court then questioned Sneed directly about whether he truly wished to proceed to trial, urging him to seriously consider the offer.  Sneed responded, "I don't want no plea bargain.  I thought about it already.  I don't want a plea bargain.  I understand the system of plea bargaining.  I don't want no plea bargaining.  I

---

[29]     Sneed argues in his Traverse that because he raised an ineffective assistance of counsel claim pertaining to counsel's failure to assert a not guilty by reason of insanity plea, that he somehow raised this sub-claim by implication.  While quite creative, this assertion is utterly without authoritative support.  *See, e.g., Hicks v. Straub*, 377 F.3d 538, 552-53 (6th Cir. 2004)(holding that "the exhaustion doctrine requires the petitioner to present 'the same claim under the same theory' to the state courts before raising it on federal habeas review.")(quoting *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987)).

want to fight it in front of a jury." *Id.* at 205.[30]

While the above colloquy does not provide conclusive evidence of counsel's efforts to persuade Sneed to accept the plea offer, it does imply such was the case. The Court finds that Sneed's self-serving affidavit is insufficient to support Sneed's position that defense counsel rejected the offer. Rather, it appears more likely that counsel were acting at Sneed's behest. If that is the case, the Court finds that defense counsel did not act unreasonably. *Coleman v. Mitchell*, 244 F.3d 533, 544-46 (6th Cir. 2001).[31]

Based on the evidence, counsel's decision to assert a defense theory in which Sneed would claim Brown actually murdered Rowan is not an objectively unreasonable one. There was no dispute during trial that Brown had shot the victim. Moreover, Sneed had admitted that he was present when Rowan was killed. Thus, this theory of defense may have been the only

---

[30]     After Sneed's half-brother, Ricky Dillard testified against him during trial, Sneed later attempted to accept the State's offer. As with the initial plea agreement, it appears from the record that counsel were acting at Sneed's instruction as counsel stated:

> [Y]esterday, Sunday, at the Stark County Jail [defense counsel conferred with Sneed] for a period of two to two and a half hours.
>         At that time, Defense Counsel went over with David Allen Sneed the evidence that was presented to him to date in his trial.
>         David Allen Sneed then directed Defense Counsel to notify the Court and the Prosecutor's Office the following day, June 9, 1986, of his wish and desire to enter a plea of guilty to the charge of aggravated murder.

(Doc. 36, at 5.) Sneed offered to plead guilty in exchange for receiving the sentence the prosecution had offered him before trial. The prosecution rejected Sneed's offer. *Id.* at 6.

[31]     Given the unequivocally defaulted status of the claim, it appears unnecessary to speculate whether counsel would have acted unreasonably in recommending that Sneed reject the State's offer. The Court notes, however, that Sneed cites no authority that would require a finding that counsel's decision to reject the State's offer was, *per se*, constitutionally ineffective.

81

choice available to counsel.  Counsel did not act unreasonably by asserting this theory of defense.

### c. Sub-claim 4: Failure to Raise Insanity Defense

Sneed alleges that his trial counsel were ineffective for failing to assert a not guilty by reason of insanity defense.  He claims that counsel did not adequately investigate this defense before resorting to utilizing what he deems the insufficient defense of asserting that Brown was Rowan's actual shooter.  Sneed raised this claim on direct appeal.  Thus, it is not defaulted.[32]

Although raised to the Ohio Supreme Court, that court failed to provide a reasoned analysis for rejecting this claim.  While it identified *Strickland v. Washington*, 466 U.S. 668 (1984), as the United States Supreme Court authority governing a criminal defendant's right to effective assistance of counsel, it summarily determined that Sneed had failed to meet his burden pursuant to *Strickland*.  The only insight into its reasoning came in a footnote that stated that counsel, "chose not to pursue the insanity defense as such trial strategy would jeopardize his opportunity of convincing the jurors that Chevette Brown, not David Sneed, was the assailant who fatally shot Herbert Rowan."  *Sneed*, 584 N.E.2d at 1171 n.6.[33]

Regardless of the depth of analysis with which the Ohio Supreme Court reviewed this claim, it does not appear to be meritorious in any event.  While Sneed claims that counsel were

---

[32]    Sneed also raised this claim in his post-conviction relief petition.  Because he already had raised, and the Ohio Supreme Court already had addressed, this issue on direct appeal, however, the Fifth District Court of Appeals held that the claim was barred by res judicata.

[33]    Aside from being unhelpful in deciding this issue, the Ohio Supreme Court's supposition about how counsel chose their strategy seems unlikely.  Logic would dictate that, based on the severity of Sneed's mental illness, counsel first would have inquired whether Sneed could assert a viable insanity defense.

ineffective for failing to request a sanity evaluation, he fails to recognize that counsel had an arsenal of mental health professionals who examined Sneed.  Sneed does not articulate how further examinations for purposes of sanity only would have differed significantly from the mental evaluation reports that counsel actually procured.  Thus, Sneed cannot successfully assert that his counsel's inactions in this instance were objectively unreasonable.

Moreover, Sneed does not demonstrate how this alleged failure prejudiced the outcome of the culpability phase of the trial.  During the mitigation hearing, several mental health professionals testified regarding Sneed's mental state at the time of the act.[34]  Each concluded that Sneed suffered from bipolar disorder, schizophrenia, and/or a number of personality disorders at the time of the act, and that he had ceased taking medication for these ailments.

Whether Sneed knew the wrongfulness of the murder, however, was less clear cut.  Dr. Edward Dutton unequivocally testified that Sneed knew that the act of killing Rowan was wrong after he shot him.  (Doc. 40, at 295.)  When asked whether he knew the wrongfulness of the act prior to committing it, Dr. Dutton's response was more ambiguous.  The colloquy transpired as follows:

> Q.    And that mental illness, was that a factor in rendering him unable to appreciate the criminality of his act?
>
> A.    I think mental illness was a factor in him not recognizing at least certain aspects

---

[34]    Pursuant to the Ohio Revised Code,  "a person is 'not guilty by reason of insanity' relative to a charge of an offense only if he proves . . . that at the time of the commission of the offense, he did not know, as a result of a severe mental disease or defect, the wrongfulness of his acts."  Ohio Rev. Code § 2901.01(N)(current version at Ohio Rev. Code § 2901.01(A)(14)); *State v. Staten*, 267 N.E.2d 122, 124 (Ohio 1971).  Under Ohio Revised Code § 2929.04(B)(3), a capital defendant may mitigate punishment for a crime if he or she was legally insane at the time of the criminal act.

of the criminality of his act.

*Id.* at 290.  During cross-examination, Dr. Dutton was equally opaque:

> Q.     So he related to you that he knew it was wrong afterwards, but what you
>
> are saying is he related to you he didn't know it was wrong before?
>
> Again, correct me if that is not a fair statement.
>
> A.     I think in terms of how he related it to me, you know, he had the intention of
>
> robbing the victim, robbing the victim as had been his pattern earlier.
>
> He was used to having the victims comply with his request and that this
>
> particular gentleman didn't follow the rules.  He didn't comply to his request,
>
> became demanding and threatening to him.
>
> [The] Defendant said things happened real fast, and he reacted as he
>
> reacted earlier in the streets in situations when he felt threatened by striking back.

*Id.* at 295-6.  Thus, Dr. Dutton did not affirmatively state that Sneed was unaware of the

wrongfulness of murdering Rowan at the time he did so.

Dr. Zakman testified that Sneed did not know the wrongfulness of his acts at the time he

murdered Rowan.  During cross-examination, however, the prosecutor exposed several defects

with the defense's attempt to prove the (B)(3) mitigating factor. First, several prison and hospital

personnel believed that Sneed was malingering, *i.e.*, feigning or exaggerating his psychiatric

symptoms to escape criminal liability.  One such report came from a hospital worker who

attended to Sneed at Lima State Hospital.  The report stated, "Seen tonight, did not play or joke.

We had some serious talks.  He admits he plays a fool to stay in places like Lima.  He learned a

lot of tricks while at Massillon."  (Doc. 41, at 483.)  Thus, there was some evidence that Sneed's

mental illness was, at least, not as severe as he outwardly demonstrated.
Additionally, Dr. Zakman admitted during cross-examination that Sneed's psychiatric issues developed shortly after he first was arrested on a prior charge.

The prosecution also revealed a second difficulty the defense team would have encountered if they had asserted a not guilty by reason of insanity defense.  After Dr. Zakman concluded on direct examination that Sneed did not know the wrongfulness of his acts, the prosecution highlighted Sneed's actions in the moments leading up to and directly subsequent to Rowan's murder.  These acts include: (1) Sneed became aware that a man was driving around the block and his instruction to Brown that she should stop the man and tell him that they wanted a ride home; (2) Sneed was carrying a gun; (3) Sneed gave Rowan false instructions on how to get to his residence; (4) Sneed put a gun in Rowan's face, attempting to rob him; (5) when Rowan refused, Sneed shot him.  After shooting Rowan, Sneed forced Brown to shoot Rowan.  He then drove to a second location and put the body in the trunk.  Thereafter, Sneed drove home and washed his car and went to his brother's house, stole Rowan's credit cards and jewelry, wrapped his body in a plastic bag tied with wires, and placed concrete blocks on it.  He then drove to a separate location and threw the body over a bridge.  *Id.* at 489-495.

While an insanity defense was clearly available to counsel based on Sneed's diagnosis of significant mental illness, it was by no means a perfect defense.  As underscored above, there were reports, albeit from lay individuals, that Sneed at least partially exaggerated his mental illness.  Moreover, the facts surrounding the murder itself could indicate to a jury that Sneed was acting as a calculating criminal, rather than haphazardly reacting to symptoms of his unbridled mental disease.

85

Based on his medical diagnosis, Sneed correctly asserts that defense counsel could have utilized a sanity defense during trial.  What defense counsel *could* have done, however, is not the standard Sneed must meet to prevail on this claim pursuant to *Strickland*.  As *Strickland* mandates, a reviewing court must "apply[] a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691.  Accordingly, the Court finds that counsel were neither unreasonable, nor did they prejudice the outcome of Sneed's trial, by failing to assert a not guilty by reason of insanity defense.

Finally, Sneed asserts in his briefs that this Court should not defer to the Ohio Supreme Court's decision to deny this claim because that court did not have a report generated by Dr. Jeffrey L. Smalldon.  Dr. Smalldon examined Sneed after the conclusion of his direct appeals and prior to Sneed's filing of the post-conviction petition in 1993.  As will be revealed, *infra*, Dr. Smalldon's report is more extensive regarding Sneed's background than those of his predecessors.  In Dr. Smalldon's report, however, he concedes that he cannot come to a conclusion regarding Sneed's sanity at the time he murdered Rowan because of its temporal remoteness.[35]  Because this report does not render any conclusions regarding Sneed's sanity that are significantly different from the psychiatric professionals who testified during trial, the Court finds that it is of little consequence that the Ohio Supreme Court was unable to review it on direct appeal.  For the reasons set forth above, the Court finds that this sub-claim is not well-taken.

### d. Sub-claim 5: Failure to Procure Experts

---

[35]     The report states, "Although from my current vantage point I am unable to specify with any confidence the exact mix of influences which were operating in David's life during the period immediately preceding the instant offense, it is clear that he was decompensating."  (Doc. 48, at 214.)

Sneed argues that counsel were ineffective for failing to procure numerous experts in advance of trial.  He asserts counsel's conduct was objectively unreasonable because counsel failed to move the court for the appointment of: (1) a forensic pathologist; (2) a criminal investigator; (3) a social worker or mitigation expert; (4) a shoe print expert; (5) a criminalist to uncover trace evidence; (6) a cross-cultural expert; (7) a fingerprint expert; (8) an independent psychologist or psychiatrist; (9) a ballistics and firearms expert, and (10) a seriologist.

Sneed raised most of these sub-claims in his post-conviction petition.  The post-conviction court held that Sneed could have raised these claims on direct appeal and they were therefore barred by res judicata.  (Doc. 49, at 491; 493.)  Other sub-claims, such as those pertaining to counsel's failure to procure an independent psychologist and psychiatrist as well as counsel's failure to procure a firearms and ballistics expert were never raised at any juncture in Sneed's state court appeals.  Because of Sneed's failure to raise these claims in a procedurally correct manner or failure to raise them altogether, the Court finds that these sub-claims are procedurally defaulted.

Sneed's assertions are also without merit.  Sneed admitted that he was present when Rowan was shot and that he helped dispose of his body after the shooting.  Thus, Sneed is hard pressed to assert that counsel were unreasonable for failing to hire a forensic pathologist, a shoe print expert, a fingerprint expert, a ballistics and firearm expert, a seriologist, and a trace evidence expert.  Moreover, Sneed does not state in his briefs what evidence these experts could have discovered.  Thus, he does not allege, much less demonstrate, how counsel's failure to request these experts altered the outcome of his trial.

Sneed asserts that counsel should have obtained permission to hire a criminal investigator

to discern what testimony Sneed's half-brother, Ricky Dillard, would provide during trial.

During trial, the State called Ricky Dillard to testify regarding a telephone conversation he had

with Sneed.  Dillard stated that he had asked Sneed whether or not he murdered Rowan and

Sneed answered in the affirmative.  (Doc. 35, at 605.)  Sneed's counsel requested a hearing

regarding the State's plea offer the day after Dillard testified.  Counsel specifically stated that

Sneed's willingness to discuss a plea offer stemmed from Dillard's testimony.  Sneed now

asserts that, had counsel procured an investigator to discover the contents of Dillard's intended

testimony, Sneed would have accepted the State's plea offer when the State first extended it.

Sneed's claim here must fail.  Because Sneed was a party to the conversation with

Dillard, Sneed must have known the likely content of his testimony.[36]  Even if counsel had

procured an investigator to interview Dillard, this investigator could not have discovered what

Dillard would have actually said at the moment of his testimony.  Thus, counsel did not act

unreasonably by failing to procure one.

Finally, Sneed cannot prevail on his claims that counsel were ineffective for failing to

obtain a cross-cultural expert, a psychologist and/or psychiatrist, or a social worker or mitigation

specialist because he cannot demonstrate any prejudice to the culpability phase of his trial.  In

fact, Sneed would be hard pressed to show that their testimony would have been relevant to the

---

[36]     In the Traverse, Sneed recognizes that he was inconsistent in not recalling his
        admission to Ricky Dillard yet subsequently confessing to the crime to court-
        appointed psychiatric personnel.  He argues that this discrepancy underscores his
        questionable sanity around the time he committed the murder.  There is absolutely
        no support for the assertion that Sneed somehow did not recall what he had
        revealed to his half-brother.  Equally plausible, as is discussed below, is Sneed's
        hope that Dillard would not disclose the content of their conversation.

issue of whether he murdered Rowan.  Thus, these sub-claims are without merit.[37]

### e. Sub-claim 6: Failure to Investigate Witnesses

Sneed asserts that counsel did not adequately investigate "the majority" of the State's witnesses prior to trial.  (Doc. 1, at 23.)  Specifically, he asserts that counsel were ineffective for failing to interview Ricky Dillard.  For the reasons set forth in the above sub-claim, the Court finds that counsel were not ineffective for failing to interview Ricky Dillard.

### f. Sub-claim 7: Failure to Investigate Caused Rejection of Plea Offer

In yet another variation on Sneed's assertion that counsel failed to investigate what would be the testimony of Ricky Dillard, he claims that counsel's alleged failure to learn of Dillard's testimony prevented Sneed from accepting the State's plea offer of a life sentence.  The Court addressed these arguments when it reviewed Sneed's fifth and sixth sub-claims.  Thus, it need not address this argument again.

### g. Sub-claim 8: Ineffective Assistance During Voir Dire

Sneed asserts in the Petition that counsel did not adequately challenge the selection of the jurors.  This failure, he claims, resulted in the seating of an all-white jury against a black defendant without any record of the State's motivations for its juror selection.  Sneed does not elaborate on this claim in his Traverse, thus, the Court cannot determine what actions Sneed believes counsel should have taken and against which venire members specifically.

While the Constitution prohibits the State from utilizing race as factor in exercising its

---

[37]     Sneed raises counsel's failure to procure these experts in the mitigation section of this claim.  Because the mitigation hearing is the point at which a death-eligible criminal defendant may introduce evidence regarding his or her background and social history, the Court addresses Sneed's claim regarding these experts when it addresses the mitigation portion of this claim, *infra*.

peremptory challenges, the United States Supreme Court held in *Batson v. Kentucky*, 476 U.S. 79, 97 (1986), that a criminal defendant wishing to assert a claim that the prosecutor used his peremptory challenges in a racially discriminatory manner must make a *prima facie* showing that the prosecution used the peremptory challenges to exclude jurors of the defendant's race.  Once the defendant makes this showing, the *Batson* Court held, the prosecution must articulate a race-neutral reason for exercising its peremptory challenges on jurors of the defendant's race.  *Id.*

Here, Sneed does not specifically allege, let alone make a *prima facie* showing, regarding the prosecution's use of its peremptory challenges.  Thus, this sub-claim is without merit.

### h. Sub-claims 9, 10, 11, 12, and 13: Failure to Challenge Jury Instruction Claims

In these sub-claims, Sneed asserts that counsel were ineffective for failing to object to several of the court's jury instructions.  Because the Court has reviewed these claims previously and finds that they are without merit, Sneed's assertion that counsel were ineffective for failing to object to these claims are necessarily equally without merit.  *See United States v. Hynes*, 467 F.3d 951, 970 (6th Cir. 2006)("We need not decide whether defense counsel performed deficiently if disposing of an ineffective-assistance claim on the ground of lack of sufficient prejudice would be easier.").

### 2. Ineffective Assistance of Counsel During Penalty Phase of Trial

Sneed also raises several sub-claims related to counsel's performance during the penalty phase of trial.  He claims that counsel should have procured independent mental health experts and a cross-cultural expert.  He also asserts counsel's ineffectiveness for failing to procure the testimony of additional family members and for failing to object to certain prosecutorial statements.

Although counsel's failure to provide constitutionally effective assistance at this stage of the trial is also governed by the *Strickland* test, the United States Supreme Court and Sixth Circuit Court of Appeals have expounded on this test relative to the requirements counsel must fulfill to provide adequate assistance during the penalty phase of a capital trial.  In *Wiggins v. Smith*, 539 U.S. 510 (2003), the Supreme Court held that counsel's failure to investigate and present to the jury mitigating evidence was unreasonable.  There, the Court held that trial counsel's failure to discover evidence of the petitioner's difficult childhood was a Sixth Amendment violation.[38]  The Court found that counsel's decision not to expand their investigation in the wake of reviewing several documents diagnosing the petitioner's mother as an alcoholic and the petitioner's placement in several foster homes was an abdication of the duties imposed on counsel pursuant to *Strickland*.

The *Wiggins* Court cautioned, however, that "a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."  *Id.* at 527.   While *Strickland* established that strategic decisions generally are not subject to challenge, the *Wiggins* Court emphasized that these decisions are not immune from attack if they are founded upon an unreasonable investigation.  *Id.*  Finding that the information the petitioner's trial counsel already had reviewed triggered a duty to investigate the petitioner's background further, the Court held that

---

[38]    The Court noted the extensive hardships the petitioner faced during childhood:
> [P]etitioner's mother, a chronic alcoholic, frequently left Wiggins and his siblings home alone for days, forcing them to beg for food and to eat paint chips and garbage.  Mrs. Wiggins' abusive behavior included beating the children for breaking into the kitchen, which she often kept locked.  . . . Petitioner's first and second foster mothers abused him physically and . . . the father in his second foster home repeatedly molested and raped him.

*Id.* at 516-7 (citations omitted).

trial counsel's actions were objectively unreasonable under *Strickland*.

To discern whether a petitioner was prejudiced by counsel's actions, a habeas court must determine "whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Rompilla v. Beard*, 545 U.S.374, 390 (2005)(internal quotation marks and citations omitted); *Dickerson v. Bagley*, 453 F.3d 690 (6th Cir. 2006).

Following the *Wiggins* Court's example, the Sixth Circuit held in *Hamblin v. Mitchell*, 354 F.3d 482, 486 (6th Cir. 2003), that courts must review trial counsel's actions in light of the American Bar Association's guidelines.  Those guidelines suggest the need for counsel to explore a petitioner's medical, educational, and employment history, as well as obtaining a family and social history through, *inter alia*, contact with family members.  *Id.* at 487 n.2.  The guidelines also state the necessity of reviewing a multitude of records to provide counsel with clues regarding the client's "childhood abuse, retardation, brain damage, and/or mental illness . . . ."  *Id.*

Other pertinent Supreme Court and Sixth Circuit decisions will be supplied and reviewed when addressing Sneed's individual sub-claims.

> **a. Sub-claim 14: Ineffective Assistance During Mitigation for Failure to Procure Independent Psychologist and Social Worker to Produce Evidence of Sexual Abuse and Organic Brain Impairment**

In this sub-claim, Sneed asserts that counsel should have requested an independent psychologist and mitigation expert to evaluate Sneed and review his life history.  He asserts that if counsel had done so, they would have been aware that Sneed was sexually abused for a prolonged period during his childhood and that he has organic brain impairment.  Sneed also

asserts that counsel should have described how the effects of mental illness affected his judgment at the time of the crime.  Had this mitigating evidence been presented to the jury, Sneed claims, it may have altered its penalty decision.

Prior to addressing the merits of the claims, the Court first must address whether it is procedurally defaulted.  That issue is not a simple one to resolve in this instance.  Sneed did not raise this claim on direct appeal because it was based on evidence outside the record.  He did, however, raise this claim in his post-conviction petition as grounds for relief 52 and 54. (Doc. 49 at 75; 78.)  The Respondent claims that these claims are, nonetheless, procedurally defaulted because while Sneed generally alleged that counsel were ineffective for failing to investigate and present mitigating evidence, the post-conviction petition does not specifically allege that counsel should have uncovered and introduced evidence of sexual abuse and organic brain impairment during trial.

After reviewing Sneed's post-conviction petition and amended post-conviction petition, it is clear that the Respondent's assertions are correct.  Sneed makes only general references to counsel's failures regarding their mitigation preparation and presentation during trial.[39]  Consequently, the issue the Court must decide is whether a general allegation regarding a claim is tantamount to a "full and fair" presentation to state courts to satisfy the habeas exhaustion requirements.

The Respondent cites to the Sixth Circuit's decision *Jacobs v. Mohr*, 265 F.3d 407 (6th Cir. 2001), to support his position.  In that case, the Sixth Circuit held that a habeas petitioner had fairly presented an ineffective assistance of counsel claim for failing to notify the petitioner

---

[39]     Sneed does, however, refer the post-conviction court to several exhibits, including Dr. Smalldon's report, described *infra*, when asserting these claims.

93

regarding his right to appeal.  The *Jacobs* court utilized the test set forth in *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000), in holding that the petitioner had fairly presented his claim in state court.  *Id.* at 415.  The *McMeans* court advised habeas courts to review four factors in determining whether a petitioner has fairly presented his claims in state court: "(1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law."  *McMeans*, 228 F.3d at 681 (further citations omitted).  The *McMeans* court further advised habeas courts that, "[g]eneral allegations of the denial of rights to a "fair trial" and "due process" do not "fairly present" claims that specific constitutional rights were violated."  *Id.* (citing *Petrucelli v. Coombe*, 735 F.2d 684, 688-89 (2d Cir. 1984)).

Since the *McMeans* and *Jacobs* holdings, the Sixth Circuit has examined three other cases in which the respondent alleges a petitioner's failure to fairly present a claim in state court. In two of the three, the Sixth Circuit adjudicated on whether the petitioner set forth sufficient decisional or constitutional law in the briefs to constitute a fair presentation.  *See Blackmon v. Booker*, 394 F.3d 399, 400-01 (6th Cir. 2004)(holding petitioner failed to fairly present his claim that the prosecutor commented on matters outside the evidence and trial court failed to admit same because petitioner alleged only that such actions violated his right to fair trial and due process); *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003)(finding petitioner fairly presented trial court instruction claim in state court when he alleged that trial court's failure to instruct "violated [his] right to due process of law under the Fifth and Fourteenth Amendments of the United States Constitution.").  These cases are not directly on point because the Respondent does

94

not assert that Sneed failed to set forth sufficient law apprising the state court of his ineffective assistance during mitigation claim.  Instead, the Respondent contends that Sneed did not set forth a sufficient *factual* allegation regarding what actions in preparation of mitigation counsel failed to take.[40]

The third Sixth Circuit decision, *Hicks v. Straub*, 377 F.3d 538 (6th Cir. 2004), offers the Court more direct guidance on this issue.  In that case, the petitioner raised a prosecutor misconduct claim based on the prosecution's failure to produce a witness who the prosecutor said during opening statements would testify that the petitioner had confessed to the crime.  *Id.* at 541.  He also asserted that the trial court's instruction to the jury in an attempt to remedy the prosecution's failure to produce the witness was inadequate because the prosecution never specifically named the witness but the trial court's instruction referred to the witness only by his proper name.  The petitioner then asserted that implicit in this claim was a Confrontation Clause claim based on his inability to confront the prosecution witness.  On direct appeal, the petitioner failed to raise a Confrontation Clause claim based on the prosecutor's actions.  The court of appeals nevertheless addressed the claim, noting that it likely was not properly preserved.  *Id.* at 544.

The district court held that the petitioner had fairly presented his Confrontation Clause claim in state court.  *Id.* at 548.  Relying on the *McMeans* holding, it concluded that "the facts underlying the 'prosecutorial misconduct claim . . . [that the petitioner presented] in his state

---

[40]      In grounds for relief 52 and 54 in the post-conviction relief petition, Sneed alleged, *inter alia*, that trial counsel's failure to investigate and present mitigating evidence led to a violation of his rights under the "Due Process Clause of the Fifth Amendment . . . the Right to Counsel Clause of the Sixth Amendment." (Doc. 49, at 78.)

95

court briefs were 'well within the mainstream of constitutional law' [on the Confrontation Clause] such that the Michigan state courts should have recognized and addressed the Confrontation Clause issue.'" *Id.*  Although the district court found that the Confrontation Clause claim was procedurally defaulted because counsel failed to object to the prosecutor's statements during trial, the court held that the petitioner successfully stated a claim of ineffective assistance of counsel for failing to object to the prosecution's failure to call the witness.

On appeal from the district court's decision, the Sixth Circuit reversed.  It held that the petitioner did not fairly present the factual predicate of the Confrontation Clause claim "in terms relating to legal precedent on the Confrontation Clause nor in terms of a specific violation of his right to confrontation." *Id.* at 553.  It noted that the petitioner failed to mention the phrases "confrontation" or "cross-examination" in his claim and cited to only one inapposite federal legal case analyzing Confrontation Clause claims. *Id.* at 553-54.  Thus, the court held that the petitioner's claim was not "fairly presented" to the state courts and thus procedurally defaulted.

While the *Hicks* case is somewhat helpful to the Court, it by no means dictates the outcome of the Court's decision.  Unlike the *Hicks* petitioner, Sneed failed to cite any federal cases, including *Strickland*, in his post-conviction petition.  As noted above, however, he did cite to the constitutional provisions related to the right to counsel.  Additionally, although Sneed did not state specifically what actions counsel failed to take during their mitigation investigation and presentation, he did assert that the ineffective assistance of counsel claim was predicated on their mitigation phase investigation failures.  His amended post-conviction petition reads as follows:

> Petitioner's convictions and sentences are void and/or voidable because trial counsel failed to conduct an adequate pre-mitigation investigation.

* * *

96

Prior to the mitigation phase of the proceedings, trial counsel had a duty to investigate possible mitigating factors known to counsel and those discoverable by making a thorough review of Petitioner's background.

Trial counsel violated this duty of pre-mitigation investigation by the following acts and omissions:

* * *

B) Failed to obtain information concerning the Petitioner, and failed to use information obtained concerning the Petitioner.

C) Failed to obtain the necessary reports and evaluations from appropriate experts for use as evidence in order to make decisions and render advice on all aspects of mitigation evidence.

* * *

F) Failed to obtain necessary experts such as a mitigation expert and an independent psychologist.

Had petitioner received effective advice and representation, his case would have included a thorough investigation and preparation for the mitigation phase of the proceedings.  Petitioner's competency and his decisions regarding mitigation would have been thoroughly explored.

Had a thorough investigation and preparation in the mitigation phase occurred, the matters would have been presented to the trier of fact for its consideration at the mitigation phase of the proceeding.

Due to the errors and omission of trial counsel, Petitioner's right to effective assistance of counsel and resulting fair and reliable trial on the issues of the appropriateness of his punishment were prejudiced.

(Doc. 49, at 75-6.)[41]

As observed above, the amended post-conviction petition does not state specifically that counsel's thorough investigation would have produced evidence that Sneed was sexually abused and brain impaired.  Thus, the question before the Court is whether these general allegations that trial counsel failed to investigate are sufficient to put the state court on notice of his intent to raise them.

---

[41]     Sneed's fifty-fourth ground for relief alleges ineffective assistance for failing to introduce mitigating evidence.  Its factual predicate and constitutional citations are nearly identical to those presented in ground 52.

97

Based on the case law as cited above, it is a close question whether Sneed "fairly presented" this ineffective assistance claim to the state courts.  After a careful review of this case law and the Fifth District Court of Appeals's decision, it appears that he did.  Unlike the *Hicks* petitioner, Sneed clearly articulated that grounds 52 and 54 were ineffective assistance of counsel during mitigation phase claims.  Sneed also stated the predicate for his assertion, *i.e.*, that counsel inadequately investigated and presented evidence during the mitigation hearing.  What Sneed did not state, and what appears to be the thrust of the Respondent's argument, is that Sneed failed to articulate how he was prejudiced by counsel's failures under the second *Strickland* prong.  He failed to assert that he was sexually abused during childhood or that he suffers from brain impairment.  Thus, the Court must answer the more narrow question of whether it was necessary to so assert to "fairly present" his claims to the state court.

The Court finds that Sneed's failure to set forth in detail his assertions regarding sexual abuse and organic brain impairment did not prevent him from fairly presenting his claims in state court.  The most obvious indication of what the state court understood was before it is its written opinion.[42]  The Fifth District Court of Appeals held in its opinion that, "[a]part from the allegation of sexual abuse, the record is replete with the unstable, uncaring and chaotic life of appellant as a child."  (Doc. 49, at 495.)  Thus, the Fifth District, perhaps upon reading the report of Sneed's retained post-conviction psychologist, Dr. Smalldon, understood the nature of the claim that Sneed presented to it.  Although the Fifth District did not comment on Sneed's

---

[42]    The appellate brief that Sneed submitted to the Fifth District Court of Appeals is relatively short and did not re-argue claims 52 and 54 as Sneed raised them to the post-conviction court.  (Doc. 50, 95; 97.)  Thus, it is fair to assume that in responding to these claims, the Fifth District reviewed Sneed's post-conviction petition and its appendices.

asserted brain impairment, information regarding Sneed's brain impairment was also contained in Dr. Smalldon's report. Thus, it is reasonable to conclude that both evidence of Sneed's prior sexual abuse and organic brain impairment were "fairly presented" to the Fifth District Court of Appeals.

In his Petition, Sneed claims that defense counsel should have requested an independent psychologist and mitigation specialist so that they could have discovered evidence of sexual abuse and organic brain impairment. He also contends that counsel should have required the psychologists that testified on Sneed's behalf to not only identify the mental diseases with which Sneed was afflicted, but to explain how these diseases actually mitigated his conduct and impaired his functioning during the commission of the crime. He also asserts that counsel could have presented testimony regarding his lack of a father figure and his mother's illegal activities, his educational capacities and failure to thrive in school because of multiple relocations, his medical history, and alcohol and drug abuse. Finally, Sneed asserts that counsel's failure to obtain an independent psychologist led to their request of a pre-sentence investigation report, which the state used to impeach the psychologists who testified during mitigation.

The extent of defense counsel's investigation can be discerned from their mitigation presentation. Clearly, Sneed's counsel presented a wealth of mitigation evidence. First, David Slater, a senior parole officer from the Ohio Adult Parole Authority testified regarding Sneed's conditions for parole from a prior offense. Slater stated that the conditions for Sneed's parole were that he receive psychological counseling and medication until "no longer needed." (Doc. 38, at 62.) Another parole officer, Patrick Munford, testified that Sneed's live-in girlfriend contacted him regarding Sneed's behavior in early December 1984. She stated that Sneed was

acting erratically and that he had not been to the mental health facility in three months.  *Id.* at 123.

Counsel produced several witnesses who depicted Sneed's educational background. They elicited the testimony of Ronald Green, the Director of Pupil Services for the Massillon City Schools.  Pursuant to Sneed's school records, Green testified that Sneed was enrolled in a program for troubled youths called Twelve Incorporated.  William Danilik, Director of Pupil Personnel for the Canton City Schools also testified regarding the exceptionally frequent relocations Sneed endured as a child.  Daniluk estimated that Sneed moved once every year in his primary years of education.  *Id.* at 143.  Daniluk also testified about Sneed's poor school performance and frequent absences.  Counsel adduced testimony from James Sproul, a school psychologist for the Canton City Schools.  Sproul testified that Sneed's "extremely poor attendance" would have led to Sneed's lack of educational development.  *Id.* at 158.

One point Sproul noted from a psychological evaluation of Sneed in his early primary education was that Sneed felt "very, very inadequate because of his clothing."  *Id.* at 160.  Sproul also observed that Sneed's clothing was ill fitting and not well kept, that his pants were too short and tight, and that his clothes were dirty and in disrepair.  He noted from this observation that Sneed's custodial care did not seem to be adequate and that his family "was having a great deal of difficulty meeting the needs of the child at that time."  *Id.* at 163.  Not surprisingly, Sneed tested poorly compared with other children his age.

Counsel produced many witnesses, both professional and lay, to adduce evidence regarding Sneed's mental condition both generally and at the time of the criminal act.  He called Robert Riddle, an inspector at the Ohio State Reformatory in Mansfield.  Riddle testified that a

treating physician concluded Sneed was "suffering from a mental illness of a severity requiring hospitalization." (Doc. 39, at 180.)  The Certificate of Examination completed by the treating psychiatrist stated that Sneed was "psychotic, delusional, and is assaultive."  *Id.*  Riddle explained that Sneed was at substantial risk of harming himself or others.  Gloria Sanders, a social worker at the Central Stark Mental Health Center in Canton reported that after Sneed was paroled, he failed to attend appointments he had made at the Center and to obtain his medication.

Roxanne Goosby, Sneed's live-in girlfriend, testified regarding Sneed's behavior prior to the murder.  She stated that prior to July, 1984, Sneed was caring towards her and her two children.  She also testified that Sneed visited his own child during that time.  After he went off his medication, Goosby testified, Sneed assaulted her for failing to prostitute herself to provide him with money.  She described his behavior off the medication as "real hyper, pacing the floor, drinking a lot of coffee, smok[ing] a lot of cigarettes.  He would tell me his mind was racing a thousand miles an hour."  *Id.* at 251.

Counsel produced the testimony of Sneed's examining psychologists.  First, Dr. James McCutcheon testified.  Dr. McCutcheon worked at the Central Stark County Mental Health Center and examined Sneed in May, 1984, as part of his parole condition.  He noted that Sneed was alert and cooperative when he first visited Dr. McCutcheon and concluded that Sneed was "in remission from his mental illness."  (Doc. 40, at 264.)  Dr. McCutcheon diagnosed Sneed with bipolar disorder controlled or in remission and antisocial personality disorder.  He prescribed Lithobid, a mood stabilizer, and Mellaril.  He last saw Sneed in July, 1984.  Sneed failed to visit the Center after that point.  Dr. McCutcheon did not see Sneed again until after the

Rowan murder.  At that time, Dr. McCutcheon found Sneed to be "delusional, paranoid, and grandiose and believed to be dangerous."  *Id.* at 271.

As stated above, both Dr. Dutton and Dr. Zakman testified about Sneed's mental state at the time of the offense.  Dr. Dutton concluded that Sneed had no intentions of killing the victim. Dr. Zakman testified that Sneed panicked after the shooting because he had never shot anyone before.  He stated that, during the period leading up the murder, Sneed's "symptoms of mental illness [had] been reemerging and were in the course of taking over his behavior."  (Doc. 41, at 456.)

Dr. Dutton also testified regarding Sneed's childhood.  Dr. Dutton relayed that Sneed's father had a very poor relationship with him.  Sneed's father was an alcoholic who, during the few instances in which he would visit Sneed, would take him to illegal drinking establishments. Sneed described his childhood to Dr. Dutton as one in which his poor economic situation caused him to relocate frequently.  Thus, he never formed lasting friendships with neighborhood children.

Dr. Zakman testified that Sneed's mother was taken to prison for child endangerment because she was absent from the home when a fire occurred there.  (Doc. 41, at 454.)  Sneed and his siblings were then placed in foster care.

Jack Calhoun, Richard DeHeer, and Robert Freeman, employees of the prison system, testified on Sneed's behalf.  Calhoun testified regarding the difference in Sneed's behavior between his initial incarceration after the offense and after obtaining psychiatric treatment and medication from the Moritz Forensic Center, calling him a "model prisoner" after his return. (Doc. 40, at 304.)  DeHeer, an employee of the Juvenile Court in Canton testified about Sneed's

102

criminal adjudications and those of his siblings.  Unlike most other delinquents, DeHeer stated, Sneed did not go home after his release from the Cuyahoga Hills Boys School, a secured facility for juvenile offenders.  Instead, DeHeer reported, Sneed was sent to a group home for juvenile offenders.  He stated that typically a child is not sent home because "[e]ither the home is not suitable and/or able to care for them or in fact the delinquent's pattern is such that they cannot go back into the same neighborhood or area."  (Doc. 41, at 520.)  Freeman testified regarding Sneed's unruly behavior and suicide attempts prior to receiving medication.  His behavior after receiving treatment at the Moritz Center, Freeman stated, had altered, "a hundred percent." (Doc. 42, at 66.)

Finally, several family members, acquaintances, and even co-defendant Chevette Brown testified for Sneed at the mitigation hearing.  Theotis Lee Dillard, Sneed's half-brother, testified regarding the significant alteration in Sneed's behavior after he went off his medication.  Dillard stated that Sneed would move around fast, was up late at night, and began using street drugs. (Doc. 40, at 308.)  Similar to Theotis's testimony, another one of Sneed's half brothers, Ricky Dillard, stated that Sneed's demeanor was significantly different before and after going off his medication.  Chevette Brown also testified that Sneed could not sit still and "always wanted to do something."  (Doc. 42, at 571.)  She stated that she harbored no ill feelings towards Sneed and even "felt sorry for him."  *Id.* at 573.

Juanita Dillard, Sneed's mother, testified at length regarding her life and, consequently, Sneed's upbringing.  Juanita Dillard stated that she married and had two children.  Her husband soon abandoned the family and Juanita Dillard lived off of Aid for Dependent Children.  She thereafter bore five additional children from four different fathers.  When Sneed was around nine

or ten years old, Juanita testified, she went to work for Ecko Products as a knife sharpener.  She

described Sneed's father, Robert Sneed, as an alcoholic who did little to support Sneed and his

older sister.  He passed away sometime in 1984.  She also testified that she moved her children

often because her current residence would fall into disrepair.  She would move to one residence

in the summer but would relocate to a warmer residence for the winter.  *Id.* at 322.  Juanita

Dillard described the incident in which she abandoned her children.  She stated that Sneed's

father, Robert Sneed, had asked her to go to Massillon.  She initially asked her brother to watch

the children.  Robert Sneed, she testified, did not want to return home and delayed their return by

several days.  When they finally returned, Juanita Dillard was charged with child neglect.

### i. evidence of sexual abuse

Sneed claims that trial counsel's failure to procure an independent psychologist or

mitigation expert led to counsel's failure to discover and introduce evidence of Sneed's sexual

abuse during his childhood.  As depicted in Dr. Smalldon's post-conviction report, Sneed

endured severe, prolonged sexual abuse between the ages of seven and ten years old.  Dr.

Smalldon's report most aptly describes its duration and extent:

> An "extremely big" neighbor by the name of James Melvin reportedly raped
> David repeatedly, over a period of months or even years.  The abuse began with
> fondling, and eventually David was forced to perform fellatio.  The neighbor
> attempted anal penetration as well, but as David recalls it, "He was too big [to
> achieve penetration]."  Psychological torture often accompanied the rapes.  For
> example, David recalls the man threatening that his dog "would eat [David] up" if
> he refused to do what he was told..  The abuse continued until a relative of a
> neighborhood girl who was also abused by the man confronted the neighbor and,
> according to David, "almost killed him."
>
> Asked whether he ever disclosed his abuse to anyone, he says that he did not,
> adding that he always felt "too embarrassed and too scared."  David also reports
> having been sexually abused by a friend of his mother's, who during walks
> together would sometimes take him into an abandoned home, where he would

give David money to fondle him and perform oral sex.  Although David himself
insists that there were no other abusers, his older sister has reported that during
the time David spent – as a toddler – in a foster home while his mother was in
prison, members of the foster family sexually abused him, as well as other
children who were staying there.  She speculated, too, that David may have been
sexually abused by other adults.

(Doc. 48, at 296.)  Dr. Smalldon describes in his report the impact that this sexual abuse had on

Sneed's development and adult functionality:

> One extremely important factor in David's background which had apparently not
> been disclosed prior to the mitigation hearing at his original trial – and which as a
> consequence remained unknown to the triers of fact – is the severe and prolonged
> sexual abuse that he suffered as a child.  Although there is not a single set of
> symptoms which can be said to characterize victims of childhood sexual abuse,
> among the most common symptoms seen in such individuals are extreme and
> generalized anger; a distorted sense of their own sexuality; a tendency to distrust
> people, especially those in positions of authority; poor impulse control with roots
> in their sense of helplessness; and poor self-esteem.  One irony of very low self-
> esteem is that it is sometimes expressed through a narcissistic, even exploitative
> orientation in interpersonal relationships, and in my opinion Mr. Sneed's
> tendency as an adult to try and manipulate and control other people is best
> understood as a reflection of his nagging underlying sense of inferiority.

*Id.* at 307.

As depicted by Dr. Smalldon, the testimony regarding Sneed's childhood sexual abuse

was significant.  When reviewing this claim on post-conviction appeal, the Fifth District Court of

Appeals observed that counsel failed to discover this abuse, but summarily held that "the failure

to discover the claimed sexual abuse did not affect the outcome of the trial."[43]  (Doc. 49, at 495.)

---

[43]     Sneed also alleges that the Fifth District Court of Appeals incorrectly applied the
*Strickland* standard by holding that evidence of Sneed's sexual abuse "did not
affect the outcome of the trial."  (Doc. 49, at 495.)  Sneed correctly notes that
*Strickland* requires a habeas court to ascertain whether it is *more likely than not*
that the outcome of the proceeding would have been different.  As the Respondent
points out, however, if the Fifth District actually utilized this incorrect standard, it
was a lower standard than *Strickland* requires.  Thus, because Sneed could only
have benefitted from the Fifth District's error, the Court will not further address
this aspect of Sneed's argument.

When a state court does not assess the merits of a petitioner's habeas claim, the deference due under the AEDPA does not apply.  *Newton v. Million*, 349 F.3d 873, 878 (6th Cir. 2003); *Maples v. Stegall*, 340 F.3d 433, 436-37 (6th Cir. 2003).  In such a case, the habeas court is not limited to deciding whether that court's decision was contrary to or involved an unreasonable application of clearly established federal law, but rather conducts a *de novo* review of the claim. *Maples*, 340 F.3d at 436-37.  Thus, the Court reviews Sneed's failure to find sexual abuse claim pursuant to this standard.

In so doing, the Court cannot find that Sneed's counsel were ineffective for failing to procure an additional psychologist and/or mitigation expert to discover evidence of sexual abuse. Sneed does not assert in the Petition that counsel failed to investigate this aspect of Sneed's background.  In fact, this or a similar assertion is notably absent from the Petition.  Instead, Sneed asserts specifically that counsel were unreasonable *for failing to procure an independent psychologist and mitigation expert*.

Three psychologists examined Sneed and testified regarding his background and mental illness.  Sneed failed to discuss any details of sexual abuse with any of these mental health professionals.  Dr. Dutton states, without detail, that "[i]t is also reported that the defendant was sexually abused by a male neighbor when he was about nine years old."  (Doc. 42, at 415.)  It is not alleged that counsel failed to investigate this statement.  Rather, Sneed alleges that counsel should have hired a fourth psychologist or mitigation expert to procure information regarding sexual abuse.  The Court cannot hold that counsel's failure to procure additional experts to examine Sneed's background, after obtaining the results of three such professionals, constitutes unreasonable behavior.  In light of the wealth of mitigating evidence counsel presented in

106

Sneed's case, to hold that counsel were ineffective for failing to request the evaluation of a fourth psychologist would essentially set the precedent that defense counsel's failure to request an independent psychologist is per se unreasonable in every case.  The Court is unwilling to so find.

### ii. evidence of brain impairment

Sneed asserts that if counsel had procured an independent psychologist, he or she would have performed the psychological tests that Dr. Smalldon performed and discovered his organic brain impairment.

In his report, Dr. Smalldon finds the possibility of brain impairment.  He writes:

> My evaluation did not include a comprehensive battery of tests to assess neuropsychological functioning.  In my opinion, however, there remains ample reason to suspect the possibility of underlying brain impairment.  There is a great deal of evidence pointing to an early history of profound deprivation, and by his own admission David began using an assortment of street drugs even before he became a teenager.  His drug use included inhalation of various toxic substances, as well as the injection of various narcotics.

> Even in the absence of clear evidence indicating structural brain impairment, there remains the question of whether his symptoms of psychiatric disturbance may be related to underlying – probably sub-clinical – brain malfunction.  Current thinking in both the psychological and psychiatric communities holds that Schizophrenia and Bipolar Disorder are probably best understood as primary diseases of the brain, with psychosocial factors acting as intervening variables that play an important role in how the underlying brain pathology is ultimately expressed.  The term "organicity" is too vague to have much practical significance.  However, if it is used to signify the presence of abnormal brain functioning, then in my opinion it is highly likely that "organicity" has been an important contributing factor to Mr. Sneed's pattern of illegal and otherwise maladaptive behavior.  Because of this, a full neuropsychological evaluation should be conducted.

(Doc. 48, at 308.)    As is apparent from Dr. Smalldon's report, he suspects, without concluding,

that Sneed suffers from organic brain malfunction.[44]

Initially, the Court notes that the Sixth Circuit has held that a criminal defendant has the right to an independent psychiatrist rather than a neutral, or court-appointed psychiatrist when a defendant's mental health is at issue.  *Powell v. Collins*, 332 F.3d 376, 392 (6th Cir. 2003). Moreover, the Sixth Circuit has examined ineffective assistance of counsel claims which involve counsel's failure to discover evidence of a petitioner's brain impairment.  In *Frazier v. Huffman*, 343 F.3d 780 (6th Cir. 2003), the Sixth Circuit held that counsel acted in violation of *Strickland*. In that case, the petitioner sustained a brain injury that impaired his brain functioning.  *Id.* at 794. Although aware of this injury, counsel did not investigate its occurrence or the possible impact it may have had on the petitioner's behavior and commission of the crime.  Moreover, counsel failed to present any mitigating evidence, other than the petitioner's unsworn statement, during the mitigation phase of trial.  The Sixth Circuit held that counsel's failure to investigate could not have been part of a reasonable trial strategy.  *Id.* at 795.  Thus, it concluded, the state court had unreasonably applied *Strickland* in its contrary finding.

In other cases involving counsel's failure to procure experts, the Sixth Circuit has held that counsel cannot be held ineffective for failing to procure a neuropsychologist when a retained psychologist failed to find a mental ailment.  In *Carter v. Mitchell*, 443 F.3d 517 (6th Cir. 2006), the court found a petitioner's defense counsel were not ineffective for failing to employ a mental health expert.  It reasoned that because the petitioner did not demonstrate that he was prejudiced by counsel's failure to procure such an expert in the absence of any finding that the petitioner suffered from brain impairment his counsel could not be held ineffective.  *Id.* at 530.  *See also*

---

44      Because Dr. Smalldon is a psychologist, not a neurologist, he is likely not
        qualified to make a brain impairment diagnosis.

*Lundgren v. Mitchell*, 440 F.3d 754, 772 (6th Cir. 2006)("A licensed practitioner is generally held to be competent, unless counsel has good reason to believe to the contrary.").  Additionally, in *Slaughter v. Parker*, 450 F.3d 224, 235 (6th Cir. 2006), the Sixth Circuit held that defense counsel were not unreasonable in failing to procure an independent psychologist when there was no suggestion that the evidence presented during the mitigation hearing was insufficient.

Similar to Sneed's other ineffective assistance for failure to hire an independent psychologist claim, the Court cannot find that, based on the investigation that counsel conducted and the three other psychologists who examined him, that counsel were unreasonable for failing to procure the opinion of yet another psychologist.  As depicted above, each psychologist who evaluated Sneed testified during the mitigation phase of trial.  None indicated that Sneed had suffered from brain impairment.  Thus, like the holding in *Slaughter*, the Court finds that, because there was no reason for counsel to suspect that a fourth, independent psychologist would find evidence of brain impairment, counsel were not ineffective for failing to obtain one. Moreover, unlike defense counsel in *Frazier* who had reason to suspect that their client suffered an injury that could have damaged his brain function, counsel here had no such indication. Because Sneed cannot demonstrate that his counsel were ineffective for failing to procure a fourth psychologist to detect the possibility that he may suffer from brain impairment, the Court finds this sub-claim is not well-taken.

### iii. other sub-claims

Finally, Sneed asserts that counsel's failure to procure experts prejudiced him in several other respects.  He contends that counsel should have elicited testimony regarding how his mental disease mitigated his conduct in the commission of the crime.  He also states that

independent experts could have presented testimony regarding his father, his mother's illegal activities, his educational absences and failures, and his medical history and substance abuse history.  Sneed also faults counsel for requesting a pre-sentence investigation report, which the State utilized to introduce information that Sneed was malingering regarding his mental illness.

The Sixth Circuit recently held in *Slaughter v. Parker*, 450 F.3d 224 (6th Cir. 2006), that while trial counsel acted unreasonably because he failed to investigate thoroughly for mitigating evidence, the petitioner was not prejudiced by that failure because much of the information the petitioner asserted was omitted was adduced in the penalty phase by the petitioner's own testimony.  In denying the petitioner's claim on this ground, the *Slaughter* court held that "there is an insufficient showing of prejudice where 'one is left with pure speculation on whether the outcome of the trial or the penalty phase could have been any different." *Id.* at 234 (quoting *Baze v. Parker*, 371 F.3d 310, 322 (6th Cir. 2004)).

Here, as in *Slaughter*, Sneed does not demonstrate the prejudice he must in order to prevail under *Strickland*.  He asserts that an independent psychologist would have explained how his mental illness actually mitigated his conduct and impaired his functioning during the commission of the crime.  During his mitigation testimony, however, Dr. Zakman testified regarding Sneed's poor judgment because of his mental illness.  He stated:

Q:      Would you expect as part of the disease that poor judgment would be
        present?

A:      I wouldn't expect anything different.  Judgment was affected quite
        seriously from June on because he apparently stopped taking the
        medication which was necessary for his welfare.

110

\* \* \*

Q:     Now, will you point to those things that you found where poor judgment

shows out in the case of David Sneed?

A:     The course of events that I have followed points to a number of very poor

judgment decisions.  One is to – he wants to rob a person, and he

approached him behind a bar which he was frequenting.

I didn't see anything to say that he would stop going there, so he

would be easily caught there.  That is Point No. 1.

Second, selection of the incident where to stop the car and say give

me your money.  Actually instructing the victim to drive in [the] general

direction of their apartment.

Then after the shooting, involving of his half brother as [an]

additional witness of the events, attaching concrete blocks to the body,

taking the belongings that easily make [a] connection between the act and

keeping them for a substantial period of time, and especially to keep that

revolver was extremely poor judgment.

Then dropping the body, even if he believed there was sufficient

water in the creek, dropping it on the back of the small river the taking of

credit cards without knowing how to get money from the cards, this

continuous chain of poor judgment decisions at a critical time of events

prior and after.

(Doc. 41, at 457-58.)  Thus, defense counsel elicited testimony regarding the effects of mental

111

illness on Sneed's behavior at the time of the crime.

As depicted in the description of the mitigation testimony above, Sneed also is hard pressed to assert that counsel failed to adduce testimony regarding his father, his mother, his educational background and frequent relocations, and his alcohol and drug abuse.  Trial counsel produced numerous witnesses who testified about these events in Sneed's life.  Finally, Sneed cannot demonstrate that he was prejudiced by trial counsel's pre-sentence investigation report request.  While the prosecution used portions of that report to introduce evidence that Sneed was feigning or exaggerating his mental disease, Dr. Zakman explicitly stated that, after observing Sneed for several weeks, he ruled out the possibility that Sneed was malingering.  (Doc. 41, at 441.)  Thus, Sneed's assertions that counsel were ineffective for failing to produce this evidence is not well-taken.

### b. Sub-claim 15: Failure to Call Additional Family Members

Sneed next asserts counsel's ineffectiveness for failing to call additional family members. He asserts that doing so would have humanized him before the jury.  Sneed does not elaborate on which family members counsel should have called or why the family member testimony that counsel presented was insufficient.  The Court cannot address this claim because it is too vague. Thus, it is not well-taken.

### c. Sub-claim 16: Failure to Procure Cross-Cultural Expert

As with the above claim, Sneed does not specify how a cross-cultural expert would have aided him during the mitigation phase of trial.  While he avers that this expert would have addressed the "cross-racial aspects of the crime," he does not state what this expert would have stated if procured and produced during trial.  Without this pertinent information, the Court

cannot review this claim.

### d. Sub-claim 17: Failure to Object to Prosecutor's Statements

Sneed alleges in this sub-claim that counsel should have objected to the prosecutor's misconduct during mitigation. As is discussed, *supra*, the prosecutor did not act inappropriately during the mitigation phase of trial. Thus, Sneed was not prejudiced by counsel's inactions.

**G. Petitioner's constitutional rights were violated by an improperly empaneled jury, which included some individuals who were automatic death penalty jurors and others who, but for the trial court's unconstitutional denial of valid "cause" objections and defense counsel's failure to ask for removal by cause, would have been excused had Petitioner not exhausted his peremptory challenges.**

Sneed's seventh ground for relief is that the trial court impaneled a pro-death jury. He claims that these venire members indicated that they would not give him a fair mitigation hearing if they found him guilty of aggravated murder. The Respondent asserts that this claim is procedurally defaulted because, while Sneed raised it in his post-conviction petition, the Fifth District Court of Appeals held that it was barred by res judicata because it could have been raised on direct appeal. The Court concurs and finds that this claim is barred from federal habeas review.

This claim also lacks merit. Although Sneed vaguely references juror number 3 and venire members 23, 33, 50, 159, 165, 170, and 203 in the Petition, he does not specify on what he bases his assertion that these members were not fair and impartial and should have been excused for cause. Without stating why he believes these potential jurors and juror who actually served were predisposed to voting for a death sentence, the Court finds that this claim is too vague to be reviewed.

**H. Trial court errors violated Petitioner's constitutional rights and ruined any chance for a reliable outcome at either phase of Petitioner's trial. As a result,**

113

**Respondent forfeited a valid finality interest in Petitioner's conviction and death sentence.**

Sneed argues that the trial court rendered his trial unfair because of several of its decisions or inactions during trial.  He claims that his Fourteenth Amendment rights were violated when the trial court: (1) failed to enforce full and fair discovery; (2) failed to ensure that Sneed was competent to stand trial; (3) failed to ensure that Sneed had effective assistance of counsel in procuring investigators and experts; (4) failed to impanel a fair jury; (5) failed to ensure a complete trial record; (6) failed to lawfully instruct jurors; (7) failed to file a final entry to include a reference to an unindicted specification; (8) erred when it did not permit Sneed to use grand jury testimony to impeach Roxanne Goosby; and, (9) permitted the State to adduce testimony that Goosby and Brown were afraid of Sneed.

The Court will not address several of these sub-claims because Sneed raised them in other claims in the Petition.  Thus, the Court will not address sub-claims (1), (2), (3), (4), and (6) as they were raised and addressed in other portions of this Opinion.[45]   Additionally, the Court will not address sub-claims (5) and (7).  Sneed tersely states in the Petition that the trial court failed to create a complete trial record.  He does not clarify, in either the Petition or Traverse, however, what portions of the trial he believes were omitted from the record.  Because Sneed does not allege, let alone demonstrate, that the trial court failed to record a significant portion of trial, the Court need not address this sub-claim. Sneed also alleges that the trial court did not prepare and file a final entry including a reference to an unindicted specification.  As the

---

[45]     Specifically, the Court addressed sub-claim (1) in the first ground for relief; sub-claim (2) in the fourth ground for relief; sub-claim (3) in the sixth ground for relief; sub-claim (4) in the seventh ground for relief; and sub-claim (6) in the fifth ground for relief.

Respondent observes, however, the only death specification with which Sneed was charged – aggravated robbery – was pled in the indictment.  Thus, it is unclear what Sneed is asserting in this sub-claim.

The Respondent asserts that the remaining sub-claims are procedurally defaulted because Sneed never raised them at any point in his state court appeals.  Sneed cannot overcome this assertion of procedural default.  Thus, the Court finds that these claims are barred from federal habeas review.

Even if ripe for review, these claims lack merit.  Sneed's assertions that the trial court erred by failing to permit defense counsel to cross-examine Goosby with her grand jury testimony and by permitting evidence that Goosby and Brown were afraid of Sneed to be introduced during trial are predominantly state law issues immune from attack on federal habeas review.  *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).  A state law violation may rise to the level of a due process violation only if it created a serious risk of convicting an innocent person.  *Neumann v. Jordan*, 84 F.3d 985, 987 (7th Cir. 1996).  Barring this circumstance, a federal court must defer to the state court's interpretation of its own rules of evidence and procedure.  *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988), *cert. denied*, 488 U.S. 1011 (1989).  A federal court does not act as an additional court of appeals to review a state court's interpretation of its own laws.  *Id.*

Because of the overwhelming evidence supporting Sneed's guilt, including testimony in which he admitted to Rowan's murder, the trial court's evidentiary decisions did not create a serious risk that Sneed was erroneously convicted of it.  Moreover, the trial court's decision to exclude Goosby's grand jury testimony appears to be a sound one.  As is revealed in the trial

115

transcripts, her trial testimony was substantially identical to what she stated before the grand jury.[46] Thus, the trial court's decision prohibiting defense counsel from cross-examining on it did not render Sneed's trial unfair.

Sneed also asserts that the trial court improperly permitted the State to introduce evidence that Goosby and Brown were fearful of him. Goosby stated during her testimony that she was afraid of Sneed because he had called her and made threats to her to come home from the hospital. It was at that time that Sneed told her that he had committed and would commit a murder. Brown also testified that Sneed held a gun to her head after Sneed shot Rowan and told her to shoot Rowan also.

Both statements appear necessary as part of proving the State's case. First, the Goosby testimony was necessary to lay the foundation for Sneed's admission statement. Brown's statement regarding Sneed's actions directly after the murder were important to explain why Rowan had two bullet holes in his head. Brown's testimony also outlined the State's theory that Brown was not a willing accomplice to the murder. The trial court did not err when it permitted the State to adduce this testimony. Sneed's eighth ground for relief lacks merit.

**I. Petitioner's appellate counsel violated his right to effective assistance of appellate counsel by failing to raise obvious errors, which if raised, would have rendered his conviction and death sentence unreliable. These constitutional violations rendered Petitioner's conviction and death sentence unreliable.**

---

[46] During trial, Goosby stated that Sneed had told her, "He was trying to get me to come home, he said I committed a murder, I have, I will, he said I'll go crazy if you don't come home." (Doc. 34, at 355.) During her grand jury testimony, Goosby stated, "[H]e had been calling me trying to get me to come home. He was saying all kinds of stuff. He said I committed murder. I will commit a murder. I'm going crazy if you don't come home, and I told him I didn't want to hear all that stuff." *Id.* at 363. After an in camera inspection, the trial court held that these statements were not inconsistent. *Id.* at 364.

116

Sneed argues that his appellate counsel was ineffective in violation of his Sixth Amendment rights.  He sets forth eleven claims that he asserts appellate counsel should have raised on direct appeal.[47]  The Respondent asserts that these claims are procedurally defaulted because Sneed first raised them in a *Murnahan* application.  Because Sneed did not comply with Ohio Rule of Appellate Procedure 26(B) by filing this application within 90 days of the journalization of his appeal, as quoted above, the Fifth District Court of Appeals held that Sneed's application to reopen was untimely.

As stated above, the Sixth Circuit in *Franklin v. Anderson*, 434 F.3d 412 (6th Cir. 2006), found that the Ohio Supreme Court inconsistently has enforced Rule 26(B) over the approximately fifteen years since its enactment.  Although it appeared that the Ohio Supreme Court at one point enforced the rule, it began to ignore the rule on several occasions in the year 2000.  The Ohio Supreme Court appears to have begun enforcing the timeliness rule in a series of cases decided in 2004, but the Sixth Circuit held that because of the Ohio Supreme Court's vacillation in enforcing the ninety-day rule, it could not find that the rule was "adequate."  Thus, it concluded, "Rule 26(B) is not an adequate and independent state rule that can preclude consideration of [a petitioner's] ineffective assistance of appellate counsel claim."  *Id.* at 421. Because Rule 26(B) is not "adequate," this Court cannot find that Sneed has procedurally defaulted his ineffective assistance of appellate counsel claims by failing to comply with the

---

[47]     These claims are: (1) involuntary receipt of medication during trial; (2) pre-trial publicity tainted his trial; (3) the State's improper use of peremptory challenges; (4) Sneed was not present during critical phases of his trial; (5) prosecutorial misconduct; (6) ineffective assistance of trial counsel; (7) insufficient evidence; (8) trial court errors; (9) erroneous jury instructions during culpability phase of trial; (10) erroneous jury instructions during penalty phase of trial; and, (11) proportionality of Sneed's sentence compared with that of Chevette Brown.

Rule.  Thus, the Court will hear these claims on the merits.

The Court finds that the claims lack merit.  As the Sixth Circuit recently observed, appellate counsel are presumed to have provided constitutionally sufficient assistance.  It held that "'[g]enerally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome.'" *Poindexter v. Mitchell*, 454 F.3d 564, 585 (6th Cir. 2006)(quoting *Coleman v. Mitchell*, 268 F.3d 417, 430 (6th Cir. 2001)(further citation omitted).  Moreover, the United States Supreme Court held in *Jones v. Barnes*, 463 U.S. 745 (1983), that appellate counsel are not ineffective for failing to raise every colorable claim on appeal.

Here, Sneed has failed to demonstrate why the claims he believes appellate counsel should have raised are clearly stronger than those appellate counsel actually raised.  Moreover, the majority of claims that Sneed asserts appellate counsel was ineffective for failing to raise were raised as distinct claims in the Petition.  The Court has reviewed those claims and finds that they lack merit.[48]  Thus, Sneed cannot establish, as he must pursuant to *Strickland v. Washington*, that appellate counsel's failure to raise these claims prejudiced the outcome of his appeal.  Accordingly, the Court finds that this ground for relief is not well-taken.

**J. Petitioner's death sentence is constitutionally infirm because Ohio's capital punishment system on its face as codified, as construed by Ohio's courts, and as applied to Petitioner operates in an arbitrary, capricious and discriminatory**

---

[48]    Specifically, the Court addressed the underlying merits of Sneed's ineffective assistance of appellate counsel claims as follows: Claim one was addressed in ground for relief two; Claim three was addressed in ground for relief seven; Claim five was addressed in ground for relief three; Claim six was addressed in ground for relief six; Claim seven was addressed in ground for relief twelve; Claim eight was addressed in ground for relief eight; Claim nine was addressed in ground for relief five; Claim ten was addressed in ground for relief five; and Claim eleven was addressed in ground for relief ten, footnote 49.

**manner in violation of the United States Constitution.**

Sneed's tenth ground for relief is aimed at the structure of Ohio's capital punishment scheme. He asserts Ohio's capital punishment scheme is unconstitutional on its face. The Court will address each sub-claims but is not persuaded by any of Sneed's allegations. In summary fashion, and regardless of its defaulted status, the Court lists below these allegations, in italics, and thereafter state the reasons they are unpersuasive.

- *Ohio's scheme is unconstitutional because one of the aggravating circumstances merely repeats an element of the crime and fails to narrow the class of death-eligible defendants.* The Supreme Court has articulated clearly the constitutional mandates for imposing the death penalty. In *Lockett v. Ohio*, 438 U.S. 586 (1978), the Court held any death penalty statute must allow the sentencer to review all mitigating evidence during the penalty phase, thereby fashioning a sentence befitting the individual defendant. Because death "is so profoundly different from all other penalties," the Court reasoned, it cannot be imposed without individualizing the sentence. *Id.* at 605. The Court further refined the statutory limiting requirement in *Zant v. Stephens*, 462 U.S. 862 (1983). In that case, the Court concluded that any death penalty statute must narrow the class of death-eligible defendants from those not death eligible. *Id.* at 177. Specifically, a state may choose either to legislatively limit the definition of death-eligible crimes, or it may broadly define capital offenses but narrow the defendants who actually receive a death sentence by using aggravating circumstances during the penalty phase. *Lowenfield v. Phelps*, 484 U.S. 231, 246 (1987).

    Ohio's death penalty scheme complies with these mandates. First, §§ 2929.04(B) and (C) allow the defendant to present, and the fact finder to consider, all statutorily enumerated mitigating factors. Moreover, § 2929.04(B)(7) permits a fact finder to consider all mitigating factors in addition to those enumerated in the statute. Finally, the Ohio death penalty scheme satisfies the *Zant* requirements by demanding that the fact finder find the existence of at least one aggravating circumstance set forth in § 2929.04(A) before imposing the death penalty.

- *Ohio's scheme is unconstitutional because of the manner in which the Ohio courts conduct the proportionality review.* Sneed claims the Ohio Supreme Court improperly excludes cases in its review in which the State sought the death penalty but did not receive it. A proportionality review is not constitutionally required. *Pulley v. Harris*, 465 U.S. 37, 50-51 (1984). *See also McQueen v. Scroggy*, 99 F.3d 1302, 1333–34 (6th Cir. 1996), *overruled on other grounds by*, *Abdur'Rahman v. Bell*, 392 F.3d 174 (6th Cir. 2004)("There is no federal constitutional requirement that a state appellate court conduct a comparative proportionality review."). By statute, however, Ohio requires the appellate courts to engage in a proportionality review. Under Ohio

Revised Code § 2929.05(A):
In determining whether the sentence of death is appropriate the court of appeals, in a case in which a sentence of death was imposed for an offense committed before January 1, 1995, and the Supreme Court shall consider whether the sentence is excessive or disproportionate to the penalty imposed in similar cases. They shall also review all the facts and other evidence to determine if the evidence supports the finding of the aggravating circumstances the trial jury or the panel of three judges found the offender guilty of committing, and shall determine whether the sentencing court properly weighed the aggravating circumstances the offender was found guilty of committing and the mitigating factors. Ohio Rev. Code § 2929.05(A).

Because Ohio law requires appellate courts to engage in a proportionality review, the review must be consistent with constitutional requirements. *Kordenbrock v. Scroggy*, 680 F. Supp. 867, 899 (E.D. Ky. 1988), *rev'd on other grounds*, 919 F.2d 1091 (6th Cir. 1990)(citing *Evitts v. Lucey*, 469 U.S. 387 (1985)). Nonetheless, when the state courts have engaged in a proportionality review, the federal habeas court's review is limited. The habeas court examines the state's proportionality review only to determine whether the imposition of death on the petitioner is patently unjust or "shocks the conscience; the court is not to second-guess the state court's comparison of other cases in which the death penalty was imposed." *Id.* (citing *Moore v. Balkcom*, 716 F.2d 1511, 1517 (11th Cir. 1983)). *See also Spinkellink v. Wainwright*, 578 F.2d 582, 604 (5th Cir. 1978), *cert. denied*, 440 U.S. 976 (1979)(same).

In *Spinkellink*, the petitioner argued that his crime, when compared to other Florida death penalty cases, was insufficiently gruesome or heinous to warrant the death penalty and had highlighted seven other cases in which the Florida Supreme Court had reversed death sentences. All of these other cases allegedly involved defendants equally or more deserving of the death penalty than he. *Moore*, 716 F.2d at 1517–18 (quoting *Spinkellink*, 578 F.2d at 604). The court "condemned a federal case by case analysis of the cases used by the state appellate court in its proportionality review as an unnecessary intrusion on the [state] judicial system." *Id.* (citing *Spinkellink*). It held:
A federal habeas court should not undertake a review of the state supreme court's proportionality review and, in effect, 'get out the record' to see if the state court's findings of fact, their conclusions based on a review of similar cases, was supported by the 'evidence' in the similar cases. To do so would thrust the federal judiciary into the substantive policy making area of the state. *Id.*
Moreover, when examining an Ohio capital conviction on habeas review, the Sixth Circuit has stated because "proportionality review is not required by the Constitution, states have great latitude in defining the pool of cases used for comparison." *Buell v. Mitchell*, 274 F.3d 337, 369 (6th Cir. 2001). Because Sneed's death sentence does not "shock the conscience," this claim is not well-

120

taken.[49]

- *Ohio's scheme is unconstitutional because it fails to require that the State prove that the death penalty is the only appropriate remedy.*  No such constitutional mandate exits.  Moreover, the Ohio scheme provides for an appropriateness review on direct appeal.

- *Ohio's scheme is unconstitutionally arbitrary because it allows for prosecutorial discretion to determine whether to seek a capital indictment.*  The United States Supreme Court in *Gregg v. Georgia*, 428 U.S. 153 (1976), rejected this argument under a similar death penalty statute, condoning the discretionary system.

- *Ohio's scheme is unconstitutional because it is imposed in a racially discriminatory manner.*  Sneed alleges that those who are racial minorities or who kill whites are more likely to receive the death penalty.  Pursuant to *McClesky v. Kemp*, 481 U.S. 279 (1987), a capital defendant cannot evade a death sentence merely by demonstrating the statistical disparity of capital defendants or victims of a particular race.  Instead, the capital defendant must prove that the decision maker in his or her individual case acted with a discriminatory purpose, and that such actions had a discriminatory effect on the proceeding.  *Id.* at 292.  As Sneed has not asserted that discrimination occurred during his sentencing, this claim must fail.

- *Ohio's scheme is unconstitutional because it imposes a risk of death on those capital defendants who choose to exercise their right to trial.*  In *United States v. Jackson*, 390 U.S. 570, 582 (1968), the Supreme Court determined that a legislative body cannot

---

[49]  Recently, the Sixth Circuit reversed a death sentence on proportionality grounds, finding the disparity between the life sentence a defendant received in a murder for hire trial was disproportionate to the death sentence the actual killer received.  *Getsy v. Mitchell*, 456 F.3d 575 (6th Cir. 2006).  It concluded the petitioner's death sentence, "while the arguably more culpable [murder for hire defendant] received a life sentence for the *very same* crime, violates the Eighth Amendment, as construed by the Supreme Court in *Furman [v. Georgia*, 408 U.S. 238 (1972)] and *Enmund [v. Florida*, 458 U.S. 782 (1982)], and its prohibition of arbitrary and disproportionate death sentences."  *Id.* at 587 (emphasis in the original).  Because it does not appear that Sneed raised a proportionality claim based on the disparity between his conviction and sentence and Brown's conviction and sentence, the Court need not address Sneed's proportionality claim pursuant to the *Getsy* holding.

Were it to do so, however, the Court could easily distinguish Sneed's circumstances from those in *Getsy*.  Unlike the co-defendant in *Getsy* who actually planned the murder, Brown became involved in Rowan's murder only *after* Sneed shot him in the head.  Additionally, she testified, and the jury found, that she shot Rowan under threat of Sneed shooting her.  Thus, the Court finds that the *Getsy* decision is not helpful to Sneed.

121

produce a chilling effect on a defendant's Fifth Amendment right not to plead guilty and Sixth Amendment right to demand a jury trial. In that case, the Court struck down the capital portions of a federal kidnapping statute because it authorized only the jury to impose the death sentence. Conversely, in Ohio "a sentence of death is possible whether a defendant pleads to the offense or is found guilty after a trial." *State v. Buell*, 489 N.E.2d 795, 808 (Ohio 1986). Consequently, the Ohio scheme comports with constitutional mandates.

- *Ohio's scheme is unconstitutional because it requires that the pre-sentence report be submitted to the jury once the defendant requests it.* Although the Fifth Amendment would be violated if a court *orders* a defendant to undergo a psychiatric examination, without informing the defendant that his statements can be used against him, and then admits his statements into evidence during the sentencing phase in order to prove statutory aggravating circumstances, *see Estelle v. Smith*, 451 U.S. 454 (1981), the Fifth Amendment will not be violated if the defendant requests the psychiatric evaluation himself. This reasoning is explained in *Buchanan v. Kentucky*, 483 U.S. 402 (1987):

  > A criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding. This statement leads logically to another proposition: if a defendant requests such an evaluation or presents psychiatric evidence of such an evaluation, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested. The defendant would have no Fifth Amendment privilege against the introduction of this psychiatric testimony by the prosecution.

  *Id.* (citations omitted).

- *Ohio's scheme is unconstitutional because it fails to provide the sentencing authority with an option to impose a life sentence when it finds that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt.* The Supreme Court rejected the identical argument in *Blystone v. Pennsylvania*, 494 U.S. 299 (1990).

### K. The cumulative effect of the errors and admissions presented in this habeas petition constitute constitutional violations which merit relief.

Sneed asserts that he is entitled to habeas relief based on cumulative errors that occurred during his state court proceedings. The Court finds that it is foreclosed from reviewing these claims pursuant to the strictures of the AEDPA. As the Sixth Circuit has held, "[t]he Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief."

122

*Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002), *amended on other grounds*, 307 F.3d 459 (6th Cir. 2002), *and cert. denied at*, 538 U.S. 947 (2003).[50]  *See also Gillard v. Mitchell*, 445 F.3d 883, 898 (6th Cir. 2006)(following *Lorraine* and holding while errors might accumulate to produce unfair trial setting, Supreme Court has never held distinct claims can accumulate to grant habeas relief); *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005)(same).  Accordingly, Sneed is not entitled to relief for this claim.

> **L. Sufficiency and weight of the evidence at mitigation; due process violations.**

Sneed argues that there was insufficient evidence to support a death sentence.  He lists several facts regarding his childhood which the jury never heard as evidence that, he says, would support a reduction in his sentence.  Although the Respondent asserts that this claim is not procedurally defaulted, it does not appear that the Ohio Supreme Court addressed it in its opinion on direct appeal.  Thus, the Court must address the merits of the claim without deferring to the Ohio Supreme Court's reasoning.

In *Jackson v. Virginia*, 443 U.S. 307 (1979), the United States Supreme Court explained the standard of review a habeas court must employ when reviewing an insufficiency of the evidence claim.  It concluded the habeas court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id.* at 319; *Biros v. Bagley*, 422 F.3d 379, 392 (6th Cir. 2005).  In applying *Jackson*, this Court must limit itself to

---

[50]     The Court acknowledges that, in a subsequent case, the Sixth Circuit granted habeas relief on cumulative error grounds.  *DePew v. Anderson*, 311 F.3d 742, 751 (6th Cir. 2003).  Because the *DePew* petitioner had filed his petition prior to the AEDPA's effective date, however, the AEDPA provisions did not apply.  *Id.* at 748.

evidence adduced during trial because a "sufficiency of the evidence review authorized by *Jackson* is limited to 'record evidence.' *Jackson* does not extend to non-record evidence, including newly discovered evidence." *Herrera v. Collins*, 506 U.S. 390, 402 (1993)(citing *Jackson*, 443 U.S. at 318). The *Jackson* standard does apply, however, "whether the evidence of guilt was direct or circumstantial." *Scott v. Elo*, 302 F.3d 598, 602 (6th Cir. 2002)(citing *Spalla v. Foltz*, 788 F.2d 400, 402 (6th Cir. 1986)).

As explained in the *Herrera* decision, an insufficiency of the evidence claim must be reviewed based solely on the evidence presented during trial. In this case, jurors heard about Sneed's background and upbringing but found the aggravating fact that Sneed murdered Rowan in the course of an aggravated robbery outweighed any mitigating factors. A rational factfinder surely could find that the aggravated robbery and murder of an unarmed stranger who was offering Sneed and Brown a ride to their residence outweighed the mitigating factors presented during trial. The Court finds that this claim is not well-taken.

### M. Petitioner Sneed's execution will violate the Eighth and Fourteenth Amendments because he will be unable to rationally understand the connection between his acts and the punishment to be inflicted.

Sneed's final claim is that he will be insane at the time of execution rendering him ineligible to receive such a sentence. He acknowledges that this claim may not yet be ripe for review as his execution is not imminent. He raises this claim at this juncture, he maintains, to be certain that it may be preserved for assertion at the appropriate time. The Respondent takes no position on Sneed's attempt at preservation or whether this claim may be properly raised when Sneed's execution is at hand.

In *Ford v. Wainwright*, 477 U.S. 399 (1986), the United States Supreme Court held that

124

the execution of an insane individual would violate the Eighth Amendment of the Constitution.

An "insane" inmate is one who is unaware of the impending execution and the reason for it.

Because an inmate's competency to be executed may only be assessed near the time of

execution, the Court finds that Sneed's claim is not yet ripe for habeas review.  If Sneed were to

later return to federal court once the *Ford* claim is ripe, however, he could run the risk of the

Court later construing it as a successive petition pursuant to 28 U.S.C. § 2244(b).  Thus, Sneed

maintains, he must assert his *Ford* claim in the instant Petition.

Sneed's argument has some merit.  The Supreme Court decided the issue of whether a

petitioner who raises a *Ford* claim in his initial petition before it is ripe is subject to § 2244(b)'s

limitations on successive petitions in *Stewart v. Martinez-Villareal*, 523 U.S. 637 (1998).  In that

case, the petitioner asserted a *Ford* claim in his initial petition but the district court dismissed it

without prejudice as not ripe for review.  After the state obtained a warrant for execution and

determined that the petitioner was fit to be executed, the petitioner sought federal habeas review

for his claim.

The *Stewart* Court held that the petitioner's re-assertion of his now-ripe *Ford* claim was

not a successive petition.  Comparing the district court's decision to dismiss the *Ford* claim to a

habeas court's dismissal of a claim to exhaust state court remedies, the Court held that, because

the district court had not adjudicated the merits of the claim, it was not a successive petition.  In

a footnote, however, the Court expressly reserved ruling on whether a petitioner who failed to

raise a *Ford* claim in an initial petition would be filing a second or successive petition pursuant

to the AEDPA.  *Id.* at 645 n.1.  Thus, because the Supreme Court has not yet guaranteed the

protection of *Ford* claims not raised in an initial habeas petition, a petitioner who wishes to

125

secure adjudication of such a claim when it becomes ripe is wise to preserve his or her

*Ford* claim by raising it in the initial petition.

This claim is not ripe for review.  The State has not obtained an execution date and

Sneed's competency to be executed necessarily must be evaluated at a time close to that event.

Once those two events have occurred, Sneed necessarily must seek review of his *Ford* claim in

state court prior to obtaining federal habeas review.  After exhausting his claim in state court,

Sneed may then seek to pursue federal habeas review of this claim.  Accordingly, this Court,

pursuant to the *Stewart* holding, dismisses Sneed's *Ford* claim without prejudice and without

adjudication on the merits.[51]

## VIII. Certificate of Appealability Analysis

The Court now must determine whether to grant a Certificate of Appealability ("COA")

for any of Sneed's claims.  The Sixth Circuit Court of Appeals has determined neither a blanket

grant nor a blanket denial of a COA is an appropriate means by which to conclude a capital

habeas case as it "undermine[s] the gate keeping function of certificates of appealability, which

ideally should separate the constitutional claims that merit the close attention of counsel and this

court from those claims that have little or no viability."  *Porterfield v. Bell*, 258 F.3d 484, 487

(6th Cir. 2001); *see also Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001)(remanding motion for

---

[51]     When eventually deciding this claim, the Court will undoubtedly need to review a
case for which the United States Supreme Court recently granted certiorari.  On
January 5, 2007, the Court granted certiorari to hear *Panetti v. Quarterman*, No.
06-6407, 2007 WL 30552 (Jan. 5, 2007)(granting motion to proceed in forma
pauperis and petition for a writ of certiorari).  In that case, a mentally ill prisoner
understood that he committed a crime that was the basis for his execution.  He
harbored beliefs, however, that the actual basis for his execution was to stifle his
religious practices.  Thus, the Court took certiorari on the issue of whether a
mentally ill prisoner can be executed when he or she is delusional regarding the
reason for the execution.

certificate of appealability for district court's analysis of claims).  Thus, in concluding this

Opinion, this Court now must consider whether to grant a COA as to any of the claims Sneed

presented in his Petition pursuant to 28 U.S.C. § 2253.

> That statute states in relevant part:
>
> (c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from –
> > (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court . . .
>
> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

28 U.S.C. § 2253.  This language is identical to the requirements set forth in the pre-AEDPA

statutes, requiring the habeas petitioner to obtain a Certificate of Probable Cause.  The sole

difference between the pre- and post-AEDPA statutes is that the petitioner must now

demonstrate he was denied a *constitutional* right, rather than the federal right that was required

prior to the AEDPA's enactment.

The United States Supreme Court interpreted the significance of the revision between the

pre- and post-AEDPA versions of that statute in *Slack v. McDaniel*, 529 U.S. 473 (2000).  In that

case, the Court held that § 2253 was a codification of the standard it set forth in *Barefoot v.*

*Estelle*, 463 U.S. 880 (1983), but for the substitution of the word "constitutional" for "federal" in

the statute.  *Id.* at 483.  Thus, the Court determined

> "[t]o obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that, under *Barefoot*, includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "'adequate to deserve encouragement to proceed further.'"

*Id*. at 483–04 (quoting *Barefoot*, 463 U.S. at 893 n.4).

127

The Court went on to distinguish the analysis a habeas court must perform depending upon its finding concerning the defaulted status of the claim.  If the claim is not procedurally defaulted, then a habeas court need only determine whether reasonable jurists would find the district court's decision "debatable or wrong."  *Id.* at 484.  A more complicated analysis is required, however, when assessing whether to grant a COA for a claim the district court has determined is procedurally defaulted.  In those instances, the Court opined, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Id.*  (emphasis supplied).

After taking the above standard into consideration, the Court finds as follows regarding Section VII of this Opinion.

The Court will not issue a COA for the following claims: A(5); D; E(1)(a) and (d-h), (2)(a-c) and (e-g); F(1)(a-b) and (d); G; and H(8-9) because they are unequivocally procedurally defaulted.  No reasonable jurist would debate this finding.  Moreover, the Court will not address whether to grant a COA as to the following claims: A(1), (2), (6) and (8); E(1)(i) and (k), (2)(d); F(1)(e-g), (2)(b-c); and H(1-7), because they are either duplicative of other claims raised and addressed by the Court or are too vague to warrant habeas relief.

The Court finds that no COA should issue for the claims discussed in A(3-4) and (7) (*Brady* claim) of this Opinion.  No reasonable jurist could argue that Sneed's claims either do not involve exculpatory evidence or, as with the snow on the victim's car, do not involve facts that are in the exclusive control of the prosecution.

Similarly, reasonable jurists would agree that the Court's decision set forth in B (use of

hypnotically induced testimony) was correct.  As the Ohio Supreme Court stated, Jasionowski's testimony was insignificant in the wake of the multitude of evidence demonstrating Sneed's guilt.  Thus, no COA will issue for this claim.

The Court will not issue a COA for the claims set forth in C (prosecutorial misconduct). Any comments that the prosecutor made that were arguably improper were either isolated or cured by the trial court's instructions to the jury.  No jurist of reason would debate the Court's finding on this issue.

It is also unequivocal that the Court's decision to deny a COA for (E)(1)(b-c) (jury verdict form claim and accomplice credibility instruction claim) would not be debated among jurists of reason.  First, the Ohio Supreme Court set forth ample reasoning why the jury found that Sneed was the principal offender to Rowan's murder.  Moreover, the trial court's jury instruction regarding witness credibility was adequate.  The Court also will not grant a COA for E(1)(j) (firearm instruction), because contrary to Sneed's assertions, there was a firearm specification in the indictment.  No jurist of reason would debate this finding.

Conversely, the Court grants a COA for the claim set forth in F(1)(c) (ineffective assistance for failure to assert an insanity defense).  Although the Court held that counsel were reasonable in asserting that Sneed was not Rowan's actual shooter based on the equivocal testimony of the psychologists, it is undisputed that Sneed suffers from a severe mental illness. Thus, a reasonable jurist could conclude that trial counsel's best defense was to utilize the testimony of the psychologists in proving that Sneed met the legal test for insanity.

The Court also issues a COA for the claim set forth in F(2)(a)(i-ii) (counsel's failure to procure experts to find evidence of Sneed's childhood sexual abuse and organic brain

impairment).  While trial counsel presented a wealth of testimony during the mitigation phase of trial regarding Sneed's background and mental health impairments, a reasonable jurist could conclude that counsel should have procured an independent expert or mitigation investigator to investigate this background information.

Conversely, no COA will issue for the claim set forth in F(1)(h), (2)(a)(iii) and (2)(b-d). (ineffective assistance for failure to object to jury instructions, for failure to procure additional experts, and for failure to object to prosecutor's statements).  As the Court held above, Sneed cannot prevail on his ineffective assistance jury instruction and prosecutorial misconduct claims because he cannot demonstrate that counsel's inaction inured to his prejudice.  Similarly, Sneed cannot demonstrate that counsel were ineffective for failure to hire an expert who would explain his mental illness to the jury when one of  the psychologists who testified during the mitigation hearing specifically did so testify.  No jurist of reason would find this Court's reasoning to be debatable.

The Court will not issue a COA as to the claim set forth in I (ineffective assistance of appellate counsel).  Sneed makes no effort to support his assertion that the claims appellate counsel actually raised were weaker than those he wished counsel had raised.  No jurist of reason would debate this finding.

The Court will not issue a COA for the claims set forth in J, K, and L (unconstitutionality of the death penalty, cumulative error, and insufficient evidence, respectively).  These claims occur almost *pro forma* in capital habeas petitions but are routinely denied.  Reasonable jurists would agree with this finding.

Finally, the Court issues a COA for the claim set forth in M (*Ford* claim).  Although the

130

case law appears to dictate that the Court should dismiss Sneed's claim without prejudice and without adjudication on the merits so that Sneed can preserve it for eventual federal habeas review, neither the United States Supreme Court nor the Sixth Circuit Court of Appeals have explicitly held that habeas petitioners must raise their *Ford* claims in this fashion in order to preserve them.  These courts, and thus reasonable jurists, could debate whether the Court's decision to dismiss this claim was the proper means by which to address this claim.

**IX. <u>Conclusion</u>**

> For the foregoing reasons, the Petition is denied in part and dismissed without prejudice in part.  The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision could be taken in good faith as to the following claims set forth in Section VII of this Opinion: F(1)(c), (2)(a)(i-ii); and M.  The Court hereby issues a certificate of appealability pursuant to 28 U.S.C. § 2253(c) and Fed.R.App.P. 22(b) as to those grounds only.  As to all remaining grounds, the Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision could not be taken in good faith, and that there is no basis upon which to issue a certificate of appealability.  28 U.S.C. § 2253(c); Fed.R.App.P. 22(b).

> IT IS SO ORDERED.


>  /s/ Patricia A. Gaughan
> PATRICIA A. GAUGHAN
> United States District Judge

Dated: 3/2/07

131